## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KSERVICING WIND DOWN CORP., *et al.*,[1] | Case No. 22-10951 (CTG) |
| Post-Confirmation Debtors. | (Jointly Administered) |
| KSERVICING WIND DOWN CORP. (f/k/a Kabbage, Inc.), | |
| Plaintiff, | Adversary Proceeding No. 25-_____ |
| v. | |
| ROBERT FROHWEIN, KATHRYN PETRALIA, LESLIE SCOTT ASKINS, SPENCER ROBINSON, SAM TAUSSIG, DON BUTLER, JONATHAN EBINGER, ALEX CHULACK, LAURIE HODRICK, BRYAN STOLLE, IOANNIS PIPILIS, THOMVEST VENTURES LTD., BLUERUN VENTURES IV, LP, BRV OPPORTUNITIES FUND, L.P., REVERENCE CAPITAL PARTNERS OPPORTUNITIES FUND I, L.P., REVERENCE CAPITAL PARTNERS OPPORTUNITIES FUND I (CAYMAN), L.P., RCP KICKER CO-INVEST, L.P., REVERENCE CAPITAL PARTNERS OPPORTUNITIES FUND I (AI), L.P., MDV IX, L.P., SOFTBANK VISION FUND (AIV M2) L.P., SOFTBANK PRINCEVILLE INVESTMENTS, L.P., CURIEUX LIMITED CO., BENNU HOLDINGS LIMITED CO., RAYMOND JAMES & ASSOCIATES, INC. CSDN FBO ROBERT FROHWEIN RIRA U/A/D 5/27/16 A/C 2867A298, and THE FROHWEIN FAMILY 2015 TRUST, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## ORIGINAL COMPLAINT

---

[1] The post-confirmation Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: KServicing Wind Down Corp. (f/k/a Kabbage, Inc. d/b/a KServicing) (3937); KServicing Wind Down Canada Holdings LLC (f/k/a Kabbage Canada Holdings, LLC) (N/A); KServicing Wind Down Asset Securitization LLC (f/k/a Kabbage Asset Securitization LLC) (N/A); KServicing Wind Down Asset Funding 2017-A LLC (f/k/a Kabbage Asset Funding 2017-A LLC) (4803); KServicing Wind Down Asset Funding 2019-A LLC (f/k/a Kabbage Asset Funding 2019-A LLC) (8973); and KServicing Wind Down Diameter LLC (f/k/a Kabbage Diameter, LLC) (N/A).  The Debtors' mailing and service address is KServicing Wind Down Corp. c/o Resolute Commercial Services, 6750 E. Camelback Road, Suite 103, Scottsdale, AZ 85251.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

PARTIES AND RELEVANT NON-PARTIES .................................................................... 14

A.      Plaintiff ...................................................................................................................... 14

B.      Defendants ................................................................................................................. 14

JURISDICTION AND VENUE ............................................................................................ 18

FACTUAL BACKGROUND ................................................................................................ 19

A.      Kabbage Nearly Collapses from the COVID-19 Pandemic. ............................... 19

      1.      Kabbage builds its business by making risky small business loans with
          automated underwriting. ...................................................................... 19

      2.      Kabbage almost goes bankrupt at the outset of the pandemic. ........................... 20

      3.      Defendants recognize that the PPP could be a lifeline for Kabbage..................... 21

B.      Defendants Are Aware of the Major Gaps in Kabbage's Fraud Controls Before
      Kabbage Becomes a PPP Lender. ........................................................................... 23

      1.      The SBA requires Kabbage to have a BSA/AML compliance
          program and perform good-faith reviews of loan calculations. ........................... 23

      2.      Kabbage BSA/AML Policies impose specific oversight duties on the Board
          and Askins..................................................................................................... 24

      3.      Defendants know that prior audits of Kabbage's BSA/AML compliance
          measures found major weaknesses that were left unresolved.............................. 26

      4.      Defendants force out Kabbage's Head of Fraud at the outset of the PPP for
          complaining about the lack of fraud controls. ..................................................... 27

      5.      Defendants ignore concerns raised by Kabbage's BSA/AML Officer, who
          then leaves Kabbage soon after the start of the PPP............................................ 28

C.      Kabbage's PPP Lending Practices Create Massive Legal and Financial Liabilities
      for the Company. ...................................................................................................... 30

      1.      Kabbage becomes a PPP lender in April 2020. .................................................. 30

      2.      The Officers know that Kabbage's nearly non-existent compliance team
          cannot appropriately handle the massive influx of PPP applications. .................. 31

3.      The Officers know or deliberately ignore that Kabbage was approving inflated PPP Loans. ................................................................................................ 33

4.      The Officers know or deliberately ignore that Kabbage was still struggling to implement reliable compliance procedures weeks after the PPP started. ........................................................................................................... 38

5.      Kabbage employees recognize that the Officers are ignoring the prevalence of fraudulent PPP applications. ............................................. 42

6.      Wells Fargo terminates its relationship with Kabbage in part due to concerns over Kabbage's compliance issues. ...................................... 49

7.      A Kabbage legal analyst—who later becomes a whistleblower under the False Claims Act—reports major gaps in Kabbage's fraud controls to his superiors, but they ignore his report. ................................................. 50

8.      Although the Board has multiple formal and informal meetings between April and October 2020, the Directors do not inquire about Kabbage's compliance with PPP laws. .................................................................... 61

D.      Motivated to Cash Out for the Highest Amount Possible, Defendants Decide to Leave Kabbage Hopelessly Insolvent. ................................................................ 63

1.      Defendants know that Amex does not want the PPP loan portfolio and the liabilities associated with it. .......................................................... 63

2.      Defendants know that while they are turning a blind eye to Kabbage's illegal conduct, Amex harbors reservations about Kabbage's PPP loans. ....................... 65

3.      The Officers agree to get the solvency opinion requested by Amex as a condition for the deal, but they ensure that the opinion is unreliable. ................. 69

4.      The Board approves the Amex Merger on August 13, 2020. .............................. 75

E.      Between August and October 2020, the Directors and Officers Receive More Evidence that Kabbage Will Be Hit with Lawsuits. ............................................... 77

F.      Kabbage Makes a More Than $730 Million Fraudulent Transfer to Amex Kabbage. ...... 81

G.      Kabbage Is Hit with a Series of Legal and Regulatory Actions. ..................................... 82

CAUSES OF ACTION .................................................................................................... 86

COUNT I ........................................................................................................................ 86
        Breach of the Fiduciary Duty of Care
        (Against Frohwein, Petralia, Askins, Robinson, and Taussig)

COUNT II ............................................................................................................................ 90

    Breach of the Fiduciary Duties of Loyalty and Good Faith
    (Against Frohwein, Petralia, Askins, Robinson, and Taussig)

COUNT III ........................................................................................................................... 93

    Breach of Fiduciary Duties of Loyalty and Good Faith
    (Against Butler, Ebinger, Chulack, Hodrick, Stolle, and Pipilis)

COUNT IV ........................................................................................................................... 96

    Recovery of the Fraudulent Transfer under 11 U.S.C. § 550(a)
    (Against the Fraudulent Transfer Beneficiaries)

COUNT V ........................................................................................................................... 100

    Disallowance of Claims Under 11 U.S.C. § 502(e)
    (Against the Directors and Officers)

COUNT VI........................................................................................................................... 101

    Disallowance of Claims Under 11 U.S.C. § 502(d)
    (Against all Defendants)

COUNT VII ......................................................................................................................... 103

    Equitable Subordination Under § 510(c)
    (Against all Defendants)

JURY DEMAND ................................................................................................................. 103

PRAYER FOR RELIEF ..................................................................................................... 104

KServicing Wind Down Corp. (f/k/a Kabbage, Inc.) ("Kabbage") hereby files this Original Complaint against (1) Kabbage's former officers, Robert Frohwein, Kathryn Petralia, Leslie Scott Askins, Spencer Robinson, and Sam Taussig (collectively, the "Officers"); (2) Kabbage's former directors, Don Butler, Jonathan Ebinger, Alex Chulack, Laurie Hodrick, Bryan Stolle, and Ioannis Pipilis (together with Frohwein in his capacity as a Kabbage director, the "Directors"), and (3) other former Kabbage shareholders, Thomvest Ventures Ltd., BlueRun Ventures IV, LP, BRV Opportunities Fund, L.P., Reverence Capital Partners Opportunities Fund I, L.P., Reverence Capital Partners Opportunities Fund I (Cayman), L.P., RCP Kicker Co-Invest, L.P., Reverence Capital Partners Opportunities Fund I (AI), L.P., MDV IX, L.P., Softbank Vision Fund (AIV M2) L.P., SoftBank PrinceVille Investments, L.P., Curieux Limited Co., Bennu Holdings Limited Co., Raymond James & Associates, Inc. CSDN FBO Robert Frohwein RIRA U/A/D 5/27/16 A/C 2867A298, and The Frohwein Family 2015 Trust (together with Frohwein, Petralia, Askins, Robinson, Taussig, and Hodrick, the "Fraudulent Transfer Beneficiaries"), and alleges as follows:

## INTRODUCTION

1.       Kabbage was a non-bank financial services company that quickly became one of the nation's largest providers of loans in connection with the Paycheck Protection Program ("PPP")—the loan program backed by the Small Business Administration ("SBA") that distributed taxpayer money to help small businesses keep their workforce employed during the COVID-19 crisis. Kabbage, however, exploited the PPP (to the detriment of the SBA and U.S. taxpayers) to receive tens of millions of dollars in lucrative loan processing fees by knowingly or recklessly approving tens of thousands of fraudulent or otherwise ineligible loan applications.[2] Kabbage's

---

[2] To be clear, during the first round of the PPP (as described further below), Kabbage received a total of more than $217 million in fees in connection with its role as a PPP lender.

conduct was so egregious that after just a few months of operating as a PPP lender, the company faced the real prospect of hundreds of millions of dollars in legal and other liabilities to the SBA, United States Department of Justice ("DOJ"), the Federal Reserve System, and the company's lending partners.

2.      These massive liabilities could and would have been avoided had Kabbage's former Directors and Officers fulfilled their fiduciary duties to operate and oversee Kabbage's business in good faith and with the requisite care.  As Defendants knew, in order to participate in the PPP, the SBA required non-bank lenders like Kabbage to certify that they had Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance controls "equivalent to that of a comparable federally regulated institution" before being approved as a PPP lender and originating loans.[3]  That is, Kabbage was required to have, among other things, a reasonable system, including adequate staffing, to verify a potential borrower's identity and to detect, prevent, and report fraud and other suspicious activity.  The SBA also required lenders such as Kabbage "to perform a good-faith review . . . of the borrower's calculations and supporting documents concerning average monthly payroll costs," which determined the amount of a PPP loan the borrower could receive.[4] Kabbage certified to the SBA that it had complied with all PPP requirements.

3.      But these certifications were false.  Rather than ensuring that Kabbage complied with the program's BSA, AML, and other requirements, Kabbage's Directors and Officers had a different agenda.  Because the SBA paid lenders a fee based on a percentage of the loan amount disbursed, the Directors and Officers focused on having Kabbage approve as many loans as possible, regardless of their potential fraudulent nature or ineligibility.

---

[3] 85 Fed. Reg. 20811, 20815.

[4] SBA PPP FAQ #1 (Apr. 3, 2020).

4.     Unlike traditional banks that chose to focus on making PPP loans to existing customers who had already undergone BSA/AML compliance screening, including "Know Your Customer" ("KYC") and "Know Your Business" ("KYB") processes, along with other required customer due diligence for the purpose of verifying customer identities, Kabbage made more than 90% of its PPP loans to new customers.  Kabbage made these loans to new customers on a largely automated and expedited basis, with a tiny and ill-trained BSA/AML compliance team, and without reasonable systems and controls to verify customer identities, much less to detect, prevent, and report fraud.  The Directors and Officers knew or should have known that Kabbage's approach to PPP lending—which was to maximize fees at the expense of reasonable screening for fraudulent or suspicious applications—would subject Kabbage to liability, including under the False Claims Act.[5]  In addition, the Directors and Officers knew that the SBA's forgiveness of PPP loans or guarantee of defaulted PPP loans depended on Kabbage adhering to the program's requirements.  Thus, if Kabbage failed to comply with the PPP lending requirements, the SBA could seek repayment of the lender processing fee and determine that the loan was not eligible for a guaranty.  This would in turn lead to additional contractual liability for Kabbage, which was obligated to repurchase, or "put back," loans funded by its partners and the Federal Reserve Bank of San Francisco (the "Reserve Bank").

5.     The Directors and Officers, however, had no concern for the long-term consequences of their actions.  Instead, they were focused on short-term profits that would assist

---

[5] The False Claims Act ("FCA") is an anti-fraud statute that allows private citizens to bring actions on behalf of the government.  The FCA provides that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990," plus three times the amount of damages which the government sustains because of the act of that person.

in their efforts to sell Kabbage to American Express Travel Related Services Company, Inc. ("Amex").  The Directors and Officers knew that once they closed this transaction with Amex (hereinafter, the "Amex Merger," as described in detail below), they and Kabbage's other majority shareholders—entities to whom most Directors also owed fiduciary duties or in which they otherwise held financial interests—would collectively receive more than half a billion dollars.

6.      While the anticipated cash payout from the Amex Merger was a significant incentive for the Directors and Officers to shirk their management and oversight duties, they also knew that Amex had no intention of acquiring Kabbage's PPP portfolio and the significant liabilities associated with it.  The parties thus agreed to separate Kabbage's PPP and legacy loan portfolios from the sale of the rest of the business to Amex.  Management proposed to accomplish this by transferring Kabbage's non-PPP assets to a new "Kabbage" entity, Alpha Kabbage, Inc. ("Amex Kabbage"), which Amex would then acquire.[6]  The plan to distribute Kabbage's assets to Amex Kabbage (hereinafter, the "Fraudulent Transfer") and "orphan" the PPP liabilities with Kabbage, as Kabbage's outside counsel aptly described it, gave Defendants another reason to turn a blind eye to Kabbage's illegal conduct.

7.      Because the Officers planned to join Amex Kabbage upon its acquisition by Amex—collectively receiving $30,365,000 in retention bonuses for doing so—and because the Directors planned to resign from Kabbage's Board of Directors (the "Board") once the Amex Merger closed, neither set of Kabbage's fiduciaries was concerned about the fallout from Kabbage's lax compliance program and flagrant violations of the law.  Simply put, the Directors' and Officers' strategy for Kabbage to avoid massive liabilities to the federal government was based

---

[6] Alpha Kabbage, Inc. was renamed "American Express Kabbage, Inc." following the Amex Merger.

solely on their hope that the government would likewise turn a blind eye to Kabbage's misconduct—or at least not discover the misconduct until after the Directors and Officers had effectively cashed themselves out.

8.      Even more egregiously, the Directors and Officers schemed to leave Kabbage woefully unable to pay the liabilities it had just incurred.  Before the Amex Merger could close, Kabbage—as the entity that Amex was ***not*** purchasing—had to set aside a certain amount of cash to cover its future servicing obligations and contingent liabilities.  The Directors and Officers, however, decided to reserve ***only $1 million*** for Kabbage to pay its legal liabilities, which Kabbage's general counsel, L. Scott Askins, testified did not include any consideration for liability stemming from the PPP. And the Directors and Officers reserved less than $1 million for "put-back liability" to account for PPP loans that Kabbage would be contractually obligated to buy back.  They decided to reserve this clearly insufficient sum in order to funnel most of Kabbage's remaining cash earned from the PPP ($120 million) to Amex Kabbage as part of the Amex Merger. The more cash Amex Kabbage (and thus Amex) received in the merger, the more cash Amex paid Kabbage's shareholders, including Defendants.   In fact, Defendants, as former Kabbage shareholders, received more than half a billion dollars in consideration from the Amex Merger.

9.      Kabbage's Officers knew that Kabbage's lending practices had created significant legal liabilities, but they consciously ignored these liabilities in deciding how much cash to extract from Kabbage in connection with the Amex Merger.  Defendant Robert Frohwein, Kabbage's CEO, joked with Officers prior to the company's participation in the PPP that Kabbage was only good at spotting fraud "in the rear-view mirror."  Nonetheless, once Kabbage started making PPP loans, Frohwein led the effort by management to pressure Kabbage's employees to "focus[] on

driving more completed" PPP loans, regardless of the suspicious nature of the hundreds of thousands of loan applications Kabbage was receiving.

10.     Defendant Kathryn Petralia, Kabbage's President, knew that Kabbage lacked the requisite staff to conduct appropriate fraud reviews but did not address the issue.  Instead, when a Kabbage analyst alerted Petralia to the amount of fraudulent and ineligible applications Kabbage's system was letting through, she just responded with the sarcastic comment: "fascinating."

11.     Defendant L. Scott Askins, Kabbage's General Counsel, who was supposed to oversee Kabbage's BSA/AML program, also cared little about the massive amount of fraudulent and suspicious loans Kabbage was approving.  When Kabbage's BSA/AML Officer resigned in the middle of the first round of the PPP, Askins declined to even look for a permanent replacement because of the impending (but still not public) Amex Merger.  As Chief Compliance Officer, the duties of the BSA/AML Officer fell to Askins, but she instead focused the bulk of her time on diligence matters related to the Amex Merger.  Compliance was such a secondary concern to Askins and her team that as of late July 2020—only weeks before the PPP was set to end—neither Askins nor anyone on her team knew what changes had been made to the BSA/AML policy to comply with PPP requirements.  Askins later privately acknowledged that unlike other PPP lenders (*i.e.*, traditional banks), Kabbage appeared to have approved a lot of fraudulent or otherwise ineligible loans.

12.     Defendant Spencer Robinson, Kabbage's Head of Strategy (which oversaw Kabbage's purported risk and fraud departments), privately admitted that Amex's pre-merger questions about Kabbage's fraud controls were "bad" in the sense that he did not "disagree with" Amex's apparent concerns.  In fact, Robinson and those who reported directly to him received numerous complaints from Kabbage employees that "***the level of fraud we're reviewing is wildly***

*underestimated*."[7]  Not only was Robinson aware of Kabbage's lack of sufficient fraud controls, various Kabbage employees also alerted him to other issues with Kabbage's PPP lending platform, including how Kabbage permitted thousands of borrowers to receive inflated loans.  Yet, like the other Officers, Robinson deliberately ignored these concerns.

13.     Defendant Sam Taussig, Kabbage's Head of Policy (who was instrumental in getting Kabbage approved as a PPP lender), became aware of massive issues with the company's fraud controls related to the PPP.  He likewise learned that the DOJ had created a taskforce that intended to pursue grossly negligent lenders (like Kabbage).  Yet Taussig did nothing to either address the issues with the company's fraud controls or shift the company's focus from the Amex transaction.

14.     Not only did the Officers have specific knowledge of myriad issues with Kabbage's purported compliance measures, they also openly discussed that Amex did not want the PPP portfolio because Amex was concerned about "*liability flowing from fraudulent applicants, anything that would give the government, applicants, and others suing them*."  Amex was right to be concerned.

15.     Shortly after the Amex Merger closed in mid-October 2020, Kabbage was hit with investigations by the DOJ and SBA into its PPP lending practices.  With new management and a new board of directors, Kabbage spent several years working to settle the government's claims.  Kabbage reached a partial settlement with the SBA for *$30 million* in 2021.  Yet, given the full extent of the DOJ's and SBA's claims—and Kabbage's actual liability on those claims—Kabbage ultimately had no choice but to file for bankruptcy in October 2022.

---

[7] Unless otherwise stated herein, emphasis has been added to quotes from documents.

16.     Following its bankruptcy, Kabbage settled the DOJ's claims under the False Claims Act and the SBA's claims arising out of forgiveness and guaranty payments that the SBA had made on inflated or fraudulent loans issued by Kabbage.  As part of those settlements, Kabbage agreed to allowed claims for the DOJ totaling *$120 million* and an allowed claim for the SBA totaling *$92 million*.

17.     The DOJ, however, is continuing its pursuit of claims against some of Kabbage's former officers.  Frohwein, Petralia, and Robinson were deposed by the DOJ in connection with its investigation, and each of them pleaded their Fifth Amendment rights in response to the DOJ's questions.  A reasonable inference to draw from their refusal to answer questions is that they knew—or were at the very least deliberate or reckless in their ignorance—that Kabbage was submitting fraudulent and ineligible PPP loans to earn tens of millions of dollars in fees. Following the DOJ's investigation, on December 20, 2024, the DOJ intervened in two False Claims Act cases originally filed against Kabbage (in November 2020 and February 2021, as explained further below) by private individuals as *qui tam* (*i.e.*, "whistleblower") complaints.

18.     Kabbage's Directors (except for Frohwein) were generally unaware of the number of fraudulent PPP loans that Kabbage approved.  In addition, again except for Frohwein, they likewise did not know that Kabbage was failing to perform a good-faith review of borrower payroll calculations.  But their ignorance stems from their own conscious disregard of their fiduciary duties to Kabbage.  The Directors utterly failed to ensure that an effective information and reporting system existed that could and would have alerted them to Kabbage's substantial violations of the PPP regulations.

19.     Notably, before Kabbage became a PPP lender in April 2020, the Directors knew that prior testing of Kabbage's BSA/AML compliance program indicated that the program was

"*an important weakness that require[d] prioritization by the Company*."  The Directors, however, made little effort to ensure that Kabbage had remediated the compliance issues before Kabbage certified in April 2020 that it had an BSA/AML "compliance program equivalent to that of a comparable federally regulated institution."  The Directors did not inquire into the status of any remediation plan because they did not want to know the answer—Kabbage's BSA/AML program had systemic gaps and weaknesses, especially for the number of loans to new customers that Kabbage planned to approve as part of the PPP.

20.     As Chief Compliance Officer, Askins understood that Kabbage's "corrective action plans" were not complete in June 2020, months after Kabbage became a PPP lender, because the remediation would "require significant effort to operationalize and validate."  And both Askins and the Board knew that the company had no Board-approved BSA/AML Officer, nor a Board-approved BSA/AML policy that reflected changes needed for participation in the PPP.  Kabbage management did not submit a new BSA/AML policy for Board approval until approximately one week before the end of the PPP.  And even then, the Board asked no questions and expressed no concern regarding the timing or substance of the policy.  Instead, the Board was just rubber stamping the policy so that Kabbage could tell Amex that it had done so.

21.     Also in June 2020, Askins, Robinson, Taussig, and other officers received a risk assessment report (the "Risk Assessment Report") conducted by Alvarez & Marsal ("A&M") regarding Kabbage's PPP lending platform.  A&M identified numerous significant deficiencies with Kabbage's fraud controls and related compliance procedures.  But due to the complete lack of appropriate reporting systems and related controls, this Risk Assessment Report was not disclosed to the Board.

22.     Moreover, the only reason such a report even existed was because Kabbage's former BSA officer, who left the company in early June 2020, pressed Kabbage's executives to hire A&M.  But A&M's work was circumscribed by the limited fees that Kabbage agreed to expend on the risk assessment.  A&M considered a sample of only ten PPP loans out of tens of thousands at the time of its "assessment" in late May 2020.  Yet, even with this very limited review, A&M immediately identified problems with Kabbage's lending practices.  Moreover, because Kabbage provided A&M with inaccurate or incomplete documents concerning Kabbage's fraud review procedures (or lack thereof), the Officers knew or should have known that A&M's conclusions were unreliable.

23.     With Kabbage's former BSA/AML Officer gone, and her job ostensibly assumed, without Board approval, by Askins—who, by her own admissions was consumed by overwhelming amounts of work related to the Amex Merger—the Officers chose to ignore A&M's findings.  The Risk Assessment Report, however, was provided to Kabbage legal analyst Paul Pietschner, who was helping with reviews of PPP applications.  After reading the report, Pietschner surveyed several members of Kabbage's operations team to investigate concerns about Kabbage's compliance with BSA/AML requirements.  This investigation, not surprisingly, confirmed A&M's findings and identified many additional issues missed by A&M, including further serious gaps in Kabbage's fraud controls.

24.     As part of their own grass-roots investigation, Pietschner and other Kabbage employees documented dozens of examples of fraudulent or potentially fraudulent loans that Kabbage approved.  Pietschner created a report—which he called the "Kutworm Report"— outlining the findings from the investigation and proposing some measures to improve Kabbage's compliance with the relevant PPP regulations.  Among other things, the Kutworm Report noted

that Kabbage "**has faced challenges tracking fraudulent accounts and suspicious activity for a variety of reasons**."   The report also warned: "As it appears that we are already receiving subpoenas from the Department of Justice regarding fraudulent applications that were processed, approved, and funded, **it is not improbable for us to face more specific questioning**."

25.     Pietschner provided this report to Elizabeth Maiellaro, an internal counsel who Askins tasked with addressing the issues raised by the Risk Assessment Report.  He later provided the report to other Kabbage executives, including Sam Taussig.  But it took nearly two months for anyone to respond to the Kutworm Report.  Even then, the only response to the Kutworm Report—whether directed by Askins or done independently by those who reported to her—was to give Pietschner the impression that he (and potentially others involved with the Kutworm Report) would be fired for voicing their legitimate concerns.  In fact, rather than address the issues raised in the A&M Risk Assessment Report at all, Frohwein instructed his team to "punch [A&M] in the fucking face to update [the] report and pull it back" so it would not "kill our amex deal."

26.     Since Pietschner's concerns were dismissed by Kabbage management, he filed a whistleblower action alleging (correctly) that Kabbage violated the False Claims Act by falsely certifying to the SBA that Kabbage had adequate fraud controls.   Kabbage later resolved Pietschner's claims against the estate in a settlement agreement with the DOJ, which concluded that "Kabbage knowingly set substandard fraud check thresholds, reduced its fraud review staff, instructed staff to submit to the SBA highly suspicious PPP loans despite Kabbage staff having identified those loans as fraudulent or highly suspicious of fraud, and encouraged employees to approve more PPP loans applications to increase revenue."

27.     But that settlement was not the only one Kabbage reached with the DOJ.  Kabbage also settled a separate whistleblower action alleging (again, correctly) that Kabbage violated the

False Claims Act by knowingly or recklessly approving PPP loans for inflated amounts.  In that settlement agreement, Kabbage acknowledged and agreed that it had violated PPP regulations by erring in "calculating borrowers' eligible loan amounts."

28.     Had the Board implemented a reasonable information and reporting system, then it would have learned early during the PPP about Kabbage's myriad compliance failures, and it could have worked to remedy them before more fraudulent or ineligible loans were made.  At the very least, if the Board had not entirely abandoned its oversight duties, it would have had the information to know that it could not, in good faith, approve transferring $120 million in cash to Amex Kabbage as part of the Amex Merger that could have been used to satisfy Kabbage's liability to the DOJ and other creditors.

29.     But this is not just a case of a failure to implement reasonable reporting systems and controls.  Regardless of the Board's general ignorance of mission-critical issues like Kabbage's compliance with the PPP regulations (especially when Kabbage's sole business at the time was making PPP loans), the Directors must have known that a reserve of only $1 million for Kabbage's contingent legal liabilities was grossly inadequate.  That is, even if the Directors did not comprehend the full state of the massive legal liabilities Kabbage had incurred, they knew that the amount that Kabbage had reserved for contingent legal liabilities and related claims was grossly insufficient and would render Kabbage insolvent.

30.     Kabbage's insolvency was so obvious that its own counsel, Goodwin Procter LLP ("Goodwin"), openly joked about how Kabbage was not "handling the increased litigation risk" in connection with its decision to strip almost all the cash out of the company.  Goodwin also mused that Duff & Phelps, the company Kabbage retained to issue a solvency opinion in connection with the Amex Merger, was "***dumb for issuing the solvency opinion***" with so little reserved for

litigation risks.  Even Kabbage employees recognized that the Amex Merger would leave Kabbage, a/k/a KServicing, underfunded and holding the proverbial bag.  One internet meme shared among Kabbage employees cynically captured the brazen nature of the transaction:



31.      In sum, if Defendants had acted in good faith and with the requisite care, Kabbage would not have incurred hundreds of millions of dollars in liabilities to the federal government. Moreover, even after Kabbage had repeatedly violated the law, Defendants had an opportunity to act in good faith to preserve assets for Kabbage and its stakeholders, including its creditors. Specifically, Defendants could and should have preserved the remaining cash generated from Kabbage's participation in the PPP to cover Kabbage's legal expenses and liabilities arising from the PPP.  Instead, they chose to funnel this cash—$120 million—through the Amex Merger, increasing the immediate payout to shareholders, including Defendants, but leaving Kabbage hopelessly insolvent.

32.      Kabbage now brings this action against (i) the Directors and Officers to recover the hundreds of millions of dollars in damages Kabbage sustained as a result of their breaches of

fiduciary duty; and (ii) the Fraudulent Transfer Beneficiaries (including Kabbage's major shareholders) to recover the more than $500 million they received as persons or entities for whose benefit the Fraudulent Transfer was made.

## PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiff

33.   Plaintiff Kabbage is a Delaware corporation.  On October 3, 2022, Kabbage and its various subsidiaries filed the above-captioned bankruptcy case in this Court.  On March 15, 2023, the Court confirmed the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* [Dkt. No. 627] (the "Chapter 11 Plan").  Pursuant to the Chapter 11 Plan, Kabbage, as a post-confirmation debtor, retained certain claims and causes of action belonging to the company, including the claims asserted in this action.

### B.   Defendants

34.   Robert Frohwein was Kabbage's Chief Executive Officer, Co-Founder, and Chairman of the Board.  Frohwein personally received $19,096,038 from the Amex Merger (as described further below) and his affiliated entities[8] received another $10,847,965, for a total merger consideration of $29,944,003.[9]  In addition to those substantial payouts, Frohwein received a retention bonus of $13,320,000 for joining Amex Kabbage.  Following the Amex Merger, Frohwein remained as a senior Vice President at Amex Kabbage until approximately December 2021.

---

[8] As noted further below, Frohwein is an officer, director, trustee or partner of, or has a financial interest in (or a member of Mr. Frohwein's family may have a financial interest in) Curieux Limited Co., Bennu Holdings Limited Co., Raymond James & Associates, Inc. CSDN FBO Robert Frohwein RIRA U/A/D 5/27/16 A/C 2867A298 and The Frohwein Family 2015 Trust.

[9] All merger consideration amounts are rounded to the nearest dollar.

35.     Kathryn Petralia was Kabbage's President and Co-Founder.  Petralia personally received $12,010,415 from the Amex Merger, as well as a retention bonus of $13,320,000. Following the merger, Petralia remained as a senior Vice President at Amex Kabbage until approximately May 2022.

36.     Leslie Scott Askins was Kabbage's General Counsel and Chief Compliance Officer.  She also served as its interim BSA Officer from June 2020 until October 2020.  Kabbage's BSA/AML Policies (as discussed and defined further below) required Askins, as Kabbage's Chief Compliance Officer, to "promot[e] and implement[] a strong culture of BSA/AML compliance," "hold[] personnel accountable for resolution of BSA/AML corrective actions," and "oversee annual, or more frequent as necessary, compliance quality assurance, independent control testing, and review of this Policy and reporting results to the Board."   Askins personally received $1,213,872 from the Amex Merger, as well as a retention bonus of $900,000.  Following the merger, Askins served as a Vice President at Amex Kabbage until approximately December 2022.

37.     Spencer Robinson was Kabbage's Head of Strategy.  In this role, he oversaw what was left of Kabbage's "risk" and "fraud" departments in 2020.  Although Robinson appointed Amit Kesarwani as acting "Head of Fraud" in April 2020, Robinson served as the *de facto* Head of Fraud and Head of Risk from April 2020 through October 2020.  Robinson personally received $1,494,714 from the Amex Merger, as well as a retention bonus of $2,400,000.  Following the merger, Robinson served as a Vice President at Amex Kabbage.  Robinson later served as Chief Credit Officer for Commercial Non-Card Lending at Amex from 2021 to 2023.

38.     Sam Taussig was Kabbage's Head of Global Policy.  Taussig personally received $61,486 from the Amex Merger, as well as a retention bonus of $425,000.  Following the merger,

Taussig served as a Vice President of Government Affairs in the Global Commercial Services division of Amex until approximately September 2022.

39.     Don Butler was a member of the Kabbage Board from September 2012 until the closing of the Amex Merger on October 16, 2020.  Butler is a managing director at Thomvest Ventures Ltd.

40.     Jonathan Ebinger was a member of the Kabbage Board from 2011 until the closing of the Amex Merger on October 16, 2020.  Ebinger is a managing member of BRV Management Co, L.L.C., which manages (whether directly or indirectly through its affiliates) the venture capital funds BlueRun Ventures IV, L.P. and BRV Opportunities Fund, L.P.

41.     Alex Chulack became a member of the Kabbage Board in March 2020 and remained on the Board until the closing of the Amex Merger on October 16, 2020.  Chulack is a co-founder and partner of Reverence Capital Partners, L.P., which manages (whether directly or indirectly through its affiliates) the investment funds Reverence Capital Partners Opportunities Fund I, L.P., Reverence Capital Partners Opportunities Fund I (Cayman), L.P., RCP Kicker Co-Invest, L.P., and Reverence Capital Partners Opportunities Fund I (AI), L.P.

42.     Bryan Stolle was a member of the Kabbage Board from August 2011 until the closing of the Amex Merger on October 16, 2020.  Bryan Stolle is a general partner of Mohr Davidow Ventures, which manages (whether directly or indirectly through its affiliates) the venture capital fund MDV IX, L.P.

43.     Ioannis (Yanni) Pipilis became a member of the Kabbage Board in late 2019 and remained on the Board until the closing of the Amex Merger on October 16, 2020.  Pipilis was a managing partner of SoftBank Investment Advisers, which manages (whether directly or indirectly

through its affiliates) the investment funds SoftBank Vision Fund (AIV M2) L.P. and SoftBank PrinceVille Investments, L.P.

44.     Laurie Hodrick was a member of the Kabbage Board from June 2018 until the closing of the Amex Merger on October 16, 2020.  Hodrick held restricted stock units and options in Kabbage and received $341,237 in consideration from the Amex Merger.

45.     Thomvest Ventures Ltd. ("Thomvest") was a Kabbage shareholder that held 4,463,434 units and received $51,846,255 in consideration from the Amex Merger.

46.     BlueRun Ventures IV, L.P. and BRV Opportunities Fund, L.P. (collectively, "BlueRun") were Kabbage shareholders that held 5,291,159 and 337,820 units, respectively, and collectively received $66,206,186 in consideration from the Amex Merger.

47.     Reverence Capital Partners Opportunities Fund I, L.P., Reverence Capital Partners Opportunities Fund I (Cayman), L.P., RCP Kicker Co-Invest, L.P., and Reverence Capital Partners Opportunities Fund I (AI), L.P. (collectively, "Reverence") were Kabbage shareholders that held 1,895,603; 1,569,169; 1,234,527; and 30,175 units, respectively, and collectively received $84,879,255 in consideration from the Amex Merger.

48.     MDV IX, L.P. ("MDV") was a Kabbage shareholder that held 4,700,655 units and received $53,431,252 in consideration from the Amex Merger.

49.     Softbank Vision Fund (AIV M2) L.P. and SoftBank PrinceVille Investments, L.P. (collectively, "SoftBank") were Kabbage shareholders that held 13,925,489 and 2,010,724 units, respectively, and collectively received $231,686,040 in consideration from the Amex Merger.

50.     Curieux Limited Co. ("Curieux") was a Kabbage shareholder that held 812,065 units and received $9,230,554 in consideration from the Amex Merger.  At the time of the Amex Merger, Curieux's managing member was Robert Frohwein.

51.     Bennu Holdings Limited Co. ("Bennu") was a Kabbage shareholder that held 142,293 units and received $1,617,411 in consideration from the Amex Merger.  At the time of the Amex Merger, Bennu's managing member was Robert Frohwein.

52.     Raymond James & Associates, Inc. CSDN FBO Robert Frohwein RIRA U/A/D 5/27/16 A/C 2867A298 (the "Raymond James Account") was a Kabbage shareholder that held 685,000 units and received $7,786,236 in consideration from the Amex Merger.  At the time of the Amex Merger, the custodian and, upon information and belief, the beneficiary of the Raymond James Account was Robert Frohwein.

53.     The Frohwein Family 2015 Trust (the "Frohwein Family Trust") was a Kabbage shareholder that held 500,000 units and received $5,683,384 in consideration from the Amex Merger.  At the time of the Amex Merger, the trustee and, upon information and belief, the beneficiary of the Frohwein Family Trust was Robert Frohwein.

## JURISDICTION AND VENUE

54.     This Court has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334(b) because it asserts causes of action arising under the Bankruptcy Code and/or relating to the above-captioned bankruptcy case.

55.     This action is a "core proceeding" under 28 U.S.C. § 157(b)(2).

56.     Venue is proper in the District of Delaware under 28 U.S.C. § 1409(a) because the above-captioned bankruptcy case is pending in this district.

57.     This Court has personal jurisdiction over Defendants in this action because they have filed proofs of claim in the above-captioned bankruptcy case and/or otherwise have sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004.

58.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Kabbage consents to this Court's entry of final orders or judgments with regard to any claim in this action if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

A.     **Kabbage Nearly Collapses from the COVID-19 Pandemic.**

    1.     **Kabbage builds its business by making risky small business loans with automated underwriting.**

59.     Founded by Frohwein and Petralia in 2009, Kabbage was a "balance sheet lender" that offered high-interest, short-term loans to small businesses through a proprietary lending platform.  Kabbage developed a business model relying on automated underwriting, high volume, and a significantly higher tolerance for fraud than traditional financial institutions.

60.     For most of its existence, Kabbage partnered with Celtic Bank as originator for lines of credit approved by Kabbage's online platform.  After origination, Kabbage would purchase the loan receivables from Celtic Bank and securitize the receivables in non-recourse entities, which would then fund Kabbage's ongoing lending program.  Often described as a "rent-a-bank" scheme, Kabbage's business model drew criticism from industry analysts—as well as a customer class action lawsuit—describing the model as an end-run around state usury laws.

61.     Kabbage customers, however, accepted extremely high interest rates because they were typically unable to obtain loans from banks and other financial institutions.  Kabbage customers returned repeatedly to borrow more money—with the average Kabbage customer obtaining twenty-two different loans over four years—often ending in the borrower's default.  In other words, unlike many bank and institutional lenders, Kabbage allowed its clients to become

serial borrowers who repeatedly took out new loans from Kabbage to pay off existing Kabbage loans.  One Kabbage employee derisively described the business as a "pay-day lender for eBay sellers."

62.    Given its reputation as a source of loans for applicants that would otherwise be rejected by an established financial institution, Kabbage's automated underwriting platform was a magnet for fraudulent applications.  But high reported fraud rates had the potential to negatively impact both Kabbage's ability to securitize its loan receivables and the ratings of its securitization program.  As a result, Kabbage promoted a culture of ignoring potential fraud in its loan portfolio.

**2.      Kabbage almost goes bankrupt at the outset of the pandemic.**

63.    Kabbage's business was struggling even prior to the COVID-19 pandemic.  As Reverence, one of Kabbage's major shareholders, put it in February 2020, "the company remains on a significant loss-making trajectory [that] is unsustainable."  Defendants responded to these losses by taking steps even prior to COVID-19 to reduce Kabbage's general and administrative expenses, including by reducing the number of its employees (including those in its legal, compliance, fraud risk, and risk departments).

64.    At the same time, given Kabbage's ongoing struggles and relatively bleak outlook, Kabbage's major shareholders expressed interest in an exit.  To that end, Kabbage management sought to develop a more comprehensive business model—termed "cash flow as a service"—that would provide small businesses with a host of tools related to money management.  Such a model would potentially monetize Kabbage's large and growing customer base.  Kabbage management hoped that this pivot would not only juice revenue but also draw attention from potential purchasers of the company.

65.     Then, the COVID-19 pandemic hit in March 2020.   With the entire country quarantined in their homes, commerce flatlined.  This took a particular toll on small businesses, which were Kabbage's target customers.

66.     As a result, Kabbage had to essentially shutter all but its most basic operations.  By late March 2020, Kabbage had ceased its lending program, curtailed its marketing, terminated all non-essential vendors, and furloughed a significant number of employees, including the small handful of employees dedicated to manually investigating potentially fraudulent applications and performing collection efforts on defaulting loans.

67.     While perhaps inescapable given the economic crisis, the cessation of Kabbage's core lending business had dramatic consequences.  The resulting performance and borrowing base deficiencies in Kabbage's securitization facilities threatened to trigger rapid amortization events, which would shut off Kabbage's access to funds that it would have needed to restart its lending program.  This, in turn, would trigger an event of default under Kabbage's corporate debt facility with Macquarie Investments U.S. Inc. ("Macquarie"), requiring Kabbage to seek forbearance or pay $50 million to cover its outstanding debt.

68.     It was unlikely that Kabbage would be able to raise sufficient capital to pay down its debt amid one of the most acutely distressed credit markets in history.  As a result, Kabbage faced the prospect that a "going concern" qualification would be included within its next audited financial statements.  After that, Kabbage faced either a fire sale of its assets or bankruptcy.

**3.     Defendants recognize that the PPP could be a lifeline for Kabbage.**

69.     Congress passed the Coronavirus Aid, Relief and Economic Security Act on March 27, 2020, which contemplated approximately $2.2 trillion in stimulus spending.  One of the largest components of the bill was the PPP, which Congress intended as a financial incentive for small-sized businesses to keep workers on their payroll.

70.     Although the SBA administered the PPP, it did not make loans directly.  Instead, it deputized private lenders that agreed to comply with the program's requirements.  The lenders in turn received a processing fee based on a percentage of the size of the loan.

71.     Frohwein immediately recognized the opportunity for Kabbage.  In a March 25, 2020 presentation to Kabbage's Board, Frohwein touted the possibility to "use our tech to facilitate lending for banks with balance sheets that can be rapidly deployed."  He also pushed his staff to have the company's landing page ready for the first wave of PPP pre-registrants.

72.     Frohwein viewed the PPP not only as a stopgap to address the impending default of the company's securitization and debt facilities, but also as a means to rekindle the interest of potential purchasers of Kabbage, including Amex.  On March 29, 2020, Frohwein texted an Amex Managing Director that "Kabbage is positioned to make many billions ($) of loans under the [PPP]."

73.     By April 1, 2020, Frohwein and Petralia held a kick-off conversation with the Amex Head of Global Commercial M&A to discuss the contours of a potential deal.  Two days later, Amex signed a Non-Disclosure Agreement so that it could commence due diligence.

74.     That same day, Frohwein texted a "select team" to advise that "Amex is interested in acquiring us and we are entering into DD [due diligence]."  This team (which would spend the next six months focused on the deal) included Frohwein, Petralia, Robinson, and Askins, as well as other members of management.

75.     Frohwein also updated the Kabbage Board on Amex's interest.  He reported that the company was going live with PPP applications, noting "we had over 12,000 pre-registrations and now that it is open, so much is flooding in."  He concluded, "it's the absolute craziest thing that I've ever been involved in or could have ever imagined."

B.  **Defendants Are Aware of the Major Gaps in Kabbage's Fraud Controls Before Kabbage Becomes a PPP Lender.**

1.  **The SBA requires Kabbage to have a BSA/AML compliance program and perform good-faith reviews of loan calculations.**

76.  For a non-bank, non-federally regulated entity like Kabbage to become a qualified PPP lender, it had to submit SBA Form 3507 attesting, among other things, that it would:

- "assume all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the [PPP]";

- "[be] responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan"; and

- "certif[y] that it is in compliance and will maintain compliance with all applicable requirements of the [PPP] and PPP Loan Program Requirements."

77.  By submitting this form, Kabbage was expected to "establish [a BSA/AML] compliance program equivalent to that of a comparable federally regulated institution" "prior to engaging in PPP lending activities."[10]  Federally regulated institutions, in turn, were required to have, among other things: a Board-appointed BSA Officer; an adequately staffed compliance team; policies and procedures that complied with a written Customer Identification Program ("CIP") as well as customer due diligence policies for the purpose of verifying customer identity; and Board-approved AML procedures designed to detect fraudulent activity and assess the risk of an account.[11]

78.  The PPP regulations also required lenders to "perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost."  While a lender could generally rely on the information provided to it, such

---

[10] 85 Fed. Reg. 20811, 20815.

[11] *See* C.F.R. § 1020.210(a).

reliance had to be in good faith.  Moreover, the PPP regulations required a lender that "identifies errors in the borrower's calculation" or finds a "material lack of substantiation in the borrower's supporting documents," to "work with the borrower to remedy the issue."  The regulations regarding review of borrower calculations did not displace the requirement that lenders have a BSA/AML compliance program.

79.     As the Defendant Officers well knew, a lender that failed to adhere to the PPP requirements would lose their lender processing fees and may also lose the SBA's guaranty of PPP loans that defaulted.

80.     Moreover, notwithstanding the more relaxed standards for PPP loans (compared to conventional loans), the SBA made clear to program participants that a lender would remain liable in circumstances where it knowingly transmits false information to the SBA.  Notably, even if a borrower certifies otherwise, a lender may face exposure if it knows—including under the lesser scienter standards under the False Claims Act—that the borrower's certifications are false.  In fact, Kabbage "acknowledge[d]" in its SBA Form 3507, that "any false statements made to the [SBA] and Department of the Treasury can result in criminal prosecution . . . and imposition of civil money penalties under 31 USC 3729," *i.e.*, under the False Claims Act.

81.     In addition to liability under the False Claims Act, as described in greater detail below, Kabbage faced billions of dollars in "put-back" liability to the Reserve Bank and various lending partners to the extent that any loan was denied guaranty or forgiveness as a result of Kabbage's non-compliance with PPP regulations.

**2.      Kabbage BSA/AML Policies impose specific oversight duties on the Board and Askins.**

82.     Kabbage's Board approved a United States of America Enterprise Bank Secrecy Act / Anti-Money Launder and Office of Foreign Assets Control Policy on July 24, 2019, and an

updated version with PPP-related amendments on July 29, 2020 (collectively, the "BSA/AML Policies"). (Of course, as explained below, the Board only approved the updated version near the end of the first round of the PPP, after Kabbage had already made more than six billion dollars of such loans.)

83.     The BSA/AML Policies provided that the Board was responsible for, among other things: "[r]eviewing Kabbage's BSA/AML reporting, as appropriate"; "[r]eviewing the annual independent testing of the BSA/AML Program and any plans for corrective action as necessary"; "[a]ddressing any BSA/AML issues escalated to the Board"; and "reviewing feedback from bank partners on the BSA/AML Program and receiving reports on any remedial action necessary."

84.     Kabbage's BSA/AML Policies stated that Askins, as Kabbage's Chief Compliance Officer, was responsible for: "[p]romoting and implementing a strong culture of BSA/AML compliance"; "[h]olding personnel accountable for resolution of BSA/AML corrective actions"; and "[o]verseeing annual, or more frequent as necessary, compliance quality assurance, independent control testing, and review of this Policy and reporting results to the Board."

85.     The BSA/AML Policies provided that Askins, as Kabbage's interim BSA/AML Officer (starting early June 2020) was responsible for, among other things: "[m]onitoring the effectiveness of BSA/AML compliance and taking corrective action to remedy and deficiencies found"; "[r]eviewing any changes to BSA/AML-related laws, regulations, guidance, or regulatory expectations and ensuring that Kabbage implements processes to remain fully in compliance with the BSA/AML obligations"; "[r]eviewing the BSA/AML implications of any new or changed products, services, initiatives, or distribution channels, and advising management and employees on necessary steps to mitigate BSA/AML risk"; "[p]romptly alerting the Board to any material issues of BSA/AML non-compliance, and instituting and monitoring corrective action"; and

"[p]roviding annual reporting to the Board on the state of BSA/AML compliance and significant emerging issues."

86.     As described below, Defendants consciously neglected the duties as set forth in the BSA/AML Policies.

**3.     Defendants know that prior audits of Kabbage's BSA/AML compliance measures found major weaknesses that were left unresolved.**

87.     In 2018, Kabbage retained Treliant, LLC ("Treliant") to conduct an independent "risk-based" testing of the design and effectiveness of its BSA/AML compliance program. Treliant's 2018 testing found multiple issues, including with Kabbage's KYC, KYB, and Customer Risk Review ("CRR") processes.[12]

88.     Defendants, however, failed to address the issues identified in the 2018 Treliant report.  In fact, when Treliant conducted follow-up testing in 2019, it discovered that Kabbage's issues had only gotten worse.

89.     As noted in Treliant's 2019 report—which was provided to the Board on November 13, 2019—Treliant found that Kabbage was failing to properly track and implement remediations, leading to recurring problems with KYC, KYB, and CRR processes, including failing to assign risk ratings to all of its customers.

90.     Treliant noted that the "BSA/AML Program demonstrates *limited evidence of enhancement* since [Treliant's] prior review" in 2018.  Treliant specifically advised Kabbage that it "*considers . . . the lack of enhancements in the Company's Compliance Program operational procedures an important weakness that requires prioritization*."

---

[12] CRR represents the level of risk that a customer poses to the lender, including through money laundering and other financial crimes.

91.    Treliant also found weaknesses in Kabbage's transaction monitoring, noting that the "existing monitoring scenarios have generated limited productive results . . . and that the Company should consider reviewing existing monitoring scenarios and develop new scenarios."[13]

92.    Treliant also found that Kabbage's "management reporting" policies and procedures were lacking, noting that Kabbage "*does not currently define any risk appetite or risk tolerance thresholds that would identify an out-of-control condition*."  Treliant further noted that "this weakness affects testing of CIP [Customer Identification Program] . . . [and other] controls and is considered a *systemic gap*."

93.    Rather than address the issues identified by Treliant, as described further below, Defendants removed Kabbage's Head of Fraud, reduced Kabbage's staff responsible for BSA/AML compliance, did not replace its departing BSA/AML Officer, and rushed into PPP lending without a defined set of BSA/AML compliance procedures for the massive influx of PPP borrowers.

**4.    Defendants force out Kabbage's Head of Fraud at the outset of the PPP for complaining about the lack of fraud controls.**

94.    Kabbage hired a new Head of Fraud, Nicole Hill, in January 2020.   Not surprisingly, even before the PPP, Hill soon identified several fraud rings operating in Kabbage's lending platform, which she estimated resulted in approximately $8 million in previously unidentified fraud losses.   But upon reporting the fraud rings to her superiors (including, on information and belief, Robinson), she was told "we do not have fraud" and was instructed "*not to impair investors by classifying fraud*."

---

[13] Specifically, Treliant found: "Transaction monitoring operational testing identified that five (5) of the ten (10) alerts reviewed (50%) lacked sufficient commentary to explain why review analysis concluded that the observed activity was not questionable or unusual.  Testing also identified that *eight (8) of the ten (10) alerts reviewed (80%) had insufficient supporting evidence/documentation to support the clearing conclusion*."

95.    On April 16, 2020, Robinson stripped Hill of the title "Head of Fraud," demoting her to a nebulous role in the compliance department.  The next day, Hill sent a letter to Askins to "inform [her] of several concerns" regarding Kabbage.  In addition to informing Askins about being told to ignore fraud in Kabbage's loan portfolio, Hill noted that fraud controls she developed were derided as "stupid" and not used.  She further complained that she "justifiably stated the need for additional fraud resources in the US and ha[d] been told no."  When Askins spoke with Hill shortly after reviewing the letter, Askins did not even bother to ask Hill about these serious allegations that on their face impacted Kabbage's compliance program.  Instead, Askins only discussed Hill's resignation and separation agreement.

96.    After Hill resigned, Kabbage did not bother to hire a permanent replacement. Instead, Robinson ostensibly appointed Kabbage's Director of Risk Management, Amit Kesarwani, as acting Head of Fraud despite his scant relevant experience.  But Robinson acted as the *de facto* Head of Fraud, and it was not until August 2020 (after the PPP ended) that Kabbage even posted a listing for a new Head of Fraud, but even then, only to "cover [its] bases" for the Amex transaction.

**5.    Defendants ignore concerns raised by Kabbage's BSA/AML Officer, who then leaves Kabbage soon after the start of the PPP.**

97.    In April 2020, Kabbage's then-BSA/AML Officer, Azba Habib, flagged several risks with Kabbage moving to become a PPP lender.  She noted to Askins and others that even with respect to current Kabbage customers, there might be ones "who have (a) never been KYB/KYC'd or (b) have not been KYB/KYC'd in years."  According to Habib, this could mean "***see[ing] a lot of fraud (probably after the $ has left the door)*** and [Kabbage] hav[ing] to ultimately take the fraud hit."  Habib's concern was one of the reasons that traditional banks made

most of their loans to existing customers who had already gone through KYC/KYB and other customer due diligence processes.

98.     Habib also warned that any lending partner for PPP "will be shocked if folks haven't gone through KYB/KYC at all."  She concluded that she was concerned about Kabbage later discovering fraudulent loans that could have been caught with appropriate KYB/KYC procedures:

> I would be remiss if I didn't flag this risk.  The question is are we willing to take it?  We could also get customers onboarded and then run KYB/KYC behind the scenes so we have results prior to disbursement which is going to take a hot min b/c we don't have a bank right now funding these?  ***I don't want to slow our roll but I am concerned this could become a big issue esp if we later discover fraud (which we would have caught if we did KYB/KYC) and lose SBA guarantee on loans***.

99.     Clearly inherent in Habib's concern was that Kabbage was lacking appropriate KYB/KYC procedures and the appropriate staffing to handle such procedures.  But her grave warning did not stop Defendants from submitting an application to the SBA.  Kabbage submitted its application as a non-depository financing provider in the PPP on April 9, 2020.

100.    In the SBA Form 3507 attached to its application, Askins certified that Kabbage "is in compliance and will maintain compliance with all applicable requirements of the [PPP] and [PPP] Loan Program Requirements."

101.    The SBA approved Kabbage's application on April 13, 2020.  While the application was pending, Kabbage Strategy and Operations Manager Kristel Adler, another member of Frohwein's "select team" focused on the Amex Merger, told her operations team that she "wants ~$1bn in loan calc ready to go."

C.    **Kabbage's PPP Lending Practices Create Massive Legal and Financial Liabilities for the Company.**

1.    **Kabbage becomes a PPP lender in April 2020.**

102.    Because Kabbage did not have the funds to directly make loans itself, Kabbage contracted with Customers Bancorp Inc. ("CUBI") and Cross River Bank ("CRB"), with Frohwein himself signing the contracts.   Under these arrangements, Kabbage sourced loans through its platform, and the partner banks would transfer the principal to Kabbage's account at Wells Fargo.   Kabbage transferred the funds to PPP borrowers, and Kabbage assumed the obligation to process and service the loans on the partner banks' behalf.   Kabbage would then take an agreed portion of the SBA processing fee.   Kabbage's contracts with CUBI and CRB required Kabbage to repurchase (or "put back") PPP loans in the event that, among other things, the SBA refused to guarantee a PPP loan because of Kabbage's non-compliance with program requirements.

103.    By the end of April 2020, the SBA also approved Kabbage as a direct lender.   As an approved PPP lender, Kabbage was able to participate in the PPP Liquidity Facility ("PPPLF") and borrow funds from the Reserve Bank.   Kabbage could draw on funds from the PPPLF, and it would then pass the funds directly to its borrowers without the need for a partner bank.   Although this arrangement was more profitable than sourcing and funding PPP loans through its partner banks, Kabbage's access to the PPPLF was limited by its defaulted credit agreement with Macquarie, which had to approve Kabbage taking on any additional debt.

104.    Just like its partnership with CUBI and CRB, Kabbage earned a fee from loans sourced from the PPPLF based, in part, on the size of each loan.   Also just like its partnership with CUBI and CRB, Kabbage was obligated to immediately repay the Reserve Bank the amount of a

PPP loan and the associated interest in the event that SBA denied forgiveness or a guaranty of the loan.

### 2. The Officers know that Kabbage's nearly non-existent compliance team cannot appropriately handle the massive influx of PPP applications.

105.    In late March 2020, as its lending operations ceased, Kabbage furloughed hundreds of employees in the United States, including most of Habib's compliance team and the account review team that took the lead in reviewing suspicious loan applications.  With tens of thousands of pre-registrations for PPP loans arriving in the first week of April alone, it soon became apparent that Kabbage needed to call back at least some of its furloughed employees.

106.    But even though applications were coming in at a much faster pace than pre-pandemic, Kabbage decided to only bring back a skeleton crew.  For instance, before Hill resigned, she asked for the return of six employees to help with assessing fraud risk; but Petralia only approved a single additional hire at the time, and Hill was "told to be grateful."

107.    On May 8, 2020, shortly after the start of the PPP, Kabbage's risk analysts were already discussing the number of fraud cases they had to review, including the thousands of applicants from the fraud rings they were able to identify.  During this discussion, one of them stated: "[T]his is too much.  *[W]e should not have gone so fucking fast*."  He then added: "[M]aybe the banks"—which had waded into the PPP program more cautiously than Kabbage— "know something we don't lol."

108.    What the banks realized (and Kabbage ignored) was the inherent difficulty of meeting BSA/AML requirements for new customers on the scale and at the pace that Kabbage was now seeking to approve PPP loans.  And, unlike Kabbage, the banks had large teams of BSA/AML personnel to assist in meeting BSA/AML requirements for new customers.  For its part, Kabbage

did not even bother to conduct a staffing assessment to gauge what additional manpower it might need for its new loan program.

109.     By May 27, 2020, Kabbage's account review team—which had only seven members acting without a permanent supervisor—was facing a backlog of 35,000 applications flagged as potentially fraudulent and requiring further review.

110.     Understaffed, overworked, and unguided, the team sought ways to "automate more of the process."  Not surprisingly, this automation resulted in Kabbage opening the door even wider for fraudulent applications.  For instance, Kabbage had long used a fraud-detection third-party called ThreatMetrix, which specialized in fraud management through applicant device identification.  With the dramatic increase in application volume because of the PPP, Kabbage's costs to use ThreatMetrix "skyrocketed" in April 2020.  Rather than treat the additional cost as part of its program to prevent and detect fraud, Kabbage looked for ways to reduce its use of the service and control costs.

111.     Kabbage reviewers also openly complained about the company's automated text recognition software, which ostensibly was designed to detect fraud without the need for human review.  The reviewers knew that this software was letting many fraudulent applicants through, with one reviewer noting that "all you need to do is send in a piece of chewed up gum and an old shoe" in order to get approved for a PPP loan from Kabbage.

112.     Understanding that they were the last line of defense, the review team circulated sarcastic memes and jokes about the futility of their efforts to check the failings of Kabbage's lending platform.  If Kabbage had hired additional qualified personnel, at least some of the fraudulent PPP loans could have been prevented.  But hiring more staff to help the beleaguered

review team was not on Defendants' agenda.  Nor was spending time and money to fix Kabbage's

ineffective automated tools.

### 3.   The Officers know or deliberately ignore that Kabbage was approving inflated PPP Loans.

113.   BSA/AML compliance and fraud detection were not the only issues facing

Kabbage's PPP program.  Before submitting a PPP loan for approval to the SBA, lenders had "to

perform a ***good faith review***, in a reasonable time, of the borrower's calculations and supporting

documents concerning average monthly payroll cost."[14]   Through this review, lenders were

required to "[c]onfirm the dollar amount of average monthly payroll costs for the preceding

calendar year" for each borrower.[15]   Yet even before the SBA approved Kabbage's PPP lender

application, Kabbage management learned that its lending platform allowed applicants to apply

for and receive loans in excess of what the PPP allowed.

114.   For instance, the size of a PPP loan was calculated using the borrower's average

monthly payroll.  Employers typically report their combined employee income to the Internal

Revenue Service ("IRS") on a Form W-3.  To calculate a borrower's average monthly payroll,

Kabbage's lending platform asked the borrower to add reported wages from the Form W-3 to the

borrower's state and local tax ("SALT") withholdings, which are already included in wages.  As a

result, thousands of Kabbage borrowers double counted SALT withholdings in calculating their

average monthly payroll.

115.   Kabbage identified the SALT issue before the SBA even approved Kabbage as a

PPP lender.  First, Kabbage's communications director notified Robinson, Adler, and a host of

---

[14] SBA PPP FAQ #1 (Apr. 3, 2020).
[15] 85 Fed. Reg. 20811, 20815.

other senior Kabbage executives of "feedback from Twittersphere suggesting we're doubling up on the same data points," and pasted a link to the following tweet:



By late April, this "glaring error" was likewise brought directly to the attention of both Frohwein and Petralia. Despite being shown the issue both internally and publicly, Kabbage never corrected the platform.

116.    As a result, the platform ensured the double counting of SALT withholdings any time borrowers entered all of the numbers solicited by the platform. This continued through the end of the first round of PPP loans in August 2020. During a later investigation of Kabbage's misconduct, the ***DOJ estimated that the SALT error resulted in at least 53,111 loans being inflated by at least $111 million***.

117.    In addition, PPP excluded from the definition of eligible payroll costs "the compensation of an individual employee in excess of [an annual salary of] $100,000."[16]  As early as April 27, 2020, Kabbage's operations team reported to Petralia, Robinson and others that

---

[16] 15 U.S.C. § 636(a)(36)(A)(viii)(II)(aa).

Kabbage was "***not capping sole props/single LLCs to the appropriate $100K***."  The lack of any cap led to absurd results that Kabbage employees observed in real time.

118.    In one instance, one Kabbage employee mused in Slack, "dude we got a guy whose payroll was 25,978.00.  Someone put in 2597800.00.  Homie got submitted for a $2mm loan."  A strategy analyst asked how Kabbage validated the amount, to which the other employee responded "cause we removed the cap."

119.    Just like the SALT issue, despite certain Officers' knowledge of the failure to cap payroll costs at $100,000, Kabbage did nothing to address the issue.  ***The DOJ estimated that these $100,000-cap errors, which were known to Kabbage, resulted in at least 1,972 loans being inflated by at least a total of $108,488,540.27***.

120.    In yet another example of systemic errors leading to inflated PPP loans, Kabbage's lending platform allowed borrowers to include data from Box 4 of their IRS Form 940 in calculating their average monthly payroll.  Portions of this amount were duplicative of payroll costs reflected in W-3 wages, and some of the amounts included in Box 4 were not eligible payroll costs at all.  As with other errors in the platform, Kabbage employees noticed discrepancies between borrower inputs and Kabbage calculations that included Box 4.  Robinson himself identified the issue, noticing that a borrower's tax forms "seem[] contradictory to our formulas." He rightly added, "I'm worried about our calcs."

121.    Nonetheless, neither Robinson nor the other Officers took action to fix the known issues.  So, Kabbage's lending platform continued to include amounts from Form 940's Box 4 in payroll calculations through the end of the first round of the PPP.  ***The DOJ estimated this error resulted in at least 783 loans being inflated by at least $14,224,452.72***.

122. Kabbage employees openly discussed the Officers' complete disinterest in addressing the host of issues leading to the approval of a vast number of inflated PPP loans:

| | |
|---|---|
| **Nipun Goel <ngoel@kabbage.com>**<br>lolz i cant get anyone to take thi sseriously | 4:43 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>i dont fucking understand hahaha | 4:44 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>🧑 | 4:46 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>We just don't want to reverse these loans?? | 4:46 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>Or at least edit them? | 4:46 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>We gave out millions of extra $ and are just gonna yolo it lol | 4:47 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>Or are we banking on the SBA just reversing them? | 4:49 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>nah i mean - it's just so blase about it. | 4:50 AM |

| | |
|---|---|
| **Nipun Goel <ngoel@kabbage.com>**<br>but like i cant get anyone to actually push to reverse / edit / etc. | 4:51 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>Surprised Spencer isn't willing to push on them | 4:51 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>lolz i just gotoff with spencer | 4:51 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>pretty sure he's just drunk lolz | 4:51 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>Hahahahahaha classic | 4:52 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>I mean given that they are approving things so slowly we definitely have a little time, but obviously we want to correct them before the SBA is like what the fuck | 4:53 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>I think he will come around sober lol it's not like you'll be able to convince engineering tonight | 4:53 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>some of these def already have etran numbers | 4:55 AM |
| **Hirsh Gaikwad <hgaikwad@kabbage.com>**<br>😬😬😬 | 4:55 AM |
| **Nipun Goel <ngoel@kabbage.com>**<br>lolz | 4:56 AM |

[17]

---

[17] The SBA assigned an E-Tran number after approving the loan in anticipation of funding.

123.    The tone from the top was clear to every level of Kabbage employee that maximizing Kabbage's revenue from PPP took priority over providing any "good faith" review of borrowers' applications and supporting documentation.  In a May 2020 Slack communication with Adler, Taussig, and others, Robinson succinctly summarized Kabbage's "plan" for dealing with inflated PPP loans: "[W]e just did a poor job verifying [PPP loan amounts]. . . . [It] only becomes an issue in an audit or guarantee scenario. . . . [M]aybe they'll be auto forgiven 🙏 ."  In other words, Kabbage's strategy to avoid massive liability to the SBA, the Federal Reserve, and its partner banks was based solely on the hope that Kabbage's failures would not be discovered.

124.    Frohwein, Petralia, and other Directors and Officers, meanwhile, were singularly focused on the effect PPP would have on the deal with Amex, rather than on any problems with the lending platform.  Indeed, Frohwein and the rest of Kabbage's Board fully understood just how important driving PPP applications would be to the Amex deal.

125.    On April 25, 2020, Frohwein reported to the Board that he was "good with the pace [of PPP applications] as we want to get the PPP loan processing going to increase our leverage" with Amex.  But Frohwein still was not satisfied, complaining to Robinson, "our numbers are just not budging.  *Feels like the team is not focused on driving more completed apps*.  I know we're still getting slow approvals, but it would be a shame not to keep the pressure going."  Frohwein did, in fact, "keep the pressure going" throughout April 2020, sending a clear message to Kabbage employees reviewing loan applications to "GET MORE APPROVALS" and "ISSUE ISSUE," even when it was not clear whether or how Kabbage would be able to fund additional loans.

**4.    The Officers know or deliberately ignore that Kabbage was still struggling to implement reliable compliance procedures weeks after the PPP started.**

126.    Although Kabbage was required to have an appropriate BSA/AML program *prior to* making any PPP loans, Kabbage was still trying to institute certain compliance procedures several months after becoming a PPP lender.  In fact, Kabbage had yet to address the issues raised by Treliant in its 2019 audit.  And for at least for the first several weeks that Kabbage was approving PPP loans, its fraud controls and related BSA/AML procedures were ad hoc, with few checks or guardrails in place.  Habib tried to remedy some of these issues before she left in June 2020, but she and her understaffed team (which had additional defections in June 2020) were woefully unequipped to handle the issues.

127.    On April 28, 2020—after Kabbage had started making PPP loans—Habib emailed Robinson, Askins, and others, stating that "there are two areas relevant for BSA compliance where I [need] help from our collective brain trust":

(1) We need to identify what types of characteristics at onboarding and thereafter we should flag for suspicious activity referrals and reports.  Lexis already provides helpful risk indicators (e.g., EIN is issued w/ different business name/address; multiple identities associated with SSN) and red flags (e.g., identity theft alert, name and SSN are verified but not with input address and phone) that we leverage for automated logic.  *If we supplement that with some guidance on what to look for in manual review (e.g., fake documents), we should have a good framework*.  I'll need help identifying the exact triggers and then operationalizing them.

(2) *We need a process to complete some internal quality control and testing to ensure that our automated process is working as it should* and KYB, KYC, Fraud, and KBA ticket reviews are being conducted in compliance with our desktop procedures.  I suspect these will just be spot checks but we'll need resources to complete and document the process of completion.

128.    Thus, by Habib's admission, Kabbage had insufficient systems or protocols to review loans for "fake documents" well after it submitted PPP loans for approval.  Further,

Kabbage lacked any "quality control and testing to ensure that [its] automated processes" were working.

129.    In addition to raising the above compliance issues, and with her prior concerns about "see[ing] a lot of fraud (probably after the $ has left the door)" effectively ignored, Habib pushed to retain A&M as an outside consultant on Kabbage's PPP compliance.  On May 4, 2020, she sent a proposal to Robinson to retain A&M.  While Robinson did approve the work, he told Habib to "push them [A&M] to figure out how to get the range to [$]60-72k."  With such a limited budget, it should have been obvious to Robinson that A&M's review would be limited in its scope.

130.    A few days later, on May 15, Habib emailed Frohwein to get final approval for the A&M engagement: "Just want to make sure we have our ducks in a row so we don't have issues down the road, including losing guarantees from the SBA if they perceive we didn't have a fulsome program in place."  As part of the case for the engagement, Habib explained: "***Given we have very limited resources in compliance right now***, we need the help even more," and "[a]s a PPP lender, we have to fulfill certain obligations that we have historically relied on our bank partners to fulfill, ourselves."

131.    On May 18, 2020, Kabbage formally engaged A&M to, among other things, "[c]onduct an independent risk assessment on the Paycheck Protection Program (PPP) loans" and "[p]rovide a risk assessment report, including recommendations to mitigate identified risks."

132.    While Kabbage waited for A&M's report, the company struggled to set forth a reasonable BSA/AML system to handle the number of applications it was receiving.  For instance, although it should have been obvious that Kabbage needed to file Suspicious Activity Reports ("SARs") as a PPP lender, the company was not prepared to do so.  Under the BSA, a financial institution is required to file a SAR with the Financial Crimes Enforcement Network ("FinCEN")

within 30 days from learning about suspicious activity, which is generally any conducted or attempted transaction that involves money from criminal activity, is designed to evade BSA requirements or facilitate criminal activity, or otherwise appears to serve no business or other legal purpose.

133.    On May 11, 2020, Habib explained to Kesarwani, Adler, and others: "I'm a bit concerned that we have identified a number of instances of suspected fraud (I think) and not yet filed any SARs . . . .  I'm fairly certain we will be audited in connection with our role as a PPP lender and one of the things they'll look for is whether we've filed any SARs."  (Kabbage began filing SARs in June 2020, and ultimately filed thousands of them related to PPP loans or loan applications.  But, as explained further below, the Officers knew that regardless of the SARs, Kabbage was approving a lot of suspicious loan applications.  In fact, many SARs were filed after the loans were made.)

134.    A few days later, on May 13, 2020, recognizing that Kabbage did not have a formal monitoring process for KYC and other fraud controls as it related to the PPP, Habib emailed Kesarwani and others to ask them to develop a "monitoring process" for, among other things, "KYB/KYC tickets" and "Fraud tickets."  Kesarwani, however, initially disregarded the request.

135.    Then, on May 29, Habib followed up again, explaining: "We are trying to get all the docs to the auditors [A&M] by Monday so they can get us a draft report next week.  Do you think you may be able to share something by Monday?"  Kesarwani respond: "Sure, we will create a doc by Monday."

136.    But the documents Kesarwani eventually created failed to address Habib's concerns.  After receiving drafts of the documents Kesarwani hastily put together, Habib emailed him back:

I took a look at the documents you linked and I'm a little confused. Per my original email, I was looking for 'a proposal from you guys that lays out a monitoring process that works for your team, including areas review (*i.e.*, KYB/KYC tickets, Fraud tickets, OFAC tickets, automated processing logic), frequency of reviews, sample sizes for each review, and documentation of results.' I noticed you added a section in the KYB/KYC and Fraud desktop procedures (redlined and attached for convenience) addressing the validation of any changes to the automated processing logic (which is helpful) ***but there is nothing on how we do QA/QC on manual reviews for OFAC, KYB/KYC, Fraud, KBA tickets.*** I also didn't see any changes to the OFAC desktop procedures (redlined and also attached for convenience).

137. In addition, many of Kabbage's policies or procedures regarding fraud were, as the Officers knew (or were deliberate in their ignorance), ineffectual. Robinson's team, for instance, knew that Kabbage's system allowed "customer facing" personnel to simply clear automated fraud flags. On May 4, having noticed one of the account review analysts cleared a wrong flag, Kesarwani shared his concern with a risk analyst, asking "Should we not allow this team to clear flags?" The risk analyst responded—highlighting Kabbage's ongoing layoffs and catastrophically small workforce—"who will clear if not them?" On May 15, Kesarwani reported to Kabbage's Head of Sales, that a Kabbage employee yet again cleared a "SBA-Manual verification' flag" for a borrower "listed as a fraud suspect because of its device connection with a fraudulent account" "without keeping the Fraud review team in the loop." Obviously, if the sales team could just delete fraud flags, Kabbage's fraud controls were severely lacking.

138. And the problem was not fixed. On May 20, Kesarwani again reported: "We have had one more case today where a Felony flag is removed by a customer-facing person. . . . I think we should make clear policies around – who can clear flags and who can not [sic]. Otherwise***, someday we will end up in a difficult financial/legal situation***."

139. As described further below, Kabbage received the initial version of the Risk Assessment Report on June 11, 2020. This report, and the Kutworm Report that followed it,

identified similar issues, as well as other areas where Kabbage's compliance measures were either non-existent or inadequate.  Habib, however, left the company in June 2020, and Kabbage chose not to replace her.

140.    Instead, with Board approval to be the Compliance Officer, Askins simply assumed the role of Kabbage's interim BSA/AML Officer, despite being unprepared and understaffed to do so.  Askins knew, of course, that having a Board-appointed BSA/AML Officer with the requisite experience, knowledge, and training for the role was one of the essential "Five Pillars" of a BSA/AML compliance program.  But Askins testified that appointing one did not make "a lot of sense" in light of the Amex Merger (which was still several months away).  Unlike Habib, who at least tried to make corrections to Kabbage's program after it became a PPP lender (albeit with little support or resources), Askins spent little to no time worrying about BSA/AML compliance or the soundness of Kabbage's fraud controls and monitoring procedures.  Instead, she focused her efforts on the Amex Merger so that she could cash out and get a new lucrative compensation package with Amex.

**5.    Kabbage employees recognize that the Officers are ignoring the prevalence of fraudulent PPP applications.**

141.    On May 8, 2020, Petralia emailed the Officers and others an article warning of fraudsters trying to game the PPP, commenting "Duh.  And yikes."  And from the very start of the PPP program, Kabbage employees began identifying disturbing patterns indicating widespread fraudulent applications in Kabbage's portfolio.

142.    For instance, as noted above, the PPP limited the payroll costs of a sole proprietor or single member LLC without employees to $100,000 per employee.  Because the PPP capped loans at 2.5 times monthly payroll costs, such businesses could not obtain a loan above $20,833 ($100,000/12 = $8,333; $8,333 x 2.5 = $20,833).

42

143.    Not surprisingly, Kabbage immediately began identifying applications targeting the maximum-sized loan.  On April 30, 2020, a Kabbage employee noted, "one guy his prepared 1040 sch C revenue is 100,000.00 . . . on the fucking dot.  I am like yea ok.  But we have to put it down right."  Kabbage's Head of Lending Strategy, responded, "lolzzz dopeeee yep yep."

144.    Kabbage had such an inordinate number of loans in the exact amount of $20,833—eventually totaling over 23,000 such loans—that fraud reviewers openly exchanged memes like the one below about how easy it was to game Kabbage's platform:



145.    Publicly available PPP data shows that, of PPP loans under $150,000, 7.6% were in the amount of $20,833.  Kabbage's rate was $12.9%, nearly double the average across all lenders.

146.    Another common scheme identified by Kabbage early in the PPP involved phony or fraudulent Certified Public Accountants ("CPAs") that submitted multiple applications—sometimes hundreds of them—on behalf of fictitious borrowers or borrowers that did not even know they were applying for a loan.  Kabbage employees quickly identified the scheme.

147.   From the early days of the program, fraudulent "CPAs" would even reach out directly to Frohwein and Petralia to ask about their applications.  Such direct contact with the CEO became so frequent that, again, Kabbage employees openly joked about it.

148.   In one instance, on May 10, 2020, a Kabbage Risk Manager circulated to a Manager in the Strategy & Operations department a number of applications filed by the same device seeking similar amounts, describing the applications as "Fraud af [as fuck]."

149.   While Kabbage reviewers identified and blocked some of these fraud rings, Kabbage's platform allowed applicants to use unfiled IRS forms for documentation supporting their applications.  One risk analyst reported to Kesarwani, who was the acting Head of Fraud under Robinson, that she was "not comfortable passing almost all of the people I have to pass." She added, "*I feel like the level of fraud we're reviewing is wildly underestimated*," and voiced her concerns about "the number of suspicious apps we see and that are meeting all the procedure requirements yet have 600+ matching devices, and the amount of sole props claiming 100K + a year."

150.   Her manager, however, responded in the same Slack communication, which included Kesarwani, that, so long as they "upload all the docs we provide, and they pass our inscribe and visual checks, then we should clear it."  When the analyst continued to express concern, the manager reasoned—again without any objection from Kesarwani—that the review process was fine because "*the risk here is not ours – it is SBAs risk*."  After the manager told the analyst that the Slack chain was discoverable in an audit, the risk analyst jokingly proclaimed, "Dear Secret Service, Please make sure my dog goes to a good home before I end up in prison."

151.   Given the lack of reasonable procedures, and the message from Robinson (whether direct or implied) to Kesarwani, Kabbage employees believed that they could just turn a blind eye

to what they called "first-party fraud"—*i.e.*, fraudulent submissions from borrowers—because, as Kesarwani put it in early May 2020, "we are not liable." Kabbage employees who questioned this approach—for instance, by asking "***What's the point of any fraud checks then?***"—were told their concerns were misplaced. But, as the Officers knew, nothing in the PPP regulations gave Kabbage free license to pass fraudulent or suspicious applications by borrowers onto the SBA. To the contrary, the regulations and relevant laws—which Askins reviewed before submitting Kabbage's lender agreement—provided that Kabbage would be liable for knowingly or recklessly submitting PPP loan applications for fraudulent borrowers.

152.     On June 10, 2020, Kesarwani emailed Robinson, Taussig, and others to inform them that Capital One had reported three suspicious loan recipients, none of which "hit [Kabbage's] fraud triggers" and "therefore they were auto-approved." The first account belonged to 114 Macon LLC, an alleged property management company, for which Kabbage relied only on a Form 940 "form filled pdf" that "could be fake" to approve a $1,904,593 loan. The second account belonged to a company called Gods Anointed Youth Ministry, which received a loan in the amount of $1,253,112 even though the applicant submitted a "[h]andwritten W3," the "TIN on the app does not match TIN on W3," and the "[b]usiness is a youth ministry but google search for address brings up an apartment complex." Despite these obvious red flags (which Kabbage's Head of Policy admitted to Robinson, Kesarwani, and others were "very fishy")—and further despite Habib's warning that manual reviewers needed policies regarding the identification of potentially fake documents—Kabbage protocol required even "more evidence to confirm these as fraud" before starting the recovery process.

153.     These two million-plus-dollar loans were far from the only "very fishy" loans approved via Kabbage's automated review platform. In early May 2020, a Kabbage analyst told

Kesarwani that he was "seeing some apps that look suspicious to me but didn't meet any of our fraud rules," and asked, "what should we do[?]  They have already taken the funds."  Kesarwani responded that the analyst should simply "put them in the list of suspicious" applications, to be dealt with at a future time.

154.    This attitude of "approve first, ask questions later" was repeatedly emphasized by the Officers as fraud reviewers continuously encountered already approved, and often disbursed, fraudulent loans.

155.    For example, on July 2, 2020, two Kabbage fraud analysts identified a $600,000 loan to Glamher Boutique USA as likely fraudulent, lamenting that Kabbage "should have requested more docs" before approving the loan because the applicant's W-3 indicated that "they are inflating their wages."  Even worse, the analysts noted, "her biz [business] is closed and the bank has no record of her new biz she put on file w[ith] us."  Later, in August 2020, the DOJ sent Kabbage a subpoena for more information on Glamher Boutique USA.  Kabbage's legal team, including Askins, received these subpoenas from the DOJ.

156.    Likewise, on July 7, 2020, a loan applicant called Kabbage customer service asking **how to return** a $503,311 loan deposited in her bank account, which she dubiously claimed she did not initiate (despite being associated with more than two dozen other questionable loan applications).  Neither the customer service reps nor the fraud reviewers had any idea what process to follow to get the loan money back.  The issue was elevated to the Finance Operations and Customer Service team leads, who decided *not* to issue a recall of the loan because the recall process "is really meant for fraud [and] they are not a fraudster," despite the clear indicators that the loan was fraudulent.

157.    On July 9, 2020, a fraud analyst reported to other Kabbage employees a conversation she had with Robinson, who instructed her to turn a blind eye to fraud because Kabbage could then claim it did its "due diligence" and just blame the borrower "for lying."  She emphasized that even when the fraud is so "obvious," "like a janitor who made 200k and cannot provide bank statements showing more than $500 in his bank account ever," Robinson said they "gotta let em through."

158.    In yet another example, in mid-July, Kabbage fraud reviewers identified another pattern of applicants "sending in the same Schedule c for a bunch of customers[,] all Principal Businesses say 'Electronic Shopping – Wigs, Hair Extensions, Lashes' and all made exactly $922,667."  As Kesarwani observed, the people involved in this "wigs fraud ring" had "***discovered a new way to fraud PPP***."  On July 22, 2020, mere weeks before the first round of the PPP ended, the development team was instructed to implement a new rule that "[i]f [m]ore than 2 applications have exact same w3 or 1040C amount and same city or IP or Device" to "flag them using 'SBA Manual verification failed.'"  But this control was too little too late.

159.    By September 2, 2020, one fraud reviewer had identified "811 accounts of wigs people" belonging to the wigs fraud ring, which "got close to 5 million dollars" in fraudulent PPP loans from Kabbage.  Still discussing the "wigs people," one of the reviewers mused: "Do you think someone will make a documentary on all of this PPP fraud? . . . ***[W]e could be 5 minute famous and talk about how much fraud we saw*** and tried to stop."

160.    The Officers piled on with jokes of their own.  On July 17, 2020, when Wells Fargo notified Kabbage of yet another fraudulent loan that made it through Kabbage's platform, Defendant Askins mocked the ridiculous name of the applicant, emailing her team, "OK you got me it was me—I'm behind little piglet soap company."  The actual woman behind the Little Piglet

Soap Company was ultimately sentenced to 41 months in federal prison after fraudulently obtaining nearly $2 million in PPP loans.

161.     Similarly, when a rival PPP lender sent an article about PPP fraud to Taussig, he forwarded it to Askins and others, asking for "bets on when Spencer *[Robinson] and I have to 'turn state witness'*?"  Unsurprised, Askins quipped, "did he apply with us too?"  Robinson has since been deposed regarding his role in the PPP and pleaded the Fifth Amendment in response to nearly all of the DOJ's questions.  To date, he has not yet turned State's witness.

162.     Frohwein even sought to use the fraud to Kabbage's advantage.  In late June, Askins was negotiating with Macquarie for a discount on paying down the company's $50 million debt in the lead up to the deal with Amex.  Frohwein instructed Askins to "start with a $7.5m reduction, paid by end of July.  I would scare them a bit about the lawsuits coming in and explain it will be hard for us to settle down the road if we *have a bunch of liability coming out from the PPP program*."  Like Robinson, Frohwein and fellow Kabbage co-founder Kathryn Petralia have also pleaded the Fifth Amendment in response to the DOJ's questions regarding the PPP.

163.     In sum, the amount of recognizable fraud was so prevalent that Kabbage employees openly joked about the amount and brazen nature of the fraud making its way through Kabbage's lending platform, exchanging internet memes like the following showing that Kabbage itself had stopped any form of PPP underwriting.



**6.     Wells Fargo terminates its relationship with Kabbage in part due to concerns over Kabbage's compliance issues.**

164.    Kabbage had used Wells Fargo as its corporate bank since 2014.  From the outset of Kabbage's PPP lending, the company routed funds from its lending partners through its account at Wells Fargo before the funds were distributed to the borrower's account.

165.    By mid-May 2020, Wells Fargo's fraud controls began flagging numerous disbursements to Kabbage's borrowers because of little or no activity in the receiving account prior to disbursement of the loan.  A Kabbage Risk Manager expressed confusion why Wells Fargo— which itself was one of the largest PPP lenders—would bother to review the loans that Kabbage passed through the bank "so diligently."  He further questioned whether they should even bother

49

issuing a recall for potentially fraudulent loans because, according to him, "the SBA takes the liability of first party fraud."

166.    As one of the largest PPP lenders in its own right, however, Wells Fargo knew that the SBA would not forgive or guarantee fraudulent loans if Kabbage's fraud protections were insufficient or if Kabbage did not review the loan amounts in good faith.  Given this ongoing risk, when Kabbage had to inform Wells Fargo of yet another raft of fraudulent loans disbursed to Wells Fargo accounts on July 16, 2020, Wells Fargo insisted that Kabbage provide the bank with its due diligence process, a description of controls in place to identify fraudulent transactions, and the "key drivers" of the influx of fraud.

167.    In part because of its growing concerns about Kabbage's PPP program—as well as lingering concerns about defaults in Kabbage's legacy loan portfolio—on or around June 5, 2020, Wells Fargo informed Kabbage that it was terminating its commercial relationship with Kabbage altogether.  Wells Fargo's relationship manager explained the reasoning for its decision with Frohwein personally on or around June 10.

168.    Because Wells Fargo offered Kabbage several months to transition its accounts to another bank, however, Kabbage management determined that Wells Fargo's termination would not stand in the way of its contemplated transaction with Amex.

**7.    A Kabbage legal analyst—who later becomes a whistleblower under the False Claims Act—reports major gaps in Kabbage's fraud controls to his superiors, but they ignore his report.**

169.    As mentioned above, in mid-May, Habib expressed serious concerns about the risk posed by the company's lax fraud controls.  Given those concerns, and knowing that she would soon leave Kabbage, Habib pushed Kabbage management to retain A&M.

170.    On May 15, 2020, Habib emailed Frohwein for approval to retain A&M to conduct a risk assessment of Kabbage's PPP loans.  Habib explained what Frohwein should have known

from the outset of the PPP:  "We are required to have a BSA/AML program as a PPP lender[.]  The Program requires a risk assessment on the front end and independent testing on the back end, [and] . . . [g]iven *we have very limited resources in compliance* right now, we need the help even more."  Habib's message to Frohwein concluded that she "just want[ed] to make sure we have our ducks in a row so we don't have issues down the road, including losing guarantees from the SBA if they perceive we didn't have a fulsome program in place."  Frohwein responded via text, "go for it."

171.    Robinson, however, intentionally limited the scope of A&M's assignment.  After Robinson told Habib to get the lowest fee arrangement possible, Kabbage agreed to pay A&M only approximately $70,000 for A&M's review of Kabbage's PPP policies and procedures, which obviously reduced the amount of time and effort that A&M would spend on the project.  In fact, A&M would select a woefully inadequate sample of *only ten loans* to review as part of its report out of the approximately 100,000 loans that Kabbage had originated by the end of May 2020.  Further, even though these ten loans raised multiple questions about Kabbage's review and approval process for PPP applications, A&M did not increase the size of the sample of loans it reviewed.

172.    As part of its assessment, A&M requested, among other things, "desktop procedures for KYB/KYC Ticket Reviews," "payroll verification calculations," a "listing of applicants flagged for potential fraud," "current red flag listings," and "any BSA/AML and OFAC risk assessments."

173.    But remarkably, several of the documents that Kabbage provided to A&M were not documents that Kabbage actually used to track fraudulent or suspicious PPP applications.  For instance, Kesarwani created an Excel file called "Fraud Suspect List" that showed only around

250 cases of suspected frauds as of May 22, 2020 (even though Kabbage had already made close to 100,000 loans). A&M then believed that Kabbage "leverage[d]" this workbook to "track suspicious activity and instances of fraud." But Kesarwani knew this statement was false. Not only was that workbook not used by Kabbage to track instances of fraud, but the actual population of loans flagged for fraud—both disbursed and under review—was significantly higher. In fact, documents indicate that by the end of May 2020, Kabbage had flagged over a thousand loans as potentially fraudulent, and these fraud flags remained uncleared at least as of the end of the first round of PPP loans.

174. Regardless, it does not appear that any additional testing was ever done on any of the applications identified in the Fraud Suspect List. Nor does it appear that A&M, which was conducting a limited scope review, questioned how Kabbage created the list of only 250 cases of potential fraud out of the tens of thousands of loan applications it had received and approved. The circumstances of A&M's cursory review certainly were not lost on Askins, Robinson, Taussig, and others who received the report.

175. Moreover, as A&M would have learned had it been hired to conduct a more fulsome review, Kabbage's platform and purported PPP "calculation and verification" procedures had no system to catch inflated loans. Of course, as described above, certain Officers already knew that Kabbage's process to determine and verify loan amounts had systemic gaps in it, and further knew that as of June 2020, remediations on these findings were nowhere near completed.

176. A&M issued its initial Risk Assessment Report on June 11, 2020. Even though A&M's analysis was a narrow assessment of Kabbage's program, A&M found critical weaknesses in Kabbage's policies and procedures. Specifically, the report set out several categories of risk and characterized whether Kabbage's management of such risk was "Strong," "Satisfactory," or

"Needs Improvement."  The "Needs Improvement" classification indicated that "substantial gaps exist[ed]" in Kabbage's risk management systems, and that "board and executive management participation may be insufficient."

177.    A&M classified several categories of risk as "Needs Improvement," including:

- <u>Kabbage knew or should have known it was transmitting fraudulent information to the SBA</u>.  In response, A&M recommended that Kabbage "require [the] Fraud Review Team to clear an application's suspected fraud flag(s) prior to submission to the SBA for loan approval.  Current procedure appears to allow for application to proceed to the SBA prior to flag review."

- <u>Kabbage does not have a process in place to identify and report unusual activity</u>. In response, A&M recommended that Kabbage develop "SAR procedures that include escalation of suspicious activity and how to complete a SAR."

- <u>Suspicious activity is not tracked and monitored</u>.  In response, A&M recommended that "Kabbage should consider creating a formalized suspicious activity tracking document that details" various markers of fraudulent activity.

178.    A week later, in-house counsel Elizabeth Maiellaro circulated the report to multiple members of Kabbage's senior management, fraud team, and compliance department, including Robinson, Askins, and Taussig.

179.    On June 23, Maiellaro sent the report to Pietschner, noting "please review/comment as you like."  Having been among the hundreds of employees furloughed at the outset of the pandemic, Pietschner was asked to return on or around June 1, 2020, in part to help the beleaguered company with collections efforts and other work related to the massive backlog of potentially fraudulent applications.  Pietschner immediately noticed a high volume of suspicious applications. Having heard that Kabbage commissioned the Risk Assessment Report, he specifically requested to review the report and give his thoughts.

180.    The Risk Assessment Report confirmed Pietschner's suspicions, and he set out to interview several Kabbage employees on the front line of what constituted Kabbage's "fraud controls."  What he found not only confirmed the concerns raised by A&M, but it also indicated

that the gaps in Kabbage's fraud controls ran even deeper than the Risk Assessment Report identified.

181.    Pietschner determined that the best way to draw senior management's attention to the issue was to record his concerns in a formal report.  He coined the document the "Kutworm Report," named for a "leaf-eating caterpillar that ravages cabbage crops if left untreated."  The Executive Summary of the Kutworm Report stated its purpose and conclusions bluntly:

> **Kutworm-- Executive Summary**
>
> A survey to investigate and validate concerns raised by several members of various Kabbage operations teams regarding the PPP application process revealed areas of uncertain but tangible risk regarding our verification and validation processes. This includes our identity verification, business validation, loan calculation, and general eligibility processes, in which numerous seemingly nontrivial verification issues are identified in surveyed accounts, which appeared to be out of step with our stated policies, SBA guidance, and BSA/AML best practices.

The Executive Summary went on to note the inherent legal risk facing the company, including "the traditional lender's burden of uncollectable accounts, accompanied by SBA fee clawbacks for ineligible loans, and/or requests for indemnification, refund, or return from our lending partners."

182.    The body of the Kutworm Report echoed many of the concerns raised by A&M. But it also called into question many of the risk categories that A&M classified as "satisfactory" or "strong."

183.    For instance, A&M classified Kabbage's staffing levels as "satisfactory."  But the Kutworm Report noted that there were important "gaps in [Kabbage's] organizational structure that have been essentially unfilled for years."  As a result, the report advised that Kabbage had "been unable to respond to suspicious activity reports that representatives might have otherwise raised had there not been a massive crunch in attempting to manually verify account information."  The report added that, while Kabbage did retain URS Tech Solutions to help with the review of

suspicious applications, such reviews occurred "post-hoc, rather than pre-submission, and [URS Tech Solutions did] not have a direct line of communications to customer-facing Kabbage teams." Moreover, A&M's conclusion regarding staffing levels was suspect given that it did not even mention that Kabbage also was hiring high-school students to review PPP loans.  Kabbage had some of these "interns" review payroll data and even fraud flags.

184.    Similarly, A&M classified Kabbage's ability to identify fraudulent loans through its CIP as "Satisfactory."  The Kutworm Report, however, identified "numerous nontrivial verification issues with many applications that indicate [Kabbage's] CIP program may not be as well refined as we might hope."

185.    A&M likewise classified Kabbage's KYC process as "Strong."  But the Kutworm Report found "no strong indication that [KYC] reviews are being undertaken in a systemic way" at all.  In fact, the Kutworm Report goes on to provide numerous examples of applications where no social security number or ultimate beneficial owner checks had been performed.

186.    Finally, the Kutworm Report took exception with A&M's conclusion that Kabbage had adequate protections to identify "insufficient, or fictitious documentation."  In particular, the Kutworm Report noted deep concerns that Kabbage accepted "unfiled taxes and other documents that are available to anyone via the IRS website.  Such documents would appear genuine as they are indeed filled out IRS forms, but they are not reflected in bank statements, or in a realistic look at [the] customer's financial state or claimed business concern."

187.    On July 7, 2020, Pietschner sent the Kutworm Report to Maiellaro—who had sent Pietschner the Risk Assessment Report two weeks earlier—while adding, "please provide this to [Sam Taussig, Kabbage's Head of Policy] if you believe it appropriate."  But rather than springing to action to address the deficiencies found by both A&M and Pietschner, Kabbage's legal team

instead set out to pressure A&M to downgrade its negative findings.  As Maiellaro stated in an email on July 27, 2020—near the conclusion of the first round of the PPP—"*[w]e've not done anything with [the Risk Assessment Report]* but internally find several issues that we can rebut and A&M is aware that we want to have that conversation and rewrite report."  Maiellaro added that Kabbage had not even "start[ed] the review process."

188.    Pietschner followed up several times with Maiellaro but heard nothing.  Growing increasingly distressed that his report was being ignored, Pietschner began circulating both the report, and evidence backing up the report, more widely, including to nearly a dozen members of Kabbage's Operations and Risk teams.

189.    On August 24, Pietschner sent the report directly to Taussig, copying Maiellaro. For the first time since he initially sent the report, this got the attention of Kabbage management. But rather than ask Pietschner about his findings and recommendations, Taussig and Maiellaro instead pressured Pietschner to disclose his sources and whether Pietschner had "a team" to help him conduct his review.

190.    Recognizing that his report might turn over management's "ashcan," Pietschner declined to name names.  The next day, Pietschner emailed Taussig and Maiellaro that he was "kind of getting a weird vibe from this line of questioning," and asked, "*Am I gonna get fired or something for this*?"  Neither Taussig nor Maiellaro responded.  Kabbage terminated Pietschner at the closing of the Amex transaction.

191.    The failure to escalate Pietschner's concerns was not simply due to inattention or negligence.  Rather, Kabbage's Directors and Officers intentionally created a culture at the company to try to silence concerns about fraudulent loans (like those set out in the Kutworm Report) and to protect themselves from having direct knowledge of issues with the amount of fraud

in Kabbage's PPP loan portfolio. They likewise intentionally downplayed the importance of compliance to better facilitate the Amex Merger.

192.    Bank regulators expect board members of financial institutions to set an appropriate culture of compliance, establish clear policies regarding the management of key BSA/AML risks, and verify adherence to these policies in practice. A failure by board members to convey an appropriate tone at the top is often cited in BSA/AML enforcement actions. Specifically, boards must confirm that compliance policies and procedures are clear, adhered to, and endorsed across all levels of the organization. The significance of compliance must go beyond policy statements.

193.    But when the Risk Assessment Report came to Frohwein, he set a very different "tone at the top." He viewed the damning report as a "fucking disaster" for the Amex Merger, and instructed Robinson and Taussig to "punch [A&M] in the fucking face to update [the] report and pull it back" so it would not "kill our amex deal." In case the message was not clear enough, he separately texted L. Scott Askins, to "beat the shit" out of A&M and make them cut their independent assessment "wayyyyyyyy back." Askins simply replied, "sure."

194.    Askins herself contributed to Kabbage management's lax tone from the top. For instance, Askins did not bother to get Board approval for PPP-related changes to the BSA/AML Policies until late-July 2020 when it became clear that management would need to do so for the Amex Merger. And despite having taken over as the interim BSA/AML Officer after Habib's departure nearly two months prior, neither Askins nor her team even knew what version of the BSA/AML Policies was Habib's "final" version that needed Board approval. Indeed, Askins and her team spent two days between July 26 and 27 trying to figure out what if any CRR (or Customer Risk Rating) methodology Kabbage actually used for PPP loans so they could include the methodology in the BSA/AML Policies going to the Board. Taussig responded "I think it's

technically still being remediated/updated," but he was not sure.  Askins noted that the team's inability to figure out what CRR methodology Kabbage used was "super odd as only another week of PPP so weird[.]"  Ultimately, Askins team had to reach out to Azba Habib—who by this point had been gone for nearly two months—to determine what policy should go before the Board.

195.    It was not "odd," however, but entirely predictable.  By late July, Askins should have long since replaced Habib, and that person should have devoted their time to ensuring that the company's policies were up to date and observed companywide.  But Askins did not bother to install a Board-appointed and qualified BSA/AML Officer because it would have been inconvenient for the Amex Merger.  Had the Risk Assessment Report and the subsequent Kutworm Report landed on the desk of a qualified BSA/AML Officer, they would have immediately investigated the gaps identified in Kabbage's fraud controls.  Instead, Askins shuffled these issues off to Maiellaro, who complied with the unwritten rule at Kabbage not to report things like the Kutworm Report to senior management.

196.    As Hill directly informed Askins before resigning, Spencer Robinson also served as one of the lead figures in suppressing, or at least intentionally ignoring, compliance concerns. Pietschner and other Kabbage employees recognized that Robinson was part of an "***information barrier***" at the company designed to ensure that "if [the] truth can't get in," then "there's no duty to report it":

> P    Paul Pietschner <ppietschner@kabbage.com>
> Love that everything leads back to Spencer
>
> B    Bryanna Simpson <bsimpson@kabbage.com>
> honestly i have never talked to him
>
> P    Paul Pietschner <ppietschner@kabbage.com>
> Well yeah.
>
> P    Paul Pietschner <ppietschner@kabbage.com>
> He's on the other side of the semi-permeable information barrier
>
> P    Paul Pietschner <ppietschner@kabbage.com>
> if truth can't get in there
>
> P    Paul Pietschner <ppietschner@kabbage.com>
> there's no duty to report it.
>
> P    Paul Pietschner <ppietschner@kabbage.com>
> They keep the heads away from people like us for good reason.

Likewise, in a discussion with Adler, Pietschner commented that he could not even "get Spencer [Robinson] to acknowledge that us having inaccurate borrower data is even of concern":



> P    **Paul Pietschner <ppietschner@kabbage.com>**        10:32 PM
> oh I mean I can barely get spencer to acknowledge that us having inaccruate borrower data is even of concern
>
> P    **Paul Pietschner <ppietschner@kabbage.com>**        10:32 PM
> it took a week to get two sentences out of him
>
> P    **Paul Pietschner <ppietschner@kabbage.com>**        10:32 PM
> Meanwhile I explained it to Liz and Sam four times
>
> P    **Paul Pietschner <ppietschner@kabbage.com>**        10:32 PM
> while amit similarly twiddled his thumbs

197.    Pietschner similarly implored Taussig, "I'd appreciate your backing me up on 'can someone who makes Leadership Money please look into this.'"  But Taussig did nothing.

198.    If Kabbage had proper compliance staffing, policies, and procedures in place, Pietschner's concerns, as outlined in the Kutworm Report and accompanying documents, would

have been reported further up the chain. Although Taussig did nothing with the Kutworm Report, and Frohwein, Petralia, and Askins were obviously unlikely to do anything about the report even if it did land on their desks, Kabbage should also have had policies and procedures in place to ensure that such concerns reached the full Board. Regardless, the lack of response to Pietschner's well-founded concerns—and apparent intimidation of Pietschner as a potential whistleblower—ran counter to common sense, not to mention best practices, industry standards, the False Claims Act's anti-retaliation provisions, and various other federal statutes that bar retaliation for reporting misconduct.

199.     Meanwhile, by late July, Amex developed suspicions about Kabbage's compliance issues. Thus, when Amex learned of the Risk Assessment Report, it asked for a copy in its due diligence process. Before the report could go to Amex, Frohwein received the report himself for the first time. He immediately texted Spencer Robinson and Sam Taussig in a rage, complaining "that fucking report is going to kill our amex deal." Even though the report was necessary to participate in the PPP—and Frohwein approved the report himself—he now viewed the report as "self inflicted and way out of scope." When Robinson tried to suggest it might not be a problem, Frohwein shot back, "if you read the report, you'll see the problems. They're all in red—literally. We're sending fraudulent data to the SBA. We aren't performing calculations correctly and on and on and on." Rather than address the issues raised by A&M's report, Frohwein's message to his team was to bury it: "[G]et with [General Counsel L. Scott Askins]—keep it attorney client privileged and punch them in the fucking face to update that report and pull it back."

200.     Following Frohwein's instructions to cut the Risk Assessment Report "wayyyyyyyyy back," the Officers obediently argued to A&M that Kabbage had "remediated" the identified deficiencies. But Kabbage had done no such thing. In fact, on August 10, 2020, two

months after receiving the report and only days before the Amex deal was signed, Maiellaro told

L. Scott Askins that she still had not "been able to focus on [the Risk Assessment Report]."

201.    Kabbage's comments nevertheless convinced A&M to downgrade the noted

deficiencies.  Kabbage was thus able to accomplish its cynical goal of shelving the report before

the Amex Merger closed.  Notably, several of the fraudulent borrowers flagged by Pietschner's

response to the A&M report have since faced criminal charges for defrauding the PPP.  Still more

loans identified by Pietschner were linked by their IP addresses to other fraudulent borrowers that

likewise faced criminal charges.

**8.    Although the Board has multiple formal and informal meetings between April and October 2020, the Directors do not inquire about Kabbage's compliance with PPP laws.**

202.    Given the Amex negotiations, the Board had multiple formal and informal meetings

between April 2020 (the start of the PPP) and August 2020 (the end of the PPP and the execution

of the Amex Merger agreement).  Yet, during this time frame, aside from approving an updated

BSA/AML Policy in July 2020, the Board meetings and materials after April 2020 are devoid of

any suggestion that there was any substantive discussion of BSA/AML compliance issues.  Even

at the July 29, 2020 meeting at which the Board approved the updated BSA/AML Policy, the

Board asked no questions and expressed no concern that management was just now seeking

approval of the policy despite the PPP being near its close.

203.    Notably, with regard to the few pre-merger Board meetings with minutes reflecting

any discussion about the PPP, L. Scott Askins hastily drafted those minutes on August 1 at 1:00am

because she knew Amex expected to see them included in the diligence materials.

204.    Not surprisingly, between August 2020 and closing of the Amex Merger in October

2020, the Board continued to largely ignore BSA/AML compliance issues despite numerous

stories emerging in the press that Kabbage was a "'go-to' for fraudsters" seeking to obtain fraudulent PPP loans.

205.    The Board knew that, after April 2020, it was not receiving any reports from the Chief Compliance Officer (Askins) or BSA/AML Officer (also Askins after June 2020) on compliance matters and risks.  Given that the PPP was a short-term program that was clearly a dramatic departure from Kabbage's prior lending activities—especially given the volume of loans that Kabbage was approving and the fact that PPP lending represented the company's only active business—the Board's failure to ask for and receive reporting on BSA/AML compliance matters demonstrates a conscious failure to monitor and oversee Kabbage's operations.

206.    Moreover, the fact that the Officers knew about specific "red flags" yet never disclosed them to the Board further supports an inference that the Board failed to act in good faith. As described above, certain Officers knew, *inter alia*: Kabbage's former Head of Fraud, Hill, raised concerns about Kabbage's lack of fraud controls; Kabbage's former BSA/AML Officer raised concerns about Kabbage's KYC/KYB and related policies; Kabbage was woefully understaffed to conduct reasonable reviews of PPP loan applications; Kabbage had identified errors in its lending platform that were leading to Kabbage making inflated PPP loans; Wells Fargo terminated its banking relationship with Kabbage in part because of its growing concerns about Kabbage's deficient fraud controls; and A&M classified several categories of risk as "Needs Improvement."  Kabbage employees, as demonstrated by the Kutworm Report and accompanying materials, believed that the gaps in Kabbage's fraud controls ran even deeper than the Risk Assessment Report identified.  Although each of these issues were at the very least "red flags" of Kabbage's violations of the law and major compliance failures, none of them were disclosed to the Board.

D.    **Motivated to Cash Out for the Highest Amount Possible, Defendants Decide to Leave Kabbage Hopelessly Insolvent.**

207.    Defendants knew that Amex did not want to assume Kabbage's PPP liabilities, including the legal "liability flowing from fraudulent applicants" that would lead to the "government . . . and others suing them." Kabbage's Officers knew about the underlying conduct at Kabbage—as described above—that would form the basis for the government's claims. Kabbage's Directors, despite being fully aware of Amex's significant concerns about potential PPP liability, chose to remain deliberately ignorant of the specific facts underlying Kabbage's illegal conduct.

1.    **Defendants know that Amex does not want the PPP loan portfolio and the liabilities associated with it.**

208.    Amex made its first offer to Kabbage in April 2020. But rather than proposing a purchase of Kabbage's stock, Amex structured the proposed transaction as an asset sale. It did so explicitly because it had no interest in purchasing either Kabbage's toxic legacy loan portfolio or its newly expanding (and equally toxic) PPP portfolio.

209.    On April 29, 2020, Goodwin, which Kabbage ultimately retained as deal counsel, talked with Askins about creating a workable structure for the deal since "an asset deal seems unworkable from our side." During the conversation, a Goodwin partner and Askins "did a brainstorm . . . on a spin out structure where we could possibly take the loan book and any unwanted assets and spin them out so that [the] buyer could acquire the legal entity."

210.    Meanwhile, Amex conducted initial diligence regarding the PPP portfolio. On May 1, it hosted a call with the subject "Fraud Risk Deep Dive" with Frohwein, Petralia, Robinson, and other members of Kabbage's senior management. During the call, the Kabbage team had a running text exchange in which they complained about "painful" questioning from, as Petralia put it, the "freaking Amex fraud guys." Frohwein stated to Petralia and others that the questions on "fraud

risk" were just "piss[ing]" him off.  But Robinson acknowledged that "it's a difficult spot for me to push back on the questions."

211.    Given Amex's concerns about the fraud risk and Kabbage's clear inability to address these concerns, the Officers soon grew convinced that the structure originally proposed by Goodwin to "orphan" the PPP portfolio was the best solution.  As the Officers recognized, doing so would allow Kabbage to dodge Amex's persistent questions about, as Frohwein put it, "the ongoing liability re PPP."  Under Goodwin's contemplated structure, the "liability re PPP" would all reside in an entity that neither Amex nor Kabbage's shareholders cared about.  As Kabbage's Head of Data Science marveled to Frohwein, "basically we can say bye felicia to our outstanding bad debt."

212.    For its part, Amex's initial diligence certainly did not change its mind regarding whether to take on Kabbage's loan portfolios as part of the deal.  Thus, Amex and Kabbage agreed very early during negotiations to pursue a plan to abandon Kabbage's loan portfolios.

213.    On June 9, 2020, the Kabbage Board met for an update on the negotiations with Amex.  Frohwein started the meeting by advising the Board that a sale to Amex would "***mitigate [the] risk of law suites*** [sic] ***around PPP***."  While recognizing that any future lawsuits would still be against Kabbage, the entity to whom they owed fiduciary duties, the Directors do not appear to have asked about the nature of the possible lawsuits or the extent of the legal liability Kabbage was facing.  Instead, the Board was solely focused on extracting immediate value for themselves and their affiliated investment vehicles.

214.    Frohwein recommended to the Board that Kabbage counter at $685 million, while insisting both on the structure developed by Goodwin, and further insisting that all cash (other than

what the legacy company would need to service Kabbage's loan portfolio) would be "sold" and added to the purchase price.

215.    On June 22, 2020, Amex responded at $625 million.  Critically, Amex confirmed that the purchase price would be increased by cash held at Kabbage other than what was needed to serve the loan portfolio.  Amex insisted, however, that some proceeds of the sale be placed into escrow to account for litigation risk and other contingent liabilities.

216.    Amex stated that it could not propose a size of the escrow until it completed its due diligence and determined whether and to what extent it would seek representation and warranty ("R&W") insurance.

217.    With a number in hand that the Board and shareholders were likely to approve, Kabbage gave Amex a 30-day exclusivity letter, which allowed for final due diligence and preparation of the governing transaction documents.

**2.      Defendants know that while they are turning a blind eye to Kabbage's illegal conduct, Amex harbors reservations about Kabbage's PPP loans.**

218.    Although the parties had agreed in principle on a number—and further agreed that they would structure the deal in a manner that would isolate the risk posed by Kabbage's PPP loans—Amex harbored great reservations about its own potential liability should it move forward with the deal.  Accordingly, much of Amex's final diligence leading up to close was focused on issues related to the PPP.

219.    On July 15, Amex's Credit Risk team provided a series of new diligence questions in a document named "fraud risk session side by side."  Among other things, Amex asked about the "key drivers to [Kabbage's] fraud loss since 2015," and about Kabbage's "process to combat fraud."

220.    Frustrated, Frohwein told Amex that he was "about done with [due diligence] and that we need to reconsider moving forward.  This is all such bullshit."  Kabbage's CFO texted Frohwein and Petralia that perhaps Amex might look at unforgiven loans as an opportunity, noting that "what doesn't get forgiven flips into a yield/income play on PPP vs. SMB."  Petralia responded that, while potentially true, "I have this ominous feeling that a lot of what isn't forgiven is fraud."

221.    On July 17, Frohwein and Robinson had a call with Amex's Credit Risk team regarding their fraud concerns.  During the call, Amex asked pointed questions about Kabbage's fraud controls.  Fully aware of the issues facing Kabbage's PPP portfolio, Robinson noted to Frohwein that "***the fraud questions are bad . . . in that I don't disagree with them***.  We might be better off acknowledging that we could use some help from amex there."

222.    Frohwein tacitly conceded Robinson's point, but rationalized Kabbage's lax attitude toward fraud because Kabbage's business was "set up to manage a tolerable amount of fraud":

> I think one of the things on fraud is that [Amex is] set up to catch each instance.
> ***We are set up to manage a tolerable amount of fraud, right?***  We are a volume
> shop[.]  Our fraud approach needs to be reasonable under these circumstances.  You
> can cut [out] 100% of the fraud and 100% of the opp.  Also, we work with much
> smaller loan sizes.  We have (at times) applied more fraud controls to larger ticket
> sizes[.]  Am I completely off base here?

Robinson responded, "you're right[.]  We've consistently looked at what tighter fraud rules would have 'cost' vs what we 'lost' due to the fraud and we've come out ahead."  Implicit in Frohwein and Robinson's discussion is that the cost of Kabbage's compliance with PPP guidelines was too great to bear given their assumption that the government would bear the loss.

223.    By late July, Amex had prepared a "Final Readout" summarizing its findings from months of diligence.  Amex reached several damning conclusions about Kabbage's compliance program, including:

- "Basic policies and operations are in place, but program is not well-documented or monitored.  Many processes are manual, rudimentary, and appear to not be scalable."

- "[Kabbage] staffing size and expertise may affect ability to strengthen controls."

- "External reviews highlight significant weaknesses in key processes."

- "Any [Amex] role in program management for back [loan] book will likely include compliance-related functions and extend beyond tracking payments and managing customer contact.  PPP processes, esp[ecially] not-yet-defined forgiveness flows, heighten risks and uncertainty involved with back book servicing."

- "Significant lack of documented processes, business testing/controls, and established oversight procedures need to be addressed."

- "Significant reliance on third parties . . . with minimal oversight and lack of clarity of controls."

224.    Amex also internally noted in late July that Kabbage's "compliance program lacks clear inventory of controls, consistent evidence of internal oversight, and detail on process for or output of regular risk assessments."   Given these profound concerns, Amex concluded that "historical liability" from Kabbage's compliance program "cannot be precisely assessed."

225.    Based on its serious questions about Kabbage's fraud and compliance controls, Amex also second guessed its agreement to include cash from the PPP in the purchase price.  After a July 26 call with Amex executives, Frohwein informed some of his team and Kabbage's lawyers that "*they [Amex] are concerned that the burden to prove that enough money was left in legacy co shifts to [Amex] if they push our cash from PPP through the transaction*."   In other words, Amex was concerned about its potential future liability on a fraudulent-transfer or similar claim by an insolvent and bankrupt legacy Kabbage.

226.    One way that Amex sought to protect itself was by increasing the size of the escrow contemplated by its earlier discussions with Kabbage.  By the end of July, Amex was insisting that

$37.5 million of the sale proceeds be placed into the escrow as a backstop to protect itself from liability.  On August 4, Frohwein had yet another call with an Amex executive focused on the PPP, during which, as Frohwein recounted to Kabbage's Goodwin attorneys, Petralia, Askins, and others involved in papering the deal, that executive "explained that [Kabbage's PPP program] is much larger than it used to be, they perceive more risk, yada yada."

227.    Given that Kabbage's PPP customers represented the core of Kabbage's business, some at Kabbage actually questioned why Amex would want to "abandon" them when it comes to servicing the PPP loans.  Frohwein responded bluntly to the question, on a text message thread that also included Petralia, that Amex is "***very worried about legal liability***," adding that "***the thing that worries them legally is any liability flowing from fraudulent applicants, anything that would give the government, applicants and others suing them***."  When Kabbage's CFO noted that it may be cheaper for Amex to be more closely involved in servicing PPP loans, Frohwein noted, in the same text thread that included Petralia, that "[Amex is] not going to love that answer.  ***They're worried about PPP***. . . .  This is not about them saving us money.  ***It's about separating legal liability***."

228.    Frohwein was similarly blunt with the other members of Kabbage's Board, telling Stolle that Amex was washing its hands of the PPP portfolio because of "litigation risk."  Not surprisingly, the major shareholders that had seats on the Board were likewise concerned about litigation risk.  For instance, in conversations with Kabbage's counsel, Chulack, who was appointed to the Kabbage Board by Reverence, advised that Reverence wanted nothing to do with ownership interest in the legacy Kabbage entity after the deal.  Counsel passed this request along to Frohwein, noting "This is 'Amex syndrome'—***they are paranoid about having some other liability***."

229.    Ultimately, Amex got comfortable enough with its risk to move forward with the deal, but only after Kabbage agreed to an unusual amount of concessions designed to shield Amex from government investigations and other litigation, including (i) a solvency opinion for Kabbage post-transaction; (ii) an R&W insurance policy paid in part from the sale proceeds; (iii) a $37.5 million escrow that would serve as additional insurance for Amex in the event of, among other things, litigation related to the PPP; and (iv) broad indemnification rights against both Kabbage shareholders and Kabbage itself (which received none of the sale proceeds).

**3.      The Officers agree to get the solvency opinion requested by Amex as a condition for the deal, but they ensure that the opinion is unreliable.**

230.    Wanting to close the deal as soon as possible, Kabbage Officers determined they needed to obtain a draft of the solvency opinion promised to Amex by August 7.  A month earlier, Kabbage had retained Houlihan to conduct a valuation of Kabbage's loan portfolio for tax reporting purposes.  Given that Houlihan had already begun its work on the valuation, Kabbage thought Houlihan would be a natural fit to perform the solvency opinion as well.

231.    Critical to a solvency opinion in this deal, of course, was proving that the value of Kabbage's assets exceeded the value of its liabilities, and that Kabbage had the ability to pay its debts as they came due.  To this end, Kabbage instructed Houlihan to make two key assumptions.

232.    First, Kabbage insisted that Houlihan treat the liabilities associated with its bankruptcy-remote, asset-backed security receivables as "non-recourse" debt to Kabbage.  In Kabbage's view, their non-recourse character meant the fair value of these liabilities would be less than their book value—meaning the legacy company could pass the solvency test requiring the fair value of liabilities not to exceed the fair value of assets.  Thus, Houlihan was "instructed to carve out the Non-Recourse [debt] (and associated assets) for purposes of the" solvency analysis.

233.    Second, Kabbage instructed Houlihan to assume that all of the PPP loans in Kabbage's portfolio—which Kabbage already knew was riven with fraud—would be forgiven by the SBA.  Accordingly, on July 28, Kabbage's CFO set up a call with Houlihan to discuss the opinion, noting that "as part of the solvency, we would like to get a sense of [Houlihan's] familiarity with the PPP program and particularly the latest ongoings about blanket forgiveness of loans which would directly be related to the cash capital needs of the company."

234.    From the start, Houlihan was concerned by Kabbage's insistence that the non-recourse assets and liabilities be excluded from the solvency analysis.  After all, Kabbage's assets included non-recourse, asset-backed securities with a fair value of $654 million, while the funding costs for those assets saddled Kabbage with a $695 million book value of related liabilities.  Though Kabbage repeatedly emphasized that its "funding debt does not need to be repaid at book value as it's non-recourse," that was an untested assumption Kabbage made to avoid having to retain massive amounts of cash to repay the full funding cost of the debt.

235.    In a discussion with Kabbage's CFO on or around July 30, Houlihan conveyed its hesitancy to provide a formal solvency opinion given that, absent Kabbage's assumption about the non-recourse assets and liabilities, the fair market value of Kabbage's assets (as recently marked by Houlihan's valuation team) was, on its face, less than the book value of its debt liabilities.

236.    On the PPP front, Houlihan discussed internally that there had "been some discussion that smaller PPP loans ($125-150k) could just be forgiven by Congress," but noted that "there is nothing official."  Houlihan recognized that there were still a "lot of questions around: what the level would be for 100% forgiveness, if it would apply to larger loans as well, if there is a demonstrated need based on lost revenue, when it would happen, etc."  Houlihan was concerned enough by Kabbage's insistence that it assume away all non-recourse debt without any analysis,

and being asked to ignore the possibility of contingent liabilities for Kabbage's PPP obligations did not improve its comfort levels.

237.    Houlihan nevertheless presented the engagement to its pricing committee while considering Kabbage's proposed assumptions, as reflected in the resulting draft engagement letter:

> The Company has advised and instructed us, and we will assume, without independent verification, that the Non-Recourse Assets and Non-Recourse Debt, to be identified to us in writing, should be excluded from our analyses and our Opinion. The Company acknowledges and understands that if the Non-Recourse Assets and Non-Recourse Debt were to be included in the assets and stated liabilities of the Company, respectively, such inclusion would lead to a materially different outcome. Further, the Company has advised and instructed us, and we will assume, without independent verification, that the PPP loans have the full backing of the United States Government and if a borrower under that program were to default, the U.S. Government would forgive the loan.

238.    Ultimately, Houlihan was so uncomfortable with the massive assumption regarding the treatment of non-recourse debt that it declined the solvency engagement on that basis, obviating the need to seriously consider the added risk of assuming "blanket forgiveness" of billions of dollars of loans. But even at a surface level, Houlihan's transaction opinion team saw "a lot of risk" in taking on the engagement. Houlihan particularly bristled at making a material assumption that it had spent no time assessing. Given the scope of diligence Houlihan wanted and would need to perform on the non-recourse liabilities, and the fact that Kabbage needed a solvency opinion in less than a week—to speak nothing of the fact that Kabbage's PPP portfolio would not withstand Houlihan's diligence—Houlihan advised Kabbage on August 1 that it would be unable to take the engagement.

239.    Now needing a solvency opinion prepared in less than a week, Kabbage scrambled to find a replacement firm. Kabbage's CFO lamented to Frohwein, Askins and others that "the solvency firms have a view that the opinion has an element of risk to it." He noted that Houlihan

turned it down because of that risk, and further noted that A&M—which got a front-row view of Kabbage's fraud controls—might turn it down for the same reason.

240.    Kabbage thus focused its efforts on Duff & Phelps because they were willing to go along with Kabbage's assumptions regarding the non-recourse liabilities and "blanket forgiveness," as well as the risk that such assumptions would entail.

241.    On August 2, Duff & Phelps agreed to provide a draft of its solvency opinion by August 7, although a formal engagement was not even signed until August 5.  Unlike Houlihan, Duff & Phelps was willing to enter the engagement with the explicit agreement that it would exclude "Non-Recourse Liabilities" from its solvency calculation.

242.    Kabbage thus proceeded to work with Duff & Phelps to determine the bare minimum amount of cash that would need to be left in Kabbage to satisfy both its servicing obligations as well as to satisfy what Amex termed in the Merger Agreement as "liabilities to third-parties that are known by [Kabbage] or are reasonably likely to exist."  Rather than take a good faith approach to determining that number, Kabbage viewed it as a "deal within a deal," wherein Kabbage pressured Duff & Phelps to require as low a number as possible.  Amex fully understood Kabbage's efforts, noting internally that Kabbage was seeking to "put whatever they can" in Amex Kabbage "less some leftover that will remain to operate Legacy [Kabbage]."

243.    Notably, the model on which Kabbage based its anticipated $15 million in servicing costs did not accurately reflect the cost of servicing PPP loans, which in some respects involved more obligations than even the SBA's 7(a) Loan Guaranty Program.  In fact, Kabbage executives did not even bother to comprehensively understand those servicing obligations until after the solvency opinion was complete.  Kabbage's Board and management likewise knew or should have

known that their loan servicing model did not account for the inevitable rise of servicing costs arising from the massive amount of fraudulent loans issued by Kabbage.

244.    Kabbage's ill-informed attempt at a servicing model was not even the most glaring issue with the solvency opinion.  On August 3, Kabbage's outside counsel reminded Frohwein, Askins, and other Kabbage executives that whatever cash is left with Kabbage is supposed to include "what we expect to be contingent liabilities left at [Kabbage] too."  But even counsel had no expectation that Kabbage would seriously value its contingent liabilities.  In response to Bhambani saying that Kabbage intended to reserve $1 million "for litigation," Kabbage's outside counsel responded that would be fine "as long as there is something, and it takes into account legal spend and potential settlement cost."

245.    Askins, who had knowledge of Kabbage's compliance failures, clearly knew that $1 million was not sufficient.  In fact, she noted that "the defense costs alone for outside litigation counsel have been higher than $1M annually in the past."  Of course, that historical benchmark pre-dated the PPP, where Kabbage originated nearly as much loan value in six months as the company had underwritten in its entire history before the PPP combined.  Despite this, neither Akins nor any other Kabbage executive proposed reserving a significant amount for potential litigation exposure related to Kabbage's deficient lending platform or the risk that Kabbage's PPP loans might not be forgiven or guaranteed.

246.    In its August 11 opinion—which was provided to the Board—Duff & Phelps set out the extraordinary assumptions it was making at the direction of Kabbage management, including only $1 million reserved for litigation costs.  In addition, the solvency opinion noted that "Management has assumed that lenders will be able to shield themselves from any liability relying

on the SBA's 'good faith' clauses with respect to actions it took reviewing borrower documents when originating and servicing loans":



### Cash Flow / Capital Adequacy Analysis
#### Base Case - Key Assumptions Reviewed (continued)

**PPP Key Assumptions**

- A wind-down of operating costs based primarily upon the expected run-off of loans outstanding (due primarily from SBA forgiveness & guarantees):
  - "Blanket Forgiveness" available for loans under $150,000, which Management based upon review of current versions of the proposed HEALS Act.
  - 97% - 98% (depending on cohort) of the loans below $150,000 are gradually forgiven over an 11-month period after the 6-month deferral period;
  - 75% of the loans above $150,000 are forgiven by the 7th month after the 6-month deferral period.
- Management has assumed that lenders will be able to shield themselves from any liability relying on the SBA's 'good faith' clauses with respect to actions it took reviewing borrower documents when originating and servicing loans.
- Management assumed net interest will be accrued monthly on the outstanding balance at an annualized rate of 0.65% (1% interest income less 0.35% PPPLF interest expense) until the balance is forgiven. Unforgiven amounts are assumed to continue to accrue interest until the loans mature.
- Responses to SBA Loan Reviews requesting documents on loans can be executed on an automated basis with very low cost.
- Management assumed financing of unpaid PPP interest ahead of repayment from the SBA at a financing rate of 5-year Treasuries plus 75 basis points.

247.    Even the "sensitivity case" set out in the Duff & Phelps opinion—which was intended to represent "reasonable downside scenario projections"—contemplated only $949,000 of "PPP put back liability" to account for PPP loans that Kabbage would be contractually obligated to buy back from either the PPPLF or its partner banks because of its shoddy review of PPP applications.  This represented less than 0.014% of the more than $7 billion in PPP loans processed by Kabbage.

248.    On August 11, 2020, the Kabbage Board met to discuss both the Duff & Phelps solvency opinion and the proposed deal with Amex.  The Board did not question the assumptions in the Duff & Phelps solvency opinion.  And even though Frohwein suggested that "litigation risk" was one reason the Board should approve the Amex Merger, the Board did not ask about the scope of Kabbage's litigation risk or any of its contingent legal liabilities.  Nor did it question why a $1 million reserve, which was clearly insufficient on its face, was reasonable.

249.    The Board also did not inquire into management's assumption that Kabbage could "shield [itself] from any liability relying on the SBA's 'good faith' clauses with respect to actions

it took reviewing borrower documents when originating and servicing loans." More specifically, the Board did not ask: whether Kabbage had any assessments regarding its PPP lending practices and procedures, such as the A&M Risk Assessment Report; whether the Officers had conducted any internal investigations into fraud and related issues; whether there were any reports from Kabbage employees about PPP fraud; how many loans Kabbage had flagged as potentially fraudulent; or how many SARs Kabbage had filed.

### 4.   The Board approves the Amex Merger on August 13, 2020.

250.   On August 13, Kabbage's Board approved the finalized Merger Agreement. That same day, holders of a majority of Kabbage's shares (as well as each class of its preferred shares) signed a written consent approving the Merger Agreement.

251.   Pursuant to the plan devised by Kabbage's counsel, Exhibit K of the proposed Merger Agreement set out six steps that the parties had to undertake for the deal to close:

- **Step One:** Kabbage forms a wholly owned subsidiary, Alpha Kabbage, Inc. (which later becomes Amex Kabbage). Amex Kabbage, in turn, creates a wholly owned subsidiary, Merger Sub, LLC.

- **Step Two:** Three days prior to closing, Kabbage merges into Merger Sub, LLC. As a result, Kabbage becomes a wholly owned subsidiary of Amex Kabbage, with Kabbage equity holders receiving identical securities in Amex Kabbage.

- **Step Three:** On the same day as Step Two, Kabbage converts from a Delaware corporation to a Delaware limited liability company in order to qualify as an "F" reorganization for income tax purposes and therefore not trigger income tax liability.

- **Step Four:** Kabbage transfers the assets being acquired by Amex to Amex Kabbage (*i.e.*, the Fraudulent Transfer).[18]

---

[18] Specifically, as set forth in an exhibit to the Merger Agreement, the "Transferred Assets" were "all right, title and interest in and to any and all tangible and intangible property, rights, privileges, powers and franchises, and any and all other assets or interests, of [Kabbage] except the Excluded Assets." The "Excluded Assets" included Kabbage's PPP loan portfolio and its legacy loan portfolio.

- **Step Five:** A day after Step Four, Kabbage converts back to a Delaware corporation.

- **Step Six:** Amex Kabbage merges into an Amex subsidiary, Green Acquisition Merger Sub, Inc., with Amex Kabbage surviving. Each of Amex Kabbage's equity holders receives the applicable per share purchase price, and in exchange, their shares are cancelled. Each equity holder (other than Reverence and holders of Series F preferred shares) receives a proportional share of common stock of Kabbage.

252.    As alleged above, these steps represented a cynical attempt by the Directors and Officers, on behalf of themselves and their affiliated shareholders, to make off with PPP cash and leave Kabbage with all the risk and barely any resources. Specifically, following the second step of the Merger, Kabbage's shareholders owned Amex Kabbage and, indirectly, Kabbage, because Kabbage was a wholly owned subsidiary of Amex Kabbage. At this time, the value of the shareholders' interests in the Kabbage enterprise was equal to the value of Kabbage's assets minus all of its liabilities, including its PPP-related liabilities. This is because *all* assets and liabilities were held by Kabbage, the wholly owned subsidiary of Amex Kabbage.

253.    But when Kabbage made the Fraudulent Transfer to Amex Kabbage, the value of the shareholders' interests in the Kabbage enterprise materially increased. This is because the Fraudulent Transfer separated Kabbage's principal assets from its massive liabilities, leaving Kabbage—but not Amex Kabbage—hopelessly insolvent.

254.    Simply put, the purpose and effect of the various merger steps, including the Fraudulent Transfer from Kabbage to Amex Kabbage, was to directly benefit Kabbage's shareholders, including Defendants.

255.    Kabbage and Amex executed the Merger Agreement on August 16, 2020.

E.    **Between August and October 2020, the Directors and Officers Receive More Evidence that Kabbage Will Be Hit with Lawsuits.**

256.    By the fall of 2020, Pietschner, who drafted the Kutworm Report, had seen enough to conclude that Kabbage management had intentionally ignored issues with its lending platform in order to facilitate a deal with Amex.  He brought his concerns (including the information contained in his Kutworm Report) directly to the SBA.  But the SBA's investigators did not move on Pietschner's concerns in time to affect the Amex Merger.

257.    The Department of Justice, however, was ramping up its efforts to crack down on PPP fraud.  Unsurprisingly, many suspected fraudulent borrowers had received loans through Kabbage, and Kabbage was hit with what Maiellaro deemed a "subpoena tornado!"  On September 10, 2020, Maiellaro asked a legal team member, "How many grand jury subpoenas do we have?"  The employee answered, "Like 50.  We have probably received 15 in the last few days alone.  It's insane."  Maiellaro mused, "*I guess the volume of subpoenas is reflective of the amount of fraud in the program* and I guess it could reveal something Kabbage has not done perfectly."

258.    Journalists had come to the same conclusion as Maiellaro.  On September 8, 2020, Kabbage's Head of Communications forwarded Frohwein, Petralia, Askins, and others questions from a Miami Herald reporter, noting that the newspaper "was poking around Kabbage's PPP data with the story we let in more fraud than most" and that "Kabbage was a 'go-to' for fraudsters."  Frohwein flippantly replied, "We need to crush this BS story obviously."   But Kabbage management could not deny that the Miami Herald was onto something.

259.    For instance, Kabbage's draft response to the reporter noted that Kabbage only rejected 0.2% of applications due to eligibility or fraud concerns—much lower than the 11% average rejection rate across PPP lenders.  Askins commented, "did we only reject 0.2% v 11%

avg – that seems like we let stuff through?"  Amex reviewed Kabbage's draft response and objected to the inclusion of the ".2% fraud stat."  Kabbage did not disclose this figure to the reporter.

260.    The article was published September 10, 2020, with the headline, "Quickie lender Kabbage doled out billions in PPP loans.  A number of borrowers raised red flags."  The article identified 75 companies that received loans of $150,000 or more from the PPP program even though they appeared not to exist before the spring of 2020 (rendering them ineligible because companies had to be in existence prior to February 15, 2020, to qualify for PPP loans) or appeared otherwise ineligible.  Of those 75 companies, 20% got their loans from Kabbage, even though Kabbage processed fewer than 1% of all loans included in the analysis.  The article detailed several of the suspicious loans.

261.    Frohwein circulated the article to Petralia, Askins, and Taussig calling it "a Doozy."  He asked how many of the 15 specific loans noted in the article actually got funded by Kabbage and requested that the group reply all to "keep this attorney client privileged."  Kabbage's Head of Communications replied, "4 were not funded.  1 didn't return a relevant account[.]  10 were funded, 6 of which do not have fraud flags."

262.    If any of the Officers had acted in good faith and with the requisite care, they would have asked for more information on the Kabbage loans identified in the article.  Notably, any reasonable inquiry into the four "flagged" loans would have shown that they were connected to yet other fraudulent applications.  For instance, based on a later-filed criminal indictment against the persons behind the FMP Media loan (a loan identified in the article), that loan was connected to fraudulent loans made by Kabbage to other purported companies such as Hazelnut Café, Cord Newman Global, and Green Forest Sprinklers.  In fact, Kabbage had internally flagged each of these loans as potentially fraudulent on the same day that it flagged the FMP Media loan as

suspicious.  According to the criminal indictment, Cord Newman Global provided Kabbage with voided checks, IRS schedules, and invoices to support its PPP loan.  But the documentation was false and fabricated on its face.  According to the criminal indictment, the invoices contained basic errors such as references to "Cord Welborn Global" instead of the purported business Cord Newman Global.  Certain persons connected to these fraudulent loans have pleaded guilty.

263.    Three of the loans mentioned in the article that were not tagged as potentially fraudulent by Kabbage were actually fraudulent.  For instance, two of the loans were connected to Brian Criss.  The DOJ filed an information against him on September 30, 2020, and he later pleaded guilty to claims based on the fraudulent PPP loans.  Criss's companies were first registered in May and June 2020, making them ineligible for PPP loans, and yet they received loans mere days later.  Further, Criss had defaulted on a prior SBA loan, which also made him ineligible for PPP.  Yet Kabbage gave his companies approximately $423,000 in PPP funds.

264.    Kabbage also did not place a fraud flag on the loan to Bootstate Financial Group, another loan mentioned in the article.  Bootstate Financial Group, however, was not in operation and had no employees.  The DOJ ultimately brought a forfeiture action to recover the PPP funds Bootstate Financial fraudulently received.

265.    Clearly, the story was not "BS," and Kabbage was not able to "crush" it.  The Miami Herald article contained a clear warning of Kabbage's potential future liability: it noted that a Representative from Florida had called to hold Kabbage and other lenders accountable for insufficient oversight of loans they had approved.

266.    On September 21, a Bloomberg reporter approached Kabbage with questions similar to the Miami Herald's.  Kabbage and Amex coordinated to spin the responses to questions about Kabbage's fraud protocols to focus on how Kabbage provided loans to small, marginalized

businesses and saved jobs. However, unlike the Miami Herald report, the Bloomberg story was based on DOJ complaints where the fraud had been verified. Kabbage could not spin, for example, that The Little Piglet Soap Company—which Askins had cavalierly joked about in June 2020—was a fraud and had received a $414,000 PPP loan from Kabbage.

267. Then, on September 30, Kabbage received yet another inquiry from a reporter with a non-profit government oversight group looking to write a story on PPP loan fraud. This reporter asked the following pointed questions: "At least 6 PPP loans lent out by Kabbage allegedly were fraudulently obtained, according to our review of Justice Department charging documents and analysis of PPP loan data. That's among the most of any single lender to date. What steps did Kabbage take to reduce fraud?" and "Given that Kabbage has written that 'over 75% of all applications were processed without human intervention or manual review,' that on average it took no more than four hours to approve loans, and that 98% of PPP loan applicants were new customers, how did Kabbage adequately conduct due diligence to be compliant with AML/BSA requirements?" The reporter also shared the names of the borrowers that were subject to criminal complaints. The reporter's email reached Frohwein, Askins, Petralia, Taussig, and others.

268. Three of the loans—all made by Kabbage in early June for the exact same amount ($195,383)—were part of an August 28, 2020 criminal complaint filed by the DOJ. After one Kabbage account review analyst reviewed that complaint on September 1, she remarked that three of the borrowers "somehow . . . [had] the same W3's but didn't get flagged."

269. Despite having read the Kutworm report detailing many of Kabbage's ineffective fraud controls, Taussig blamed the SBA, not Kabbage, for allowing the fraud through, stating: "At the end of the day it's the SBA's shitty rules that created fraud, not KBG [Kabbage]."

F.     **Kabbage Makes a More Than $730 Million Fraudulent Transfer to Amex Kabbage.**

270.   Pursuant to the terms of the Amex Merger Agreement, on October 13, Kabbage converted to a limited liability company and made the Fraudulent Transfer by transferring substantially all of its assets and liabilities to Amex Kabbage.  This transfer, of course, did not include Kabbage's PPP loan portfolio and its attendant liabilities.  It did, however, include $120 million in cash that Kabbage earned through the PPP.  This money was paid by SBA to support the costs of servicing the PPP loans, but unlike the money, those obligations stayed with Kabbage.

271.   On October 15, Duff & Phelps issued its "bring down" opinion, which contemplated leaving only $17 million in Kabbage.  Just like Duff & Phelps's initial solvency opinion, this number reflected only $1 million reserved for potential legal fees and settlements, and only increased the "put back liability" to $1,058,000.  At this point, of course, both Kabbage and Amex had repeatedly recognized that this liability—as well as the litigation risk posed by Kabbage's PPP loans more generally—was much greater.

272.   The fact that the Fraudulent Transfer would render Kabbage insolvent was so obvious that Goodwin attorneys joked on October 15, that Duff & Phelps was "dumb for issuing the solvency opinion."

273.   On October 16, the Merger Agreement closed, and Amex Kabbage merged into Green Acquisition with Amex Kabbage surviving as an indirect, wholly owned subsidiary of Amex.  As part of the Amex Merger, Kabbage's former shareholders received $730,159,391, including the following amounts paid to Defendants:

| Shareholder | Merger Consideration[19] |
|---|---|
| Thomvest | $51,846,255 |
| BlueRun | $66,206,186 |
| Reverence | $84,879,255 |
| MDV | $53,431,252 |
| SoftBank | $231,686,040 |
| Robert Frohwein | $29,944,003 |
| Kathryn Petralia | $12,010,415 |
| Spencer Robinson | $1,494,714 |
| L. Scott Askins | $1,213,872 |
| Sam Taussig | $61,486 |
| Laurie Hodrick | $341,237 |
| **Total** | **$533,114,716** |

## G.   Kabbage Is Hit with a Series of Legal and Regulatory Actions.

274.    Just as the Directors and Officers saw coming—or, at the very least, would have seen coming had they acted in good faith—Kabbage quickly became the subject of numerous legal, regulatory, and investigative actions related to its PPP loans.

275.    Barely more than a month after the merger closed, on November 25, 2020, a whistleblower filed the first action against Kabbage under the False Claims Act in the United States District Court for the District of Massachusetts (the "Massachusetts Action").

---

[19] Merger Consideration includes amounts held in the escrow established by the Merger Agreement that, under the terms of the Merger Agreement, may have been, at least in part, distributed to the shareholders.

276.     The Massachusetts Action alleged (correctly) that Kabbage knowingly submitted inflated PPP loan applications for approval, and falsely certified that it reviewed the amount of such loans in good faith.  This included loans inflated because of Kabbage's failure to cap payroll costs at $100,000, its double-counting of SALT withholdings, and its inclusion of certain non-qualifying costs reflected in Box 4 of IRS Form 940.

277.     On February 5, 2021, Pietschner filed a second action under the False Claims Act in the United States District Court for the Eastern District of Texas (the "Texas Action").  As Pietschner set out in the Kutworm Report, his complaint alleged (again, correctly) that Kabbage repeatedly and falsely certified its compliance with the SBA's rules and regulations implementing the PPP, including complying with necessary BSA/AML fraud controls, and further submitted false claims for processing fees and forgiveness and guaranty payments from the SBA despite its noncompliance.

278.     With only $1 million left behind for legal expenses, the legal fees from just these two actions would have quickly thrown the company into bankruptcy if it were not for the government's decision to extend the PPP in early 2021.  As Kabbage (now doing business as "KServicing") was already an approved lender, it stood to continue in that role and spent the first weeks of 2021 gearing up for "Round 2" of PPP lending.  On or around February 8, 2021, however, the SBA advised Kabbage that it was suspending its certification as a PPP direct lender on account of its platform's allowance of double-counting SALT withholdings.  Although Kabbage was able to still earn fees by reallocating its direct customers to partner banks, it was barred from the more lucrative direct-lender participation for the remaining application period of the PPP.

279.     On October 22, 2021, the SBA and Kabbage entered into a settlement agreement pursuant to which Kabbage agreed to pay the SBA $30 million *for just the SALT issue*, which

Kabbage was only able to pay because of additional fees earned through the extension of the PPP. The agreement specifically reserved the government's claims against Kabbage under the False Claims Act.

280.   Meanwhile, Kabbage became the subject of still more investigations from both Congress and the Federal Trade Commission.  DOJ's investigations into SALT and the two False Claims Act cases continued, and SBA later suspended making any payment on potentially inflated loans relating to the Massachusetts Action, while SBA payments on account of potentially fraudulent loans implicated in the Texas Action required extensive reviews and negotiations that ultimately led to SBA delaying or declining many payments due to Kabbage or its partner banks

281.   As legal fees mounted from these investigations, as well as work related to the Massachusetts and Texas Actions, the company ran out of cash to continue servicing its loans.  On October 3, 2022, Kabbage filed its bankruptcy case in the United States Bankruptcy Court for the District of Delaware.

282.   Various private and governmental entities asserted claims in Kabbage's bankruptcy case, either through scheduled or filed claims, for harm caused by Kabbage's role in the PPP. *These claims totaled more than two and half a billion dollars*, including:

| Claimant | Amount |
|---|---|
| District of Massachusetts | $ 450,182,913.00 |
| District of Texas | $ 346,157,724.00 |
| SBA | $ 720,218,115.31 |
| Federal Reserve System | $ 536,450,941.00 |
| CRB | $ 572,128,254.92 |

283.    Kabbage conducted an extensive investigation into these claims.   It was a difficult, multi-step process for Kabbage, acting through its Wind Down Officer, to contest and reduce the claims asserted against the estate.   At that time, the SBA was refusing to make guaranty payments to CRB on loans affected by the SALT, $100K, and IRS Form 940 issues, as well as on nearly 18,000 loans that Kabbage and CRB had flagged as potentially fraudulent.   As the Defendants well knew at the time of the Merger Agreement, if the SBA ultimately refused to guaranty a loan or provide a forgiveness payment to CRB based on Kabbage's conduct in originating the loans, CRB had a contractual claim against Kabbage to repurchase, or "put back," the non-guaranteed and non-forgiven loans.   Further, if the SBA elected to re-assess a loan that was already forgiven, then CRB (and ultimately Kabbage) was potentially on the hook for that loan amount as well.   The SBA was also threatening to withhold or delay payment on future loans submitted for forgiveness if they had flagged issues.

284.    Because of Kabbage's indemnification and "put-back" obligations to CRB, Kabbage had little defense against CRB's claim.   Specifically, Kabbage agreed to indemnify CRB for any losses arising out of Kabbage's failure to comply with PPP regulations, and further agreed to repurchase PPP loans funded by CRB to the extent such loans did not qualify for a 100% guaranty from the SBA.   CRB's claim could thus only be reduced and resolved if the SBA released the guaranty payments to CRB.   But the SBA would not resolve its claim against Kabbage until Kabbage settled the DOJ actions and resolved each of the fraud flags through an enormous, expensive loan-by-loan review.   Even after such a review, Kabbage might still be liable for loans with fraud flags that could not be cleared.   Kabbage had similar direct liability for loans it held on its own behalf, loans it originated for CUBI, and loans pledged to the Reserve Bank.   In total, these affected loan balances exceeded hundreds of millions of dollars.

285.    Thus, Kabbage first focused on its negotiations with the DOJ.  During an August 2023 meeting, the DOJ presented its case, including a preliminary calculation of the damages and penalties it would seek should Kabbage object to its claim and force litigation.  Following its presentation, the DOJ offered to settle its claims for approximately $212 million.  Kabbage countered, continued negotiations, and ultimately convinced the DOJ to reduce its two FCA claims to a total of $120 million.

286.    Specifically, on May 7, 2024, Kabbage settled the Massachusetts Action for an allowed claim of $63,294,270.43 in its bankruptcy case.  Also on May 7, 2024, Kabbage settled the Texas Action for an allowed claim of $56,705,729.57 in its bankruptcy case.

287.    After settling the DOJ claims, Kabbage was finally able to get traction in negotiations with the SBA to resolve its claim.  Ultimately, Kabbage was able to do so for a fraction of what the SBA originally sought in its proof of claim, giving the SBA an allowed claim of $92 million that would unlock guaranty payments to CRB for both excess loans and the 18,000 loans with fraud flags.  This drastically reduced CRB's claim against the estate, leaving CRB with a claim largely comprising contractual interest on delayed guaranty payments, legal fees, and other expenses.  Kabbage was thus ultimately able to settle CRB's claim for $30 million.

288.    As of the date of this Complaint, Kabbage estimates that it has total allowed claims of at least $270 million in its bankruptcy case.

## CAUSES OF ACTION

### COUNT I
**Breach of the Fiduciary Duty of Care**
**(Against Frohwein, Petralia, Askins, Robinson, and Taussig)**

289.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

290.    Frohwein, Petralia, Askins, Robinson, and Taussig served as officers of Kabbage. In that capacity, they owed Kabbage the fiduciary duty of care.

291.    As agents of the corporation, Frohwein, Petralia, Askins, Robinson, and Taussig had a duty to use reasonable efforts to provide the Board with material information relevant to the business.   Relatedly, Frohwein, Petralia, Askins, Robinson, and Taussig were responsible, as officers, to assure themselves that information and reporting systems existed in the organization that were reasonably designed to provide to senior management (*i.e.*, themselves) and the Board timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with the law.

292.    Frohwein, Petralia, Askins, Robinson, and Taussig also had the duty to act with the requisite care—*i.e.*, not with gross negligence—in their decision making and related management of Kabbage's business affairs.

293.     Frohwein, Petralia, Askins, Robinson, and Taussig breached their fiduciary duty of care to Kabbage in numerous ways.   Among other things, they were grossly negligent in managing Kabbage's lending practices in connection with the PPP by failing to ensure Kabbage's compliance with relevant BSA/AML laws and regulations.

294.    Frohwein, Petralia, Askins, Robinson, and Taussig knew that when Kabbage applied to become a PPP lender, the company lacked a BSA/AML "compliance program equivalent to that of a comparable federally regulated institution."   Nevertheless, acting with, at a minimum, gross negligence, they decided to certify that Kabbage was in compliance with required PPP regulations.

295.    Once Kabbage started making PPP loans, Frohwein, Petralia, Askins, Robinson, and Taussig quickly learned about gaps in Kabbage's BSA/AML compliance program, including

its fraud controls.   They also learned about errors in Kabbage's lending platform that led to Kabbage providing inflated loans to borrowers.   Nonetheless, they each failed to take appropriate action to remedy these issues to prevent Kabbage from violating the law or incurring other liabilities to the SBA.

296.     Rather than acting to address the mission-critical issue of compliance with PPP regulations, the Officers, among other things: knowingly maintained inadequate staffing; knowingly set substandard fraud check thresholds or recklessly permitted such substandard fraud checks to be set; directly or indirectly encouraged employees to approve more PPP loans applications using substandard fraud checks to increase revenue; instructed Kabbage employees to submit to the SBA highly suspicious PPP loans despite Kabbage having identified those loans as fraudulent or highly suspicious of fraud; and ignored major compliance issues escalated by Kabbage employees.

297.     In addition, and pleading in the alternative, to the extent that Frohwein, Petralia, Askins, Robinson, and Taussig were ignorant of Kabbage's myriad failures to comply with relevant laws and regulations, it is only because these Officers utterly failed to ensure that Kabbage had information and reporting systems that were reasonably designed to provide to senior management (*i.e.*, themselves) and to the Board timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with relevant laws and regulations related to Kabbage's role as a PPP lender.

298.     Notably, and by way of example, although Taussig and Maiellaro had the Kutworm Report, neither of them provided that report to the Board.   Taussig and Maiellaro's reckless failure to disclose or otherwise take action with respect to the Kutworm Report was a product of a culture

of non-compliance and the lack of reasonable reporting systems implemented by Frohwein, Petralia, Askins, and Robinson. In fact, as described herein, those Officers actively tried to suppress material information concerning Kabbage's compliance failures.

299. Moreover, following the conclusion of the first round of PPP loans in August 2020, Frohwein, Petralia, Askins, Robinson, and Taussig acted with gross negligence in failing to ensure that Kabbage retained sufficient assets to cover its legal liabilities. The Officers knew that transferring $120 million in cash to Amex Kabbage as part of the Amex Merger would render Kabbage insolvent (and, in doing so, constitute a fraud on Kabbage's creditors). As the Officers knew, there was no requirement in the Amex Merger documents to funnel that cash into the merger.

300. An officer exercising the requisite care would have, given the known and knowable massive liabilities Kabbage faced, preserved *all* Kabbage's cash to cover these liabilities. The Officers, however, clearly did not do this. Instead, acting in bad faith and with the intent to defraud creditors, the Officers caused Kabbage to transfer $120 million to Kabbage's shareholders through the Amex Merger.

301. In addition to their grossly negligent conduct in funneling Kabbage's cash to its shareholders as part of the Amex Merger, the Officers were also grossly negligent in their utter failure to disclose to Kabbage's Board the basis for the known and knowable liabilities. The Officers did not advise the Board about known issues with Kabbage's compliance failures relating to BSA/AML requirements. Nor did the Officers advise the Board about the errors in Kabbage's automated lending platform.

302. As a direct and proximate result of the Officers' breaches of the fiduciary duty of care, Kabbage suffered hundreds of millions of dollars in damages, in an amount to be proven at trial.

## COUNT II
### Breach of the Fiduciary Duties of Loyalty and Good Faith
### (Against Frohwein, Petralia, Askins, Robinson, and Taussig)

303.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

304.    Frohwein, Petralia, Askins, Robinson, and Taussig served as Officers to Kabbage. In that capacity, they owed Kabbage the fiduciary duties of loyalty and good faith.  In addition, Frohwein served as a director of Kabbage, and in that capacity also owed Kabbage the fiduciary duties of loyalty and good faith.

305.    As part of these duties of loyalty and good faith, Frohwein, Petralia, Askins, Robinson, and Taussig, in their capacity as officers, owed a duty to Kabbage to assure themselves that information and reporting systems existed in the organization that were reasonably designed to provide to senior management (*i.e.*, themselves) and the Board timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with the law.  Frohwein, in his capacity as a director, likewise owed a similar duty to Kabbage.

306.    Instead of acting in good faith, Frohwein, Petralia, Askins, Robinson, and Taussig acted in bad faith.  Among other things, as more fully described herein, they knowingly maintained inadequate staffing; knowingly set substandard fraud check thresholds or recklessly permitted such substandard fraud checks to be set; directly or indirectly encouraged employees to approve more PPP loans applications using substandard fraud checks to increase revenue; instructed Kabbage employees to submit to the SBA highly suspicious PPP loans despite Kabbage having identified those loans as fraudulent or highly suspicious of fraud; and ignored major compliance issues escalated by Kabbage employees.

307.    In addition, and pleading in the alternative, to the extent that Frohwein, Petralia, Askins, Robinson, and Taussig were ignorant of Kabbage's myriad failures to comply with relevant laws and regulations, it is only because these Officers utterly failed to ensure that Kabbage had information and reporting systems that were reasonably designed to provide to senior management (*i.e.*, themselves) and to the Board timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with relevant laws and regulations related to Kabbage's role as a PPP lender.

308.    Notably, and by way of example, although Taussig and Maiellaro had the Kutworm Report, neither of them provided that report to their superiors or directly to the Board. Taussig and Maiellaro's reckless failure to disclose or otherwise take action with respect to the Kutworm Report was a product of a culture of non-compliance and the lack of reasonable reporting systems implemented by Frohwein, Petralia, Askins, and Robinson.  In fact, as described herein, those Officers actively tried to suppress material information concerning Kabbage's compliance failures.

309.    The Officers failed to act in good faith because they were financially incentivized to turn a blind eye to the known and knowable PPP-related liabilities.  The more fees Kabbage earned from the PPP, the more money the Officers and their affiliated investment vehicles would receive as part of the anticipated Amex Merger.

310.    Then, after the close of the PPP in August 2020, the Officers knew that the more cash retained at Kabbage to deal with such liabilities, the less cash they would receive in the Amex Merger.  Perhaps more importantly, if Kabbage's Officers expressly acknowledged the known and knowable PPP-related liabilities, Amex might have backed out of the merger or required an even higher escrow amount.  Any such action by Amex would have been detrimental to the Officers,

who were personally invested in not only cashing out from Kabbage, but also becoming employees of Amex.

311.    The Officers collectively received more than $44.7 million from the Amex Merger in their capacity as Kabbage shareholders and collectively received more than $30 million in retention bonuses from Amex Kabbage, as reflected below:

| Kabbage Insider | Retention Bonus | Merger Consideration | Total |
|---|---|---|---|
| Co-Founder, CEO, and Director Robert Frohwein | $13,320,000 | $29,944,003 | $43,264,003 |
| Co-Founder and President Kathryn Petralia | $13,320,000 | $12,010,415 | $25,330,415 |
| Head of Strategy Spencer Robinson | $2,400,000 | $1,494,714 | $3,894,714 |
| General Counsel and Chief Compliance Officer L. Scott Askins | $900,000 | $1,213,872 | $2,113,872 |
| Head of Global Policy Sam Taussig | $425,000 | $61,486 | $486,486 |
| Total | $30,365,000 | $44,724,490 | $75,089,490 |

312.    As a direct and proximate result of the Officers' breaches of the fiduciary duties of loyalty and good faith, Kabbage suffered hundreds of millions of dollars in damages, in an amount to be proven at trial.

313.    In addition, equitable remedies should be awarded to disgorge any profits received, to make restitution, and/or otherwise prevent the Officers from benefitting from breaches of their fiduciary duty of loyalty.

<u>**COUNT III**</u>
**Breach of Fiduciary Duties of Loyalty and Good Faith**
**(Against Butler, Ebinger, Chulack, Hodrick, Stolle, and Pipilis)**

314.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

315.    Butler, Ebinger, Chulack, Hodrick, Stolle, and Pipilis served as directors of Kabbage.  In that capacity, they owed Kabbage the fiduciary duties of loyalty and good faith.

316.    As part of these duties of loyalty and good faith, Butler, Ebinger, Chulack, Hodrick, Stolle, and Pipilis owed a duty to Kabbage to assure themselves that information and reporting systems existed that were reasonably designed to provide to senior management and to the Kabbage's Board (*i.e.*, themselves) timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with the law.

317.    Instead of acting in good faith, Butler, Ebinger, Chulack, Hodrick, Stolle, and Pipilis acted in bad faith.  Among other things, as more fully described herein, they utterly failed to ensure that Kabbage had information and reporting systems that were reasonably designed to provide to management and the Board timely, accurate information sufficient to allow management and the Board, each within its scope, to reach informed judgments concerning Kabbage's compliance with relevant laws and regulations related to Kabbage's role as a PPP lender.

318.    Despite having multiple Board meetings between March and October 2022, the Board did not ask whether there had been an independent assessment of Kabbage's PPP compliance program.  The Board also did not ask if there had been any internally created assessments—such as the Kutworm Report—regarding Kabbage's compliance with PPP regulations.  Further, the Board did not ask for information on, among other things: how many

loans Kabbage had flagged as potentially fraudulent and the general bases for such flags; how many SARs Kabbage had filed and the general bases for such filing; whether Kabbage had made loans to borrowers that were subject to criminal investigations by the DOJ; or whether there was evidence of Kabbage providing inflated or non-complying PPP loans.

319.    If the Board had acted in good faith, it would have known that Kabbage was ill-prepared in April 2020 to become a PPP lender.  The Board knew that Kabbage had just furloughed numerous employees and that, as set forth in Treliant's 2019 report, needed to take remedial measures to get its BSA/AML compliance control "equivalent to that of a comparable federally regulated institution" before making loans.  Simply put, a Board acting in good faith would not have permitted Kabbage to become a PPP lender until it was satisfied, based on evidence, that Kabbage had BSA/AML compliance controls "equivalent to that of a comparable federally regulated institution."

320.    In addition, if the Board had acted in good faith, it would have instituted policies to ensure that it would have received the A&M Risk Assessment Report, the Kutworm Report, and other critical information regarding Kabbage's BSA/AML compliance (or lack thereof).  No board, acting in good faith, could have ignored the issues identified in the Kutworm Report and related documents.  A board acting in good faith and the best interests of Kabbage would have taken action to remedy the major deficiencies in Kabbage's compliance program and to ensure that Kabbage changed its approach to PPP lending (including by stopping the "approve first, ask questions later" instructions given to Kabbage fraud reviewers) until a sufficient remediation plan was in place.  If, for example, immediate action had been taken in June 2020—the date of the A&M Report—Kabbage's legal liabilities to the DOJ and others would have been reduced.

321.     Moreover, if the Board had not utterly shirked its oversight functions by ensuring that a reasonable reporting system existed, the multiple complaints from Kabbage employees about Kabbage's lack of reasonable fraud controls would have been escalated up the appropriate channels and addressed.  At the very least, the Board would have learned that Kabbage's Officers were intentionally suppressing reports about Kabbage's lack of compliance with PPP laws and regulations.  A board acting in good faith would have terminated those Officers who refused to take steps to have Kabbage adhere to the law.

322.     Even after the first round of PPP loans ended in August 2020, Butler, Ebinger, Chulack, Stolle, Pipilis, and Hodrick could have acted to protect Kabbage's interests—as their fiduciary duties required.  They knew that Kabbage was only reserving $1 million for contingent liabilities.  They knew that this amount was insufficient on its face.  But they failed to question the basis for that minimal reserve—and ask how much should reasonably be reserved—because they did not want an answer that would lead to Kabbage having to retain more of its cash.

323.     The Directors failed to act in good faith because they were personally financially incentivized to turn a blind eye to the known and knowable PPP-related liabilities.  The more fees Kabbage earned, the more that they and their shareholders would receive as part of the anticipated Amex Merger.  As described above, Butler was a managing director at Thomvest, which received $51,846,255 in consideration from the Amex Merger; Ebinger was a general partner of the manager of BlueRun, which received $66,206,186 in consideration from the Amex Merger; Chulack was partner of the manager of Reverence, which received $84,879,255 in consideration from the Amex Merger; Stolle was a general partner of MDV, which received $53,431,252 in consideration from the Amex Merger; Pipilis was a managing partner of manger of SoftBank, which received $231,686,040 in consideration from the Amex Merger.

324.     And, after the close of the PPP in August 2020, the Directors knew that the more

cash retained at Kabbage to deal with such liabilities, the less cash they would receive in the Amex

Merger.  More importantly, if the Directors expressly acknowledged the known and knowable

PPP-related liabilities, Amex might have backed out of the merger or required a higher escrow

amount.  Any such action by Amex would have been detrimental to the Directors because it would

have meant that their affiliated investment vehicles—to which they also owed fiduciary duties or

in which they were personally invested—would have received less cash from the Amex Merger.

325.     As a direct and proximate result of the Directors' breaches of the fiduciary duties

of loyalty and good faith, Kabbage suffered hundreds of millions of dollars in damages, in an

amount to be proven at trial.

<u>**COUNT IV**</u>
**Recovery of the Fraudulent Transfer under 11 U.S.C. § 550(a)**
**(Against the Fraudulent Transfer Beneficiaries)**

326.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set

forth in the preceding paragraphs.

327.     The Fraudulent Transfer, made on October 13, 2020, constituted a transfer of

Kabbage's interests in property to Amex Kabbage.

328.     The Fraudulent Transfer was made within two years before the petition date in

Kabbage's bankruptcy case.

329.     The Fraudulent Transfer was made with actual intent to hinder, delay, or defraud

Kabbage's creditors within the meaning of 11 U.S.C. § 548(a)(1)(A) and applicable state law under

§ 544(b).  Kabbage's Officers and Directors knew that: (i) Kabbage was likely to be subject to

extensive litigation, legal fees, fines, penalties, and other expenses arising from its PPP loans; (ii)

Kabbage would remain subject to these liabilities as "Excluded Liabilities" under the Merger

Agreement; (iii) Kabbage would have "Retained Cash" under the Merger Agreement that was

insufficient to pay these liabilities and to service its loan portfolios; and (iv) Kabbage would be rendered insolvent by the Fraudulent Transfer.

330.    Indeed, the Officers, Directors, and majority shareholders were incentivized to turn a blind eye to the known and knowable PPP-related liabilities.  Simply put, the more money left at Kabbage to deal with such liabilities, the less these shareholders would have received. Moreover, if Kabbage's management expressly acknowledged the known and knowable PPP-related liabilities, it would have threatened the deal with Amex.  Not only did Kabbage's Officers receive more than $44.7 million from the merger, they also collectively received more than $30 million in retention bonuses from Amex Kabbage.

331.    Pleading in the alternative, solely to the extent that the intent of Kabbage's Officers and Directors is insufficient by itself to establish the requisite intent to hinder, delay, or defraud creditors within the meaning of 11 U.S.C. § 548(a)(1)(A) and applicable state law, Kabbage further alleges that such intent is established through the confluence of multiple badges of fraud, including: the Fraudulent Transfer constituted substantially all of Kabbage's valuable assets; the Fraudulent Transfer did not provide any value to Kabbage; the Fraudulent Transfer rendered Kabbage insolvent; Kabbage made the Fraudulent Transfer shortly after incurring massive legal obligations, including to the DOJ under the False Claims Act; the Fraudulent Transfer directly benefited Kabbage insiders; including the Officers, Directors, and their affiliated shareholders; the Fraudulent Transfer occurred shortly before Kabbage was expected to begin incurring massive legal expenses stemming the contingent/disputed liabilities it had incurred; and the cumulative effect of the Fraudulent Transfer and each of its related transactions was to "orphan" the PPP loan portfolio and shield the recipients of substantially all of Kabbage's assets from the significant liabilities arising from that portfolio, the natural consequence of doing so was to frustrate

governmental investigators and law enforcement from imposing liability on Kabbage for its misconduct.

332.     The Fraudulent Transfer was also a constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) and applicable state law under § 544(b).  The Fraudulent Transfer did not provide reasonably equivalent value to Kabbage.  In fact, the transfer provided no value whatsoever.  The Fraudulent Transfer rendered Kabbage insolvent.  As a result of the transfer, the fair value of Kabbage's liabilities, including its massive liabilities to the DOJ and SBA, greatly exceeded the fair value of Kabbage's assets.  The Fraudulent Transfer likewise left Kabbage with unreasonably small capital to continue servicing its loan portfolios.

333.     The Fraudulent Transfer Beneficiaries (as well as other former Kabbage shareholders) were the intended and actual beneficiaries of the Fraudulent Transfer.  Although the Fraudulent Transfer itself was received by Amex Kabbage, the intent of the Fraudulent Transfer was to facilitate the Amex Merger and the payment of the merger consideration to Kabbage's former shareholders.  (The payments pursuant to the Amex Merger were technically made to Kabbage's former shareholders as shareholders of Amex Kabbage immediately prior to the merger.  But, as set forth in the Amex Merger Agreement, including Exhibit K thereto, the purpose and intent behind the various steps leading up to the Amex Merger was for Kabbage's shareholders to receive payment from Amex for Kabbage's assets.  This was accomplished by Kabbage transferring its assets (excluding its PPP loan portfolio) to Amex Kabbage immediately prior to closing of the Amex Merger.)

334.     The benefit received by Kabbage's former shareholders, including the Fraudulent Transfer Beneficiaries, was direct, ascertainable, and quantifiable, and it was closely commensurate with the value of the property transferred from Kabbage to Amex Kabbage.

335.    The Fraudulent Transfer Beneficiaries received the following benefit from the Fraudulent Transfer, in the form of cash payments to them from the Amex Merger:

| Kabbage Shareholder | Director Affiliate | Merger Consideration |
|---|---|---|
| Thomvest | Don Butler | $51,846,255 |
| BlueRun | Jonathan Ebinger | $66,206,186 |
| Reverence | Alex Chulack | $84,879,255 |
| MDV | Bryan Stolle | $53,431,252 |
| SoftBank | Ioannis Pipilis | $231,686,040 |
| **Kabbage Officer** | **Role** | **Merger Consideration** |
| Robert Frohwein | Co-Founder, CEO, and Director | $29,944,003 |
| Kathryn Petralia | Co-Founder and President | $12,010,415 |
| Spencer Robinson | Head of Strategy | $1,494,714 |
| L. Scott Askins | General Counsel and Chief Compliance Officer | $1,213,872 |
| Sam Taussig | Head of Global Policy | $61,486 |
| **Kabbage Director** | | |
| Laurie Hodrick | | $341,237 |
| **Total** | | **$533,114,716** |

336.    In addition, to the extent that Fraudulent Transfer Beneficiaries have an interest in any escrowed funds created as part of the Amex Merger, they received a benefit from the creation of that escrow.

337.    Accordingly, under 11 U.S.C. § 550(a), the Fraudulent Transfer Beneficiaries are the persons or entities for whose benefit the Fraudulent Transfer was made, and Kabbage may

recover the value of the of the Fraudulent Transfer from them in proportion to the value they received.

**COUNT V**
**Disallowance of Claims Under 11 U.S.C. § 502(e)**
**(Against the Directors and Officers)**

338.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

339.    Frohwein filed claim number 105 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  He filed similar claims against other Debtors, including claim number 6 against Kabbage Canada Holdings, LLC; claim number 4 against Kabbage Asset Securitization, LLC; claim number 4 against Kabbage Asset Funding 2017-A, LLC; claim number 6 against Kabbage Asset Funding 2019-A, LLC; and claim number 4 against Kabbage Diameter, LLC.

340.    Petralia filed claim number 124 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  She filed a similar claim (claim number 4) against Kabbage Canada Holdings, LLC.

341.    Askins filed claim number 103 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  She filed similar claims against other Debtors, including claim number 5 against Kabbage Canada Holdings, LLC; claim number 3 against Kabbage Asset Securitization, LLC; claim number 3 against Kabbage Asset Funding 2017-A, LLC; claim number 9 against Kabbage Asset Funding 2019-A, LLC; and claim number 5 against Kabbage Diameter, LLC.

342.    Robinson filed claim number 118 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

343.     Butler filed claim number 80 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage, Inc. d/b/a KServicing.

344.     Ebinger filed claim number 82 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

345.     Stolle filed claim number 146 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

346.     Hodrick filed claim number 79 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

347.     The Plan provides that "any obligations of the Debtors pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law, including amendments entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Former Officer and Director shall be rejected as of the Effective Date."

348.     In addition, the Directors' and Officers' claims are disallowed to the extent that they are "contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."

349.     Accordingly, every claim filed by an Officer or Director shall be disallowed.

<u>**COUNT VI**</u>
**Disallowance of Claims Under 11 U.S.C. § 502(d)**
**(Against all Defendants)**

350.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

351.     Frohwein filed claim number 105 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  He filed similar claims against other Debtors, including claim number 6 against Kabbage Canada Holdings, LLC; claim number 4 against Kabbage Asset

Securitization, LLC; claim number 4 against Kabbage Asset Funding 2017-A, LLC; claim number 6 against Kabbage Asset Funding 2019-A, LLC; and claim number 4 against Kabbage Diameter, LLC.

352.     Petralia filed claim number 124 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  She filed a similar claim (claim number 4) against Kabbage Canada Holdings, LLC.

353.     Askins filed claim number 103 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.  She filed similar claims against other Debtors, including claim number 5 against Kabbage Canada Holdings, LLC; claim number 3 against Kabbage Asset Securitization, LLC; claim number 3 against Kabbage Asset Funding 2017-A, LLC; claim number 9 against Kabbage Asset Funding 2019-A, LLC; and claim number 5 against Kabbage Diameter, LLC.

354.     Robinson filed claim number 118 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

355.     Butler filed claim number 80 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

356.     Ebinger filed claim number 82 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

357.     Stolle filed claim number 146 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

358.     Hodrick filed claim number 79 in Kabbage's bankruptcy alleging a right to indemnification from Kabbage.

359.     Moreover, other Defendants who received fraudulent transfers from Kabbage may seek to file or otherwise assert a claim against the Debtors.

360.     As set forth herein, because property of Defendants is recoverable under 11 U.S.C. § 550, their claims should be disallowed under 11 U.S.C. § 502(d) until they have paid the amount for which they are liable.

## COUNT VII
### Equitable Subordination Under § 510(c)
### (Against all Defendants)

361.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

362.     As more fully alleged above, the Directors and Officers breached their fiduciary duties to Kabbage, and the Fraudulent Transfer Beneficiaries received the benefit from the Fraudulent Transfer.

363.     Defendants' actions resulted in injury to Kabbage and its creditors, and they conferred an unfair advantage to Defendants.

364.     Under such circumstances, it would be unfair and inequitable to allow Defendants to seek to assert any claim against the Debtors, including but not limited to any claim for indemnification rights, *pari passu* with other creditors.

365.     Accordingly, each of Defendants' claims should be equitably subordinated to all claims pursuant to 11 U.S.C. § 510(c) to the extent necessary to undo or offset the effect of Defendants' misconduct.

## JURY DEMAND

Kabbage demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Kabbage respectfully requests that judgment and order be entered in its favor and against Defendants as follows:

a.  Entering judgment in favor of Kabbage against the Directors and Officers and awarding Kabbage all damages, in all forms, sustained;

b.  Awarding pursuant to 11 U.S.C. § 550 recovery of the amount of the Fraudulent Transfer, to the extent of the benefit received by each Defendant;

c.  Disgorging all profits the Directors and Officers obtained, directly or indirectly, as a result of breaches of their fiduciary duty of loyalty;

d.  Disallowing all claims asserted by Defendants against the Debtors for indemnification;

e.  Disallowing all claims asserted by Defendants against the Debtors in their bankruptcy cases until they have paid the amount they are liable under 11 U.S.C. § 550;

f.  Equitably subordinating all claims asserted by Defendants;

g.  Awarding Plaintiff its reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law or equity;

h.  Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity; and

i.  Granting such other relief as the Court deems just and proper.

Dated:  October 16, 2025
Wilmington, Delaware

**REID COLLINS & TSAI LLP**

*/s/ Jessica Zeldin*
Jessica Zeldin (DE Bar No. 3558)
Alexander J. Rigby (DE Bar No. 7257)
300 Delaware Ave., Suite 770
Wilmington, DE 19801
T: (308) 467-1765
jzeldin@reidcollins.com
arigby@reidcollins.com

Eric D. Madden (*Pro Hac Vice to be Filed*)
Brian J. Bah (*Pro Hac Vice to be Filed*)
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T: (214) 420-8900
emadden@reidcollins.com
bbah@reidcollins.com

Joshua J. Bruckerhoff (*Pro Hac Vice to be Filed*)
Jeremy H. Wells (*Pro Hac Vice to be Filed*)
Morgan M. Menchaca (*Pro Hac Vice to be Filed*)
Emma Culotta (*Pro Hac Vice to be Filed*)
1301 S. Capital of Texas Highway, Suite C-300
Austin, Texas 78746
T: (512) 647-6100
jbruckerhoff@reidcollins.com
jwells@reidcollins.com
mmenchaca@reidcollins.com
eculotta@reidcollins.com

-and-

**MORRIS JAMES LLP**

Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
T: (302) 888-6800
emonzo@morrisjames.com
bkeilson@morrisjames.com
tpakrouh@morrisjames.com

*Counsel for KServicing Wind
Down Corp. (f/k/a Kabbage, Inc.)*