# EXHIBIT 31

## Short Message Report

| Conversations: 1 | Participants: 21 |
|---|---|
| Total Messages: 41 | Date Range: 7/16/2020 |

## Outline of Conversations

 **ppp-fraud - 1594917375.035300 - 2020/07/16**  41 messages on 7/16/2020 · Abby Smith <asmith@kabbage.com> · Amit Kesarwani <akesarwani@kabbage.com> · Bryanna Simpson · Bryanna Simpson <bsimpson@kabbage.com> · David Yergert <dyergert@kabbage.com> · Emma Blackburn · Emma Blackburn <eblackburn@kabbage.com> · Jacob Bowman <jbowman@kabbage.com> · Jessica Robinson · Jessica Robinson <jrobinson@kabbage.com> · Latinga Maxfield · Latinga Maxfield <ldaniels@kabbage.com> · Nipun Goel <ngoel@kabbage.com> · Rose Alexander · Rose Alexander <ralexander@kabbage.com> · Sam Taussig <staussig@kabbage.com> · Scott Asher <sasher@kabbage.com> · Siddharth Shah <sshah@kabbage.com> · Slack Admin <slack@kabbage.com> · Tawana Tillard · kabbage <>

A00320

**Messages in chronological order** (times are shown in GMT +00:00)

---

**ppp-fraud - 1594917375.035300 - 2020/07/16**

---

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                    7/16/2020, 4:36 PM

Amit Kesarwani Siddharth Shah an example of us asking the customer who helped/who they helped with their application and them lying and saying no one to both questions.  we can see the customer logging in from the same device as a bunch of other applications. how should we treat these? <https://jira.kabbage.com/browse/PLO-188986>

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                    4:37 PM

I think my issue is theres SO many situations like this and they are providing all the docs necessary and they are passing inscribe so by the rules - I should clear them.

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                    4:39 PM

sure! only asking amit and sid because if we are going to clear them regardless of them lying to us what is the point of even asking?

:upvote: 2 • Emma Blackburn • Latinga Maxfield

**A**  **Amit Kesarwani <akesarwani@kabbage.com>**                    4:43 PM

I think if we have proof that someone else filled on their behalf and they are lying. We should deny

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                    4:43 PM

What would the proof be

:upvote: 2 • Jessica Robinson • Rose Alexander

**S**  **Siddharth Shah <sshah@kabbage.com>**                    4:48 PM

I am fine with declining this based on the fact that we have a device match with many other accounts and yet they claim no one has helped them fill out the application...the proof is the device match

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                    4:49 PM

Could we have a number of matches that warrants this decision?

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                    4:49 PM

Or does the amount not matter

**S**  **Siddharth Shah <sshah@kabbage.com>**                    4:52 PM

Everything else does match up for this account though which is interesting. Provided all the docs, no fraud signals in inscribe (even for the Sch C which we know is rare). Logically makes sense as well - income was 70k in 2018 and claiming 128k in 2019. The matching accounts also don't all have the same numbers on the Sch C - different numbers on the one matching account I looked at. So while I don't know if this is a common scenario where all of these things match up and all docs were provided and okayed, I do think we should decline this specific case because of their answer to our question.

**S**  **Siddharth Shah <sshah@kabbage.com>**                    4:54 PM

I don't think number of matching accounts matters...even if its one account (with a different customer name), it warrants the question who is helping them. If I understand the question correctly.

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                    4:55 PM

**A00321**

This is an EXTREMELY common scenario for me personally at least. I'm feeling really uncomfortable with the review procedure we have now because I'm not comfortable passing almost all the people I have to pass. But they have all the docs needed and answer the questions sooo what am I to do? And its a waste of time for me and CS to push back and forth asking for docs over and over.

**Emma Blackburn <eblackburn@kabbage.com>**     4:55 PM

I feel like the level of fraud we're reviewing is wildly underestimated

**Siddharth Shah <sshah@kabbage.com>**     4:57 PM

what do they answer to the questions? yes or no? if it's no despite a device match, we can use that to deny.

**Emma Blackburn <eblackburn@kabbage.com>**     4:57 PM

Most of them name an accountant

**Siddharth Shah <sshah@kabbage.com>**     4:58 PM

got it...so in that case if they answer truthfully. upload all the docs we provide, and they pass our inscribe and visual checks, then we should clear it.

**Emma Blackburn <eblackburn@kabbage.com>**     4:59 PM

Ok! This is extremely helpful for us to have some black and white guidelines regarding denying apps

**Emma Blackburn <eblackburn@kabbage.com>**     5:00 PM

Do you feel like theres a number of matches that doesn't warrant concern? Like 15 or less (just an example) or we treat them all essentially the same

**Siddharth Shah <sshah@kabbage.com>**     5:00 PM

I know of legitimate businesses that have sent us docs that looks exactly like the ones provided here...(unfiled schedule C for example). So how is it possible for us to distinguish between fraud/not fraud? I think the best way for us to do that right now is ask for the additional docs and do the inscribe/visual checks and make a decision based on that.

**Siddharth Shah <sshah@kabbage.com>**     5:01 PM

As far as level of fraud...what is the concern exactly about? review process / number of apps we are reviewing or something else?

**Emma Blackburn <eblackburn@kabbage.com>**     5:01 PM

yeah the unfiled schedule C doesn't throw us off most of them are unfiled

**Emma Blackburn <eblackburn@kabbage.com>**     5:02 PM

the number of suspicious apps we see and that are meeting all the procedure requirements yet have 600+ matching devices, and the amount of sole props claiming 100k + a year

**Emma Blackburn <eblackburn@kabbage.com>**     5:03 PM

I have seen MAYBE 2-3 sole props claiming less than 100k this week

**Siddharth Shah <sshah@kabbage.com>**     5:05 PM

i see...i am personally okay with the review process we have right now (as far as docs requested and doing the checks we do). If anyone has any better suggestions on what to do with the review

A00322

once ew actually flag an account for a device link for example, would love to hear

**S**  **Siddharth Shah <sshah@kabbage.com>**                                      5:07 PM
going on a rant here but I do think we should not look at fraud here from a kabbage lending perspective. i know device matches were nowhere as common in kabbage lending...but a fundamental difference is the risk here is not ours - it is SBAs risk.

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:08 PM
ok should we stop looking at fraud sproc? fine with me just let me know what ot do
:upvote: 1 • Emma Blackburn

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                                 5:08 PM
I understand that I think I personally am just concerned something will come back at us. Can we be included in any discussions regarding the SBAs feelings about our reviews? I personally would like to know if we're under heat from the gov for fraudsters robbing the gov
✔️ 1 • Latinga Maxfield

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:08 PM
can you please put something in writing for how we should be reviewing these accounts?
:upvote: 1 • Emma Blackburn

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:09 PM
if someone "sees something and says something" as they were instructed to do during townhall resulting in quite a few tickets for us... how should we review those?
:upvote: 1 • Emma Blackburn

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:09 PM
we are also getting a lot of tickets from nans team for "weird looking docs" but if they come back in inscribe as clear should we just say sorry there is nothing we can do here?

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                                 5:09 PM
It would be nice to have something in writing to cover my rear end

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:10 PM
yes please.

**S**  **Siddharth Shah <sshah@kabbage.com>**                                      5:10 PM
Bryanna Simpson that is definitely not what I said...fraud sproc is great and we should definitely use it

**B**  **Bryanna Simpson <bsimpson@kabbage.com>**                                  5:10 PM
sorry i just equate device matches with fraud sproc...

**E**  **Emma Blackburn <eblackburn@kabbage.com>**                                 5:11 PM
Sidd if you love fraud sproc so much why don't you marry it

**S**  **Siddharth Shah <sshah@kabbage.com>**                                      5:11 PM
I'll defer to Amit for the in written process, but a slack thread like this constitutes in writing for me. It's all fair game if/when there is an audit

**S**  **Siddharth Shah <sshah@kabbage.com>**                                      5:11 PM

A00323

It's committed to Bryanna already 😂

**Bryanna Simpson <bsimpson@kabbage.com>**                    5:12 PM
i dont know what that means

**Emma Blackburn <eblackburn@kabbage.com>**                    5:12 PM
Dear Secret Service,

Please make sure my dog goes to a good home before I end up in prison.

Thank you

**Emma Blackburn <eblackburn@kabbage.com>**                    5:16 PM
Should we document how many matches on the ticket as an internal comment? If we're just asking the questions and going with the answers - what's even the point of running fraud sproc.

**Siddharth Shah <sshah@kabbage.com>**                    5:50 PM
if someone sends in all the docs we have asked for and are not forged, we then need a convincing reason to decline them. Simply "we think you're fraudulent because you have a device match" does not cut it. If they lie to us on the questions we ask, that is convincing. I think Spencer referred to this in writing on slack.

**Siddharth Shah <sshah@kabbage.com>**                    5:51 PM
We can document that...number of applications with the matching device.
✔ 2 • Bryanna Simpson • Emma Blackburn

A00324

# EXHIBIT 32

**Chat with <+17732949576> on July 17, 2020**
+17732949576
Rob Frohwein <rfrohwein@icloud.com>
Rob Frohwein <+14042906116>
Unknown

Earliest item: 2020-07-17 11:06:27
Latest item: 2020-07-17 22:23:58

**Friday 17 July 2020**

Instant Message : Native Messages
From
  Rob Frohwein <+14042906116>                     11:06:27

Be aware that Anthony is listed as a 2 on the spreadsheet

Instant Message : Native Messages
From
  Rob Frohwein <+14042906116>                     11:06:36

He should know that's a 1 in normal parlance

Instant Message : Native Messages
From
  Rob Frohwein <+14042906116>                     11:06:45

Make sure he knows

Instant Message : Native Messages
From
  Rob Frohwein <+14042906116>                     11:06:48

now

Instant Message : Native Messages
From
  +17732949576                                    11:06:58

I have...but will re-itterate

Instant Message : Native Messages
From
  Rob Frohwein <+14042906116>                     21:31:43

Forget answering the questions. I will go a different route.

A00325

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:32:02

Also don't worry about the call on Monday. You and Anthony are off the hook

Instant Message : Native Messages
From
    +17732949576
21:34:15

...ok...I'm happy to answer any questions or meetings...I'm just pushing back where you guys had told us to...if there's a set of questions to "make the deal" I'm not against answering...I'm just looking for that line

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:49:05

Which tab of the excel were you looking at?

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:49:17

The walk away questions or the scrubbed ones?

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:49:28

Or both?

Instant Message : Native Messages
From
    +17732949576
21:51:40

I only saw the "scrubbed" tab...was there another tab?

Instant Message : Native Messages
From
    +17732949576
21:51:47

That's will be embarrassing ☺

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:52:04

Yes. The other tab was the questions remaining

A00326

Instant Message : Native Messages
From
     Rob Frohwein <+14042906116>     21:52:11

Walk away and think harder

Instant Message : Native Messages
From
     +17732949576     21:52:11

Crap there is...so which tab am I looking at?

Instant Message : Native Messages
From
     Rob Frohwein <+14042906116>     21:52:19

The first one

Instant Message : Native Messages
From
     +17732949576     21:52:21

ok...so only walk away?

Instant Message : Native Messages
From
     Rob Frohwein <+14042906116>     21:52:25

Yes

Instant Message : Native Messages
From
     Rob Frohwein <+14042906116>     21:52:30

I just yelled at amex too

Instant Message : Native Messages
From
     +17732949576     21:54:32

I don't understand these...

Instant Message : Native Messages
From
     +17732949576     21:54:59

Are they statements that they "walk away if" so we need to disprove?

A00327

Instant Message : Native Messages
From
    +17732949576
21:55:15

They don't seem to be questions...and are definitely not the way we work

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:55:26

It means some answers to these questions could give rise to not moving forward on the deal.

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:55:48

If you need clarification, then ask for it and we can share with them

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:56:51

I think they are topics for discussion during the 1.5 hour call

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:57:17

They don't want us to answer them in writing. Just one neat 1.5 hour call

Instant Message : Native Messages
From
    +17732949576
21:58:21

Ok...I guess this makes a little more sense...we can talk to these things

Instant Message : Native Messages
From
    +17732949576
21:58:28

I don't see any that concern me

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
21:58:31

Ok

A00328

Instant Message : Native Messages
From
    +17732949576                                    21:59:55

These are weird things to be worried about...but they are much better than the other tab...sorry that I only was looking at that one...didn't mean to cause extra worry

Instant Message : Native Messages
From
    +17732949576                                    22:00:25

I still think we've answered most of these things...but I guess I can see wanting extra confirmation of these types of topics

Instant Message : Native Messages
From
    +17732949576                                    22:01:11

In fact we've definitely talked to all of these in the top part...but they are framed in a way where I guess I see wanting final confirmation

Instant Message : Native Messages
From
    +17732949576                                    22:03:11

I don't have a meeting Monday on my calendar...happy to talk to these things...and discuss the bottom half (which I presume is the desire vs. us having an answer)

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>          22:03:11

Is Monday ok?

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>          22:03:43

You don't have it on there because Kate asked them for a time and then you went off on the spreadsheet and I told amex to fuck themselves

Instant Message : Native Messages
From
    +17732949576                                    22:04:29

I'm sorry

A00329

Instant Message : Native Messages
From
+17732949576
22:05:03

I could write things to defend myself...but they don't matter

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:05:18

I didn't see it either. All I'm sure will be fine

Instant Message : Native Messages
From
+17732949576
22:05:42

The fraud questions are bad...in that I don't disagree with them

Instant Message : Native Messages
From
+17732949576
22:06:20

We might be better off acknowledging that we could use some help from amex there

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:08:47

I think one of the things on fraud is that they're set up to catch each instance. We are set up to manage a tolerable amount of fraud, right?

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:08:55

We are a volume shop

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:09:33

Our fraud approach needs to be reasonable under these circumstances. You can cut our 100% of the fraud and 100% of the opp.

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:10:14

Also, we work with much smaller loan sizes. We have (at times) applied more fraud controls to larger ticket sizes

A00330

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>    22:10:21

Am I completely off base here?

Instant Message : Native Messages
From
    +17732949576    22:10:50

No you're right

Instant Message : Native Messages
From
    +17732949576    22:12:16

We've consistently looked at what tighter fraud rules would have "cost" vs what we "lost" due to the fraud and we've come out ahead...do we have the occasional instance like the Wells account frauds from what we call "fraud-vember" ya...but in the end we believe we still come out ahead

Instant Message : Native Messages
From
    +17732949576    22:12:31

Do we need to evolve...yes...are we evolving...yes

Instant Message : Native Messages
From
    +17732949576    22:12:40

That's how I'd put it

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>    22:13:54

Good. Let's cover both tactical items we do and also strategic. Part of the strategic is what I've said above (cost / benefit analysis) and how we "strategically" evolve

Instant Message : Native Messages
From
    +17732949576    22:14:20

Liked "Good. Let's cover both tactical items we do and also strategic. Part of the strategic is what I've said above (cost / benefit analysis) and how we "strategically" evolve "

A00331

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:15:00

Further, when we are dealing with larger customers - like Amex's, we can employ a diff strategy. Also when we have several products, they act together to reduce fraud

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:15:42

It's traditionally also been a pricing question for us. Our customers have traditionally valued automation and simplicity over some fraction of a percent. Maybe that changes a bit with amex.

Instant Message : Native Messages
From
    +17732949576
22:16:19

Agreed...there's a lot more we could do there

Instant Message : Native Messages
From
    +17732949576
22:16:27

Especially with larger customers

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:16:28

We need to work together with them to strike the right balance. Also, by testing approaches, that allows us to get smarter and innovate more over time in this are

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:16:31

Area

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:17:03

Geo location may play a bigger part in anti fraud with larger customers.

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>
22:17:10

They're prob at a biz site

A00332

Instant Message : Native Messages
From
+17732949576
22:17:48

Indeed...geo fencing around b2b businesses...is a good one

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:18:41

Let's turn this negative into a positive with all the incredible ideas and innovation we can bring to that table.

Instant Message : Native Messages
From
+17732949576
22:18:41

I still think we can get tax data via TaxStatus before the IRS gets their API out

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:18:59

We should be the leader and not employ 30 year old measures but bring them to today

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:19:26

Talk to it. Let's talk about innovation. They think of fraud in a very old way

Instant Message : Native Messages
From
+17732949576
22:19:37

That's needs to be the reason they value us...new way of thinking

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:19:51

Yep. We can nail this call

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>
22:20:06

And talk to them in a way that they're super pumped

A00333

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:20:52

Let's not ask for their help. Let's tell them this is a brand new dawn together and we solve this incredible puzzle. But we did it other ways before because our customer base is smaller and the arbitrage was ours

Instant Message : Native Messages
From
   +17732949576
22:21:19

Indeed...I'm sorry about earlier...too frustrated from all the questions...missed the right tab.  No excuse...but my bad.   I'm always here to get it done just frustrating sometimes

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:22:04

I get it.

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:22:09

Will get harder before easier

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:22:21

But better than the first 4 weeks of the crisis

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:22:28

🙂

Instant Message : Native Messages
From
   +17732949576
22:22:34

That's the truth

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
22:22:37

They have a couple of PPP questions

A00334

Instant Message : Native Messages
From
    +17732949576                                    22:22:40

All of it

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>                      22:22:52

I think they're assuming some stuff not in evidence

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>                      22:23:05

Make sure we have the right folks on the phone. Might want Sam

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>                      22:23:08

And others

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>                      22:23:15

Coordinate with Kate.

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>                      22:23:23

Maybe we should put together a presentation too

Instant Message : Native Messages
From
    +17732949576                                    22:23:29

Ya...I will...there's a few people as I look at the list

Instant Message : Native Messages
From
    +17732949576                                    22:23:58

Ok I'll get on it...we'll be ready and send something over the weekend to
look at

**End Thread**

A00335

Thread Statistics

**Instant Message Count**

84

A00336

# EXHIBIT 33

**Chat with "Sam Taussig" <+13014129193> and another address on July 23, 2020**

+17732949576
Sam Taussig <+13014129193>
Rob Frohwein <+14042906116>

Earliest item: 2020-07-23 21:21:32
Latest item: 2020-07-23 21:38:29

**Thursday 23 July 2020**

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>          21:21:32

So.....the A&M PPP assessment - wasn't that supposed to be just about BSA/AML?

Instant Message : Native Messages
From
Sam Taussig <+13014129193>          21:22:05

Yes....

Instant Message : Native Messages
From
+17732949576          21:22:08

I believe so...why?

Instant Message : Native Messages
From
Sam Taussig <+13014129193>          21:22:10

?

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>          21:22:48

Because that fucking report is going to kill our amex deal

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>          21:23:01

And it's self inflicted and way out of scope

A00337

Instant Message : Native Messages
From
   +17732949576
21:23:42

Why did we give it/who gave it?  Last I heard we weren't giving it

---

Instant Message : Native Messages
From
   Sam Taussig <+13014129193>
21:23:56

Did we show them??

---

Instant Message : Native Messages
From
   +17732949576
21:23:59

We haven't finished even going through it with them

---

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
21:24:11

Azba hired A&M based on apparently (she said) a recommendation she had in consultation with you two

---

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
21:24:19

We haven't showed them but they know it exists.

---

Instant Message : Native Messages
From
   Rob Frohwein <+14042906116>
21:24:32

And it's not final so you have to kill the out of scope crap in it.  Fucking consulting firms.

---

Instant Message : Native Messages
From
   +17732949576
21:24:46

wait...slow down...what's the actual issue here

---

Instant Message : Native Messages
From
   +17732949576
21:25:00

Yes we needed to do it as part of being a direct lender

A00338

Instant Message : Native Messages
From
+17732949576                                      21:25:15

So that is what it is

Instant Message : Native Messages
From
+17732949576                                      21:25:22

What's the actual problem?

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>                        21:26:05

If you read the report, you'll see the problems. They're all in red - literally. We're sending fraudulent data to the SBA. We aren't performing calculations correctly and on and on and on

Instant Message : Native Messages
From
+17732949576                                      21:26:27

Which is exactly why we're not done with it yet

Instant Message : Native Messages
From
+17732949576                                      21:26:33

So what's the problem with amex?

Instant Message : Native Messages
From
Rob Frohwein <+14042906116>                        21:26:41

Anyway, get with Scott - keep it attorney client privileged and punch them in the fucking face to update that report and pull it back.

Instant Message : Native Messages
From
Sam Taussig <+13014129193>                         21:26:42

We had lots of comments flipped back to them

Instant Message : Native Messages
From
+17732949576                                      21:26:43

They should not have seen it

A00339

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>      21:26:47

They are asking for the findings.

Instant Message : Native Messages
From
    +17732949576      21:26:59

The findings aren't there yet

Instant Message : Native Messages
From
    +17732949576      21:27:03

When they are we can give

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>      21:27:03

They haven't but they suspect issues and it's causing major problems.

Instant Message : Native Messages
From
    Sam Taussig <+13014129193>      21:27:14

Suspect issues with what?

Instant Message : Native Messages
From
    Sam Taussig <+13014129193>      21:27:20

This stuff takes time

Instant Message : Native Messages
From
    Rob Frohwein <+14042906116>      21:27:36

Will ring you guys tomorrow and include Scott

Instant Message : Native Messages
From
    Sam Taussig <+13014129193>      21:27:49

And all the should know is it's BSA because we're reporting to FinCEN

A00340

Instant Message : Native Messages
From                                                                 21:27:55
        Rob Frohwein <+14042906116>

Ive been dealing with lots of related issues all eve on reg and compliance
with them.

Instant Message : Native Messages
From                                                                 21:32:32
        +17732949576

I'm sure you have...understand everything we're doing on PPP we've run
through our outside council focused on SBA...I have no problem
defending all of it with reference to specific SBA IFR guidance.  That's what
we're working through with A&M this is not a normal BSA look...there are
caveats

Instant Message : Native Messages
From                                                                 21:38:29
        Rob Frohwein <+14042906116>

I think A&M is trying to show their value too much and they need to be
severely restricted on what they report.

**End Thread**

| Thread Statistics | |
| --- | --- |
| | **Instant Message Count** |
| 33 | |

A00341

# EXHIBIT 34

**From:** Oneal Bhambani [obhambani@kabbage.com]
**on behalf of** Oneal Bhambani <obhambani@kabbage.com> [obhambani@kabbage.com]
**Sent:** 7/26/2020 8:17:16 PM
**To:** Chu, Lawrence [LawChu@goodwinlaw.com]
**CC:** Robert Frohwein [rfrohwein@kabbage.com]; Cummings, Abbey [ACummings@goodwinlaw.com]; Hagler, Nathan E. [NHagler@goodwinlaw.com]; Scott Askins [saskins@kabbage.com]; Dolman, Amber R.E. [ADolman@goodwinlaw.com]; Larie, Kimberly [KLarie@goodwinlaw.com]; Eberhart, Kristin B. [KEberhart@goodwinlaw.com]; DG-Project Green [DG-ProjectGreen@goodwinlaw.com]; Bryan Bellmare [Bryan.Bellmare@ftpartners.com]; Amar Mehta [Amar.Mehta@ftpartners.com]
**Subject:** Re: Project Green - Merger Agreement

On the big issue (cash left in legacy), perhaps an additional reason to determine if we should do a solvency opinion (if it helps Amex get comfortable pushing PPP cash through the transaction). We'll have the completed winddown model early this week if it helps.

On Sun, Jul 26, 2020 at 5:14 PM Chu, Lawrence <LawChu@goodwinlaw.com> wrote:
Thanks Rob. We have reached out to S&C to set a time to talk and waiting to hear back. Will keep you posted. Thx

_____

Lawrence M. Chu
Office:  +1-650-752-3223
Mobile:  +1-646-436-3817

On Jul 26, 2020, at 4:45 PM, Robert Frohwein <rfrohwein@kabbage.com> wrote:

**ATTORNEY CLIENT PRIVILEGED**

Already spoke with Larry but want to update you all on my call with Todd.

Big issue: Cash left in legacy co. They are concerned that the burden to prove that enough money was left in legacy co shifts to them if they push our cash from PPP through the transaction. No legal theory really presented. I explained that we believe that there would be sufficient capital with the $12m, but it appears that this will be the substantive issue remaining this week.

Structure: Sounds like they're coming around to understanding that most liabilities will come with the deal other than the few specifically left. He suggested that during the Goodwin / S&C tomorrow, you'll see substantial movement.

Servicing: They're ok with leaving it with legacy co but taking it back in the form of an agreement between legacy and amex. I told them I wanted them to at least take ABS/pre-crisis portfolio. He seemed to think that was possible.

Publicity: shared our desire to delay until absolutely necessary. He said split feelings at Amex - many are excited to announce ASAP. He will take it back but seems open.

Conflict between Control vs. Sign/close requirements. I explained that they can't have it both ways - strong controls over the way that we operate between sign and close yet broad ability to walk and a long sign to close period. He said they've kill a lot of the controls on their side. (FYI - I still only want 3 months max).

**A00342**

Loan factoring: this issue should go away.

8/7 sign date: told him that this is immovable in my mind.  He gets it.  To that end, agrees there should be an all hands soon - maybe Wed/Thurs.

Key employees: will get this list and offers for them early side of this week.

On Jul 26, 2020, at 3:04 AM, Cummings, Abbey <ACummings@goodwinlaw.com> wrote:

All – Attached please find a list of the primary issues in the Merger Agreement markup for us to walk through on our call tomorrow (both word version and PDF).  As you will see, this is an annotated version of our first issues list from S&C's initial draft of the MA.  We have deleted resolved issues and supplemented new and still open issues in red.

I'm also attaching the full markup of the Merger Agreement again, for ease of reference.

Thanks,
Abbey

Abbey Cummings
<image001.png>
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063
o  +1 650 752 3148
f  +1 650 471 6029
ACummings@goodwinlaw.com | goodwinlaw.com

Admitted only in Illinois; her work is supervised by Goodwin Procter attorneys admitted to practice in California.

**From:** Cummings, Abbey <ACummings@goodwinlaw.com>
**Sent:** Friday, July 24, 2020 1:00 PM
**To:** Hagler, Nathan E. <NHagler@goodwinlaw.com>; Robert Frohwein <rfrohwein@kabbage.com>; Scott Askins <saskins@kabbage.com>; Oneal Bhambani <obhambani@kabbage.com>
**Cc:** Chu, Lawrence <LawChu@goodwinlaw.com>; Dolman, Amber R.E. <ADolman@goodwinlaw.com>; Larie, Kimberly <KLarie@goodwinlaw.com>; Eberhart, Kristin B. <KEberhart@goodwinlaw.com>; DG-Project Green <DG-ProjectGreen@goodwinlaw.com>; Bryan Bellmare <Bryan.Bellmare@ftpartners.com>; Amar Mehta <Amar.Mehta@ftpartners.com>
**Subject:** RE: Project Green - Merger Agreement

All – Attached is the Merger Agreement markup just received from S&C.  We will review and plan to circulate an updated issues list to the group over the weekend (likely around EOD Saturday).  We can then plan to discuss on Sunday.  Please let us know your availability for Sunday and we will put something on the calendar.

Thanks,
Abbey

A00343

Abbey Cummings
<image001.png>
Goodwin Procter LLP
601 Marshall Street
Redwood City, CA 94063
o  +1 650 752 3148
f  +1 650 471 6029
ACummings@goodwinlaw.com | goodwinlaw.com

Admitted only in Illinois; her work is supervised by Goodwin Procter attorneys admitted to practice in California.

**From:** Hagler, Nathan E. <NHagler@goodwinlaw.com>
**Sent:** Tuesday, July 14, 2020 8:03 AM
**To:** Robert Frohwein <rfrohwein@kabbage.com>; Scott Askins <saskins@kabbage.com>; Oneal Bhambani <obhambani@kabbage.com>
**Cc:** Chu, Lawrence <LawChu@goodwinlaw.com>; Cummings, Abbey <ACummings@goodwinlaw.com>; Dolman, Amber R.E. <ADolman@goodwinlaw.com>; Larie, Kimberly <KLarie@goodwinlaw.com>; Eberhart, Kristin B. <KEberhart@goodwinlaw.com>; Bryan Bellmare <Bryan.Bellmare@ftpartners.com>; Amar Mehta <Amar.Mehta@ftpartners.com>
**Subject:** Project Green - Merger Agreement

Rob, Scott, and Oneal:

Please find attached a revised draft of the Merger Agreement that was shared with S&C last night.  As I believe Larry mentioned, we proactively set up a call with S&C for this morning to walk them through at a high level our comments to the draft.  The intent is to keep up the good working relationship and momentum and to reduce comments back.  We will let you know how the call goes.

Separately, Scott, please let us know when you are free today to connect regarding the merger agreement and the process for tackling the disclosure schedules.  We are happy to establish a process that works for you and allows us to leverage our resources to assist the company in drafting the schedules, to the extent you would like.

Thanks,
Nate

Nathan E. Hagler
<image001.png>
Goodwin Procter LLP
3 Embarcadero Center
San Francisco, CA 94111
o  +1 415 733 6085
f  +1 650 471 6093
NHagler@goodwinlaw.com | goodwinlaw.com

******************************************************************

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

************************************************************** <Green - MA Issues List (7.25.20).DOCX><Green - MA Issues List (7.25.20).pdf><Change-Pro Redline - Project Green - Merger Agreement (GP Draft 7.14.20)-104002506-v7 and Project Green - Merger Agreement (S&C Draft 7.24.20)-104002506-v8.pdf>

**A00344**

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

**A00345**





## UNITED STATES OF AMERICA
## ENTERPRISE BANK SECRECY ACT/ ANTI-MONEY LAUNDERING AND
## OFFICE OF FOREIGN ASSETS CONTROL POLICY

*Approval Date: July 29, 2020*

*Effective Date: July 29, 2020*

**A00346**

 Kabbage

Enterprise BSA/AML and OFAC Policy

## Table of Contents

| | | |
|---|---|---|
| 1. | Introduction | 3 |
| A. | Purpose | 3 |
| B. | Responsibility and Training | 4 |
| C. | Scope | 4 |
| D. | Consequences of Non-Compliance | 4 |
| E. | Key Terms | 4 |
| 2. | Policy Objectives | 5 |
| 3. | Governance, Organizational Structure, and Authority | 6 |
| A. | BSA/AML Programs for Non-Regulated Institutions | 6 |
| B. | Roles and Responsibilities | 7 |
| 4. | BSA/AML Policy Requirements | 9 |
| A. | Designation of BSA/AML Officer and Governance Structure | 9 |
| B. | Internal Controls | 10 |
| I. | BSA/AML Risk Assessment | 10 |
| II. | Know Your Customer Program | 10 |
| a. | Customer Identification Program | 11 |
| b. | Beneficial Ownership Requirements for Legal Entity Customers | 11 |
| c. | Customer Due Diligence | 12 |
| d. | High-Risk and Prohibited Customers | 12 |
| e. | Enhanced Due Diligence for High-Risk Customers | 13 |
| III. | OFAC Compliance and Name Screening | 13 |
| a. | OFAC List Name Screening | 14 |
| b. | USA Patriot Act Section 314A- Customer List Screening | 14 |
| IV. | Transaction Monitoring | 14 |
| V. | Referrals for Potentially Suspicious Activity | 15 |
| VI. | Mechanisms to Monitor On-going Compliance | 16 |
| a. | New Products Approval | 16 |
| b. | Internal Control Monitoring | 16 |
| c. | Board Reporting | 16 |
| d. | Confidential Reporting of Violations | 16 |

**A00347**



Enterprise BSA/AML and OFAC Policy

VII.    Additional BSA/AML Program Considerations                16

C.    Training                                                   17

D.    Independent Testing                                        17

E.    Risk-Based Controls                                        17

5.    BSA/AML Policy Administration                              18

A.    Record Retention and Record Keeping                        18

B.    Version Control Management                                 18

**A00348**

 Kabbage

Enterprise BSA/AML and OFAC Policy

# 1. INTRODUCTION

## A. PURPOSE

Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), the Bank Secrecy Act ("BSA"), and Office of Foreign Assets Control ("OFAC") regulations each require compliance with applicable anti-money laundering ("AML") and sanctions regulations.

This document contains the Enterprise BSA/AML and OFAC Policy (the "Policy") for complying with the BSA and all other relevant statutes relating to money laundering, counter-terrorist financing, and sanctions,[1] as implemented by Kabbage, Inc. and Kabbage Payments, LLC (collectively, "Kabbage" or the "Company") in connection with Kabbage's role as:

> (1) A program manager for Celtic Bank Corporation ("Celtic Bank"), the issuer of loans to small and medium-sized businesses ("SMBs") under the Kabbage Funding™ loan program;

> (2) A payment facilitator enabling merchant processing services for SMBs through its relationship with Worldpay, LLC ("Processor") and Fifth Third Bank ("Sponsoring Bank") for the Kabbage Payments™ product;

> (3) A technology service provider to Green Dot Bank ("Green Dot"), the issuer of demand deposit accounts to SMBs for the Kabbage Checking™ product; and

> (3) A service provider to certain bank partners and independently as a non-bank lender authorized by the U.S. Small Business Administration ("SBA"), in each case, for Paycheck Protection Program loans offered pursuant to Section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act)(collectively with (1), (2), and (3), the "Offerings").[2]

The Policy sets out how the Offerings meet guidelines developed by regulators and other government agencies to control, monitor, detect, prevent, and report possible money laundering, terrorist financing, and other financial crimes and to screen, prohibit, reject, or block transactions for sanctions violations. Accordingly, Kabbage's BSA/AML program ("BSA/AML Program") encompasses a Customer Identification Program ("CIP"), including Know Your Customer/Know Your Business (collectively, "KYC") checks, transaction monitoring, suspicious activity reporting, and a comprehensive sanctions screening process. To operationalize these elements of the BSA/AML Program, Kabbage has developed a separate BSA/AML Program Manual ("BSA/AML Program Manual"). The BSA/AML Program Manual is a living operational document and is periodically revised to reflect the Company's operational procedures.

Kabbage, its management, and its Board of Directors (the "Board") are committed to deterring use of Offerings as a conduit for illegal activity. This Policy has been designed to provide the framework and high level controls for effective compliance with BSA/AML and sanctions laws and regulations, as well as to communicate a clear commitment to creating a strong compliance culture for the Company's employees. The separate BSA/AML Program Manual includes the detailed information related to the specific requirements and procedures outlined in this Policy.

---

[1] Hereafter collectively referred to as "BSA/AML," for simplicity.

[2] The Paycheck Protection Program is a temporary Offering, made available by the SBA due to the unprecedented economic circumstances resulting from COVID-19. Unless otherwise required by law and then only to such extent, the Company's BSA/AML obligations related to loans under the Paycheck Protection Program are likewise temporary and conclude upon the maturity of such loans.

**A00349**

 **Kabbage**

Enterprise BSA/AML and OFAC Policy

### B. RESPONSIBILITY AND TRAINING

This Policy is established to govern the BSA/AML Program upon review and in certain cases, approval by the Company's bank partners and the Board and is reviewed annually by one or more qualified Kabbage compliance professionals ("Compliance") and the Chief Compliance Officer ("CCO") to determine any necessary updates resulting from changes in applicable laws, regulations or rules, industry landscape, product offerings, and/or Kabbage or bank partner processes. In the event there are no material changes to this Policy, Compliance will notify the Board, or a committee to which Board has delegated authority for the Policy ("Board Committee"), that there are no material changes for consideration, in lieu of providing the full Policy document to the Board. However, if there are material changes, Compliance will provide the full policy document reflecting the recommended changes to the Board, or appropriate Board Committee, for approval.

The BSA/AML Officer oversees and administers this Policy and may make recommendations of material changes to the Policy. This responsibility may be transferred to a designated representative to the extent deemed appropriate by the BSA/AML Officer.

Kabbage personnel will be trained on this Policy in accordance with the Compliance Training Policy.

No part of this Policy or its supporting procedures should be interpreted as contravening or superseding other applicable legal and regulatory requirements imposed upon Kabbage or the Offerings. Any conflicts between this Policy and Kabbage's other applicable legal and regulatory requirements must be submitted immediately to the BSA/AML Officer for further evaluation. If necessary, the BSA/AML Officer will consult outside legal counsel.

Any exceptions to this Policy must be approved by the BSA/AML Officer. Questions or suggestions about this Policy should be sent to the BSA/AML Officer, or designee.

### C. SCOPE

This Policy applies to the Offerings and to all Kabbage personnel (i.e., management, Board members, and employees) performing services related to the Offerings.

### D. CONSEQUENCES OF NON-COMPLIANCE

All Kabbage personnel assigned to carry out any specific BSA/AML tasks are responsible for understanding this Policy. Non-compliance with, or violation of, the Policy's requirements may result in:

- Disciplinary action, up to and including termination in appropriate cases; and/or
- Individual and/or company civil and/or criminal penalties.

Willful blindness, or "turning a blind eye," to a potential BSA/AML violation can expose Kabbage and its bank partners to potential liability.

### E. KEY TERMS

**Money laundering** is generally defined as the process by which persons attempt to conceal and disguise the true origin and ownership of illegal funds. Money laundering is generally viewed as a three-stage process: placement, layering, and integration:

**A00350**

 **Kabbage**

- **Placement** is the introduction of unlawful proceeds into the financial system without attracting the attention of financial institutions or law enforcement;

- **Layering** is the movement of funds around the financial system to disguise their origin and complicate the paper trail; and

- **Integration** is the incorporation of unlawful proceeds into the financial system to convert illicit funds into apparently legitimate business earnings and acquire wealth.

**Terrorist financing** is generally defined as the process by which terrorists and/or terrorist organizations raise funds through the abuse of financial products. While money laundering is the process by which funds raised from criminal activities are made to look legitimate for re-integration into the financial system, terrorist financing differs in that it typically concerns what the funds are to be used for, rather than from where they come.

**Sanctions** are restrictions against doing business with individuals, entities, or countries. OFAC, as part of the U.S. Department of the Treasury, is responsible for administering and enforcing economic and trade sanctions based on U.S. Government requirements to support foreign policy and national security goals. U.S. persons (a term that includes individuals and entities) are prohibited from engaging in most transactions with these countries and certain individuals and entities ("Specifically Designated Nationals" or "SDNs"). OFAC maintains an up-to-date list of SDNs ("SDN List").

If a U.S. entity receives a payment from, or is asked to make a payment to, any SDN or restricted country, for whatever purpose, the entity is required to stop the payment, block or reject the proceeds, and report the transaction to OFAC within 10 business days.

## 2. POLICY OBJECTIVES

This Policy seeks to protect the Offerings from being used by individuals and entities engaging in money laundering, terrorist financing, or sanctions avoidance. Specifically, the Policy:

- Defines specific roles and responsibilities for BSA/AML compliance;

- Creates an AML risk assessment process;

- Outlines the BSA/AML internal control process;

- Creates a KYC framework that provides for risk-based customer identification, verification, and due diligence;

- Creates a risk-based transaction monitoring and suspicious activity referral and reporting process;

- Establishes a policy of compliance with all USA PATRIOT Act Section 314(a) information sharing requests by bank partners or by the Financial Crimes Enforcement Network ("FinCEN");

- Establishes controls to ensure compliance with OFAC requirements;

- Establishes a process to ensure adherence to all applicable compliance requirements, including filing of reports, responding to information requests, and maintaining records;

- Ensures Kabbage documents efforts to meet its legal and contractual obligations;

- Provides a training program for all personnel;

- Requires periodic compliance quality assurance and independent testing; and

**A00351**



- Requires regular reporting to management and the Board on Kabbage's BSA/AML efforts.

## 3. GOVERNANCE, ORGANIZATIONAL STRUCTURE, AND AUTHORITY

Kabbage's Board appoints the BSA/AML Officer, who is responsible for the execution of this Policy. The BSA/AML Officer reports directly to the CCO, who is also appointed by the Board.  Both the BSA/AML Officer and the CCO have accountability and access to the Board, as needed.

The BSA/AML Officer is responsible for maintaining sufficient staffing, both in numbers and qualifications, to implement this Policy effectively and for requesting additional resources from the Board as needed. Notwithstanding the delegation of the day-to-day activities of BSA/AML compliance to the BSA/AML Officer, the CCO, and the Board remain responsible for ensuring that adequate resources are available for the BSA/AML Officer and for the BSA/AML Program.

Every employee of Kabbage has responsibility for ensuring that he or she implements the BSA/AML Program within his or her sphere of responsibility. The BSA/AML Officer will receive advance notice of all new products or services, as well as changes to existing products or services that might affect BSA/AML risk of the Offerings.

All Kabbage personnel are directly accountable to the Company's BSA/AML Officer for implementation of this Policy and its associated procedures. The BSA/AML Officer and his/her team will have unrestricted access to any business records, IT systems, or any other business locations to which they require access in order to fulfil their responsibilities.

### A. BSA/AML PROGRAMS FOR NON-REGULATED INSTITUTIONS

While Kabbage is not a "financial institution" (as defined in the BSA at 31 U.S. Code § 5312) required by law to implement a BSA/AML program, Kabbage has made a commitment to implement an effective BSA/AML program to comply with its statutory obligations under the Paycheck Protection Program as well as its contractual obligations to its bank partners. This commitment is demonstrated through:

- Setting a clear "tone from the top" about the importance of BSA/AML compliance;
- Board and management's ongoing involvement in oversight of the BSA/AML Program, including:
    - Review and, where appropriate, approval of key documents such as the Policy and the BSA/AML risk assessment;
    - Receipt of regular management updates on the performance of the BSA/AML Program;
    - Receipt of the results of the independent review of the BSA/AML Program;
    - Resolution of escalated issues; and
    - Prompt corrective action to remediate systematic errors or control deficiencies.

Kabbage has also developed and implemented internal controls to ensure that it identifies inherent risks within the organization, including those presented by customers, products and services, and geographies.

A00352

 Kabbage

Enterprise BSA/AML and OFAC Policy

As a U.S. company, Kabbage understands that it must comply with OFAC requirements. OFAC requirements hold that all U.S. persons[3], including U.S. banks, bank holding companies, and non-bank financial institutions, must comply with OFAC's regulations. The laws and OFAC-issued regulations apply not only to U.S. entities but also to their foreign branches and in certain circumstances, foreign subsidiaries.

### B. ROLES AND RESPONSIBILITIES

This BSA/AML Policy establishes the following roles and responsibilities:

| Responsible Party | Roles and Responsibilities |
|---|---|
| BSA/AML Officer (Policy Owner) | The BSA/AML Officer owns this Policy and is responsible for: <br>• Developing, implementing and maintaining this Policy's related procedures; <br>• Reviewing and refreshing the Policy at least annually, or when circumstances warrant; <br>• Ensuring Kabbage personnel receive BSA/AML training, and that Kabbage documents training materials and attendance records; <br>• Ensuring adequate BSA/AML staffing to implement the Policy; <br>• Providing guidance and direction to Kabbage personnel about the steps they need to take to institute the Policy in their areas of responsibility; <br>• Conducting an annual risk assessment; <br>• Ensuring the completion of an annual independent test of Kabbage's BSA/AML Program; <br>• Monitoring the effectiveness of BSA/AML compliance and taking corrective action to remedy any deficiencies found; <br>• Reviewing any changes to BSA/AML-related laws, regulations, guidance, or regulatory expectations and ensuring that Kabbage implements processes to remain fully in compliance with its BSA/AML obligations; <br>• Reviewing the BSA/AML implications of any new or changed products, services, initiatives, or distribution channels, and advising management and employees on necessary steps to mitigate BSA/AML risk; <br>• Promptly alerting the Board to any material issues of BSA/AML non-compliance, and instituting and monitoring corrective action; <br>• Providing annual reporting to the Board on the state of BSA/AML compliance and any significant emerging issues; <br>• As needed, liaising with bank partners on BSA/AML issues; and |

---

[3] All U.S. persons must comply with OFAC regulations, including: all U.S. citizens and permanent resident aliens, regardless of where they are located; all persons and entities within the United States; and all U.S. incorporated entities and their foreign branches. In the case of certain programs, such as those regarding Cuba and North Korea, foreign subsidiaries owned or controlled by U.S. companies also must comply. Certain programs also require foreign persons in possession of U.S.-origin goods to comply.

A00353



|  | • Seeking outside legal advice on BSA/AML issues as required. |
|---|---|
| **Board of Directors** | The Board, or a delegated committee thereof, is responsible for:<br><br>• Designating a BSA/AML Officer responsible for day-to-day oversight of BSA/AML compliance at Kabbage;<br>• Reviewing and approving this Policy and any subsequent material changes to this Policy;<br>• Reviewing Kabbage's BSA/AML reporting, as appropriate;<br>• Reviewing the annual independent testing of the BSA/AML Program and any plans for corrective action as necessary;<br>• Addressing any BSA/AML issues escalated to the Board; and<br>• As applicable, reviewing feedback from bank partners on the BSA/AML Program and receiving reports on any remedial action necessary. |
| **Chief Compliance Officer** | The CCO is responsible for:<br><br>• Promoting and implementing a strong culture of BSA/AML compliance;<br>• Reviewing the BSA/AML risk assessment for the Offerings;<br>• Reviewing and approving this Policy and any subsequent material changes to the Policy, prior to submitting to the Board for approval;<br>• Reviewing the BSA/AML Officer's periodic reports;<br>• Holding personnel accountable for resolution of BSA/AML corrective actions;<br>• Ensuring that Kabbage has adequate BSA/AML resources;<br>• Overseeing annual, or more frequent as necessary, compliance quality assurance, independent control testing, and review of this Policy and reporting results to the Board; and<br>• As applicable, reviewing feedback from bank partners relating to the BSA/AML Program and receiving reports on any remedial action necessary. |
| **Kabbage Employees** | All employees of Kabbage with responsibilities impacting the BSA/AML Program, are responsible for:<br><br>• Promoting a strong culture of BSA/AML compliance;<br>• Knowing their responsibilities under this Policy including the prohibition on "tipping-off" (i.e., informing the subject of an investigation or a suspicious activity filing of their status as a subject), and ensuring they remain in compliance;<br>• Implementing this Policy and its associated procedures within their areas of responsibility, including designing, implementing and maintaining necessary controls;<br>• Identifying BSA/AML compliance weaknesses and promptly alerting and working with Kabbage's BSA/AML Officer, or designee, to take corrective action; |

**A00354**



|  | <ul><li>Maintaining systems, controls, and reports used to support compliance efforts;</li><li>Notifying and seeking the approval of the BSA/AML Officer for any new or modified products, services, initiatives, or distribution channels;</li><li>Reporting unusual activity to the CCO, BSA/AML Officer, or designee;</li><li>Ensuring they complete required BSA/AML training; and</li><li>Providing BSA/AML compliance personnel unrestricted access to any business records, systems or locations necessary to fulfil the duties described in this Policy and other applicable compliance policies and procedures.</li></ul> |
|---|---|

# 4. BSA/AML POLICY REQUIREMENTS

This Policy provides a summary of the various procedures and processes Kabbage employs to comply with both legal requirements and its contractual responsibilities, to establish and maintain an effective and compliant BSA/AML Program.

It describes the manner in which Kabbage implements the "five pillars" of AML compliance, namely:

A. Designation of a BSA/AML Officer and BSA governance structure;

B. Policies, procedures, and internal controls, which include:

    I. A BSA/AML risk assessment process;

    II. A risk-based KYC Program, which includes a CIP and customer due diligence ("CDD");

    III. OFAC screening, review, and reporting;

    IV. Transaction monitoring;

    V. Referring or reporting potentially suspicious activity to bank partners or FinCEN, respectively;

    VI. Mechanisms designed to monitor on-going compliance; and

    VII. BSA/AML Program controls related to account opening.

C. On-going personnel training and development;

D. Independent testing of the BSA/AML Program; and

E. Risk-based procedures for conducting ongoing customer due diligence.

## A. DESIGNATION OF BSA/AML OFFICER AND GOVERNANCE STRUCTURE

Kabbage's Board designates the BSA/AML Officer, who has responsibility for day-to-day oversight of BSA/AML compliance for the Offerings. Section 3 describes the responsibilities of the BSA/AML Officer and Kabbage's BSA/AML governance structure.

A00355

 **Kabbage**

Enterprise BSA/AML and OFAC Policy

## B. INTERNAL CONTROLS

Kabbage has in place internal BSA/AML controls designed to mitigate risks presented by the Offerings. Kabbage's internal controls include those related to customer onboarding, transaction monitoring, and sanctions screening functions.

### I.    BSA/AML RISK ASSESSMENT

The BSA/AML Officer conducts an annual risk assessment to identify the inherent BSA/AML and OFAC risk of the Offerings and the effectiveness of the existing controls.

Consistent with the regulatory obligations of covered financial institutions, the risk assessment process assigns an inherent risk rating based on an assessment of customers, product and services, and geographic risks. The BSA/AML Officer then assesses the adequacy of the design and implementation of mitigating controls to determine the residual risk.[4]

The BSA/AML risk assessment process forms the foundation of the BSA/AML Program. Using the results of the BSA/AML risk assessment, the BSA/AML Officer:

- Identifies the BSA/AML risk profile of the Offerings;
- Determines the adequacy and effectiveness of BSA/AML controls;
- Evaluates the adequacy and application of BSA/AML resources;
- Identifies the existence of any unmitigated and/or unacceptable BSA/AML risk; and
- If necessary, recommends and implements modifications to Kabbage's activities and/or Policy (or the underlying procedures and processes) to bring the BSA/AML residual risk of the Offerings to an acceptable level.

The BSA/AML Officer reports the results of the BSA/AML risk assessment to the Board, including proposed enhancements to the BSA/AML Program to mitigate any levels of excessive risk or control weaknesses identified in the risk assessment, for review and approval. The BSA/AML Officer makes the assessment available to other functions within the organization, including the business (also referred to as the first line) and any product development functions.

### II.    KNOW YOUR CUSTOMER PROGRAM

The KYC program (the "KYC Program") is a fundamental control in preventing the Offerings from becoming involved in money laundering, terrorist financing, or sanctions violations. The KYC Program covers all customers.

Customers include any business that (1) qualifies for a loan or a line of credit, (2) opens a merchant account for processing card payments, or (3) opens a demand deposit account (collectively, "Account"). Accounts are currently only available to domestic (U.S.) businesses.

The risk-based KYC processes for the Offerings encompass:

- A CIP that allows Kabbage to identify and verify the identity of customers with reasonable assurance;

---

[4] Refer to the BSA/AML Risk Assessment Methodology for additional details on this process.

A00356

 Kabbage

Enterprise BSA/AML and OFAC Policy

- A risk-based segmentation of customers; and
- A due diligence process that provides a greater depth of insight into certain customers.

Kabbage's policy is to ensure that it has a reasonable belief that it knows the true identity of all customers by collecting customer information at Account opening and collecting additional information, if warranted, depending on customer behavior.

As part of its on-boarding processes, Kabbage is required to collect and verify the identity of its customers and does so through non-documentary verification. Kabbage has engaged LexisNexis to facilitate this function. Kabbage further uses online triangulation of disparate data sources connected through its unique onboarding process to verify the identity of all customers. The vetting process for new accounts also includes automated data validation, the use of third-party data services and, when necessary, manual investigation.

In the event Kabbage is unable to form a reasonable belief that it knows the true identity of the customer, Kabbage may take the following actions:

- Decline to open the Account;
- Impose terms under which a customer may use their Account while Kabbage attempts to verify the customer's identity; or
- Close or suspend an Account after attempts to verify a customer's identity fail.

### a. CUSTOMER IDENTIFICATION PROGRAM

For purposes of CIP regulation, all Accounts are considered to be accounts subject to CIP requirements. Therefore, Kabbage performs CIP on all applicants for an Account.  Kabbage collects CIP information (a) at the time of onboarding, (b) at the time a customer initiates a change in his/her information on file, and (c) on an ongoing basis thereafter using a risk-based approach.  This process is designed to ensure Kabbage is able to form a reasonable belief that it knows the true identity of each customer and is able to mitigate the risk of identity theft, money laundering, terrorist financing, and sanctions violations.

### b. BENEFICIAL OWNERSHIP REQUIREMENTS FOR LEGAL ENTITY CUSTOMERS

In accordance with FinCEN's CDD requirements, Kabbage collects and verifies ultimate beneficial ownership information of legal entity customers at the time a new Account is opened. Legal entity customers include a corporation, limited liability company (LLC), or other entities that are created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed in the United States or a foreign country. Legal entity customers do not include sole proprietorships or unincorporated associations. Customers that were Account holders prior to the effective date of FinCEN's CDD rule (May 11, 2018) are not subject to the beneficial ownership verification requirements under the rule.

Kabbage collects, at a minimum, the name, address, date of birth, and social security number (or passport number or other similar information, in the case of foreign persons) for the following individuals, each an ultimate beneficial owner ("UBO"), from the individual opening the Account on behalf of a legal entity customer:

**A00357**

 Kabbage

- each individual who, directly or indirectly, owns 25 percent[5] or more of the equity interests of the legal entity customer ("Owner"); and

- an individual who has significant management responsibility for the legal entity customer ("Control Person")

Kabbage collects information for up to four Owners[6] and one Control Person. Kabbage further requires the individual opening the Account on behalf of a legal entity customer to certify as to the accuracy of the UBO information in a manner substantially similar to the Certification Form provided by FinCEN.[7] Kabbage uses a third-party to verify the UBO information and conducts enhanced due diligence as necessary. All records related to the identification and verification of the UBOs are retained consistent with this Policy.

### c. CUSTOMER DUE DILIGENCE

The BSA/AML Program requires that CDD be performed on all customers. CDD may include: information on business and industry type; information regarding payroll filings; corporate documents; understanding of the purpose of the loan or transaction; and a Politically Exposed Person ("PEP") check.

The BSA/AML Officer, or designee, will report or refer (as applicable) potentially suspicious activity if Kabbage identifies such activity in the due diligence processes.[8]

### d. HIGH-RISK AND PROHIBITED CUSTOMERS

Kabbage has identified certain types of businesses that pose a higher risk and as a result, require enhanced due diligence ("EDD"). These include:

- Confirmed PEPs or PEP-controlled entities; and

- Businesses that are risk rated as "High" through the Customer Risk Rating ("CRR") methodology process.

Kabbage has also identified certain types of businesses that pose significant risk and as a result, has determined that they will not be accepted as customers:

- Businesses that are unable to link at least one account from a FinCEN registered money service business ("MSB") or financial institution; and

- Any business for which Kabbage has reported or referred for suspicious activity three times;

- Businesses in the following industries: marijuana, CBD, gambling, financial services, lending, non-profits; and businesses that sell or manufacture any form of assault-style weapons and/or sell firearms or ammunition to individuals under 21;

---

[5] For Paycheck Protection Program loans, this threshold has been reduced to 20%.

[6] For Paycheck Protection Program loans, information is collected for up to five Owners.

[7] See Appendix A to 31 § CFR 1010.230 – Certification Regarding Beneficial Owners of Legal Entity Customers.

[8] As a non-bank financing provider for Paycheck Protection Program loans, Kabbage will directly file suspicious activity reports with FinCEN.

**A00358**



Enterprise BSA/AML and OFAC Policy

- Businesses deemed as prohibited or requiring pre-approval for payment processing services by the Processor;

- Businesses deemed as prohibited for demand deposit account services by Green Dot.

- With respect to Paycheck Protection Program loans, businesses that are deemed ineligible for 7(a) loans guaranteed by the U.S. Small Business Administration.

Kabbage does not offer access to consumer loans, demand deposit accounts, or payment processing services for personal accounts and therefore, does not have any individual persons as customers.

### e.  ENHANCED DUE DILIGENCE FOR HIGH-RISK CUSTOMERS

Kabbage utilizes a risk-based methodology to conduct EDD.

Kabbage's EDD process includes non-documentary means, documentary means, direct contact, and/or a combination of the foregoing.

A customer risk rating is assigned at the time of onboarding for the purposes of determining the need for EDD. Once EDD is successfully completed, the relevant documentation is added to the customer's profile but the risk level remains the same.

If after an assessment, it is determined that the Account or relationship may pose additional risks, the Account or relationship will be escalated to the Risk team, and the BSA/AML Officer may be consulted, to determine whether to open or maintain the Account or relationship.

### III.    OFAC COMPLIANCE AND NAME SCREENING

As a policy requirement, the BSA/AML Officer ensures that Kabbage complies with the OFAC requirements to enforce economic and trade sanctions based on U.S. foreign policy and national security goals. Kabbage's policy towards OFAC compliance applies to all parties with which Kabbage does business including, but not limited to customers, third-party vendors, and Kabbage personnel. The systems and controls ensure that Kabbage:

- Fully incorporates OFAC risk within the BSA/AML risk assessment;

- Screens all customers, vendors, and personnel against the SDN List;

- Updates OFAC and other applicable lists in a timely fashion when sanctions programs and/or the SDN List changes and screens existing customers, vendors, and personnel against changes to the list on a recurring basis;

- Blocks internet protocol addresses of countries subject to comprehensive OFAC sanctions, and any countries subject to narrower OFAC sanctions where the BSA/AML Officer or designee deems that internet protocol blocking is necessary to mitigate the risk of a sanctions violation;

- Works with its bank partners to resolve any sanctions concerns;

- Prevents all customers under review for a potential OFAC hit from conducting transactions;[9] and

---

[9] With regard to Kabbage Funding and Kabbage Checking, because the Account relationship is between the bank and the business (i.e., Kabbage does not own the Account and therefore cannot block or maintain property), Kabbage does not have reporting requirements to OFAC related to blocked or rejected property. Kabbage would, however, cease from enabling any further transactions on the Account.

A00359



- Documents rationales for clearing all false-positive OFAC hits.

### a. OFAC LIST NAME SCREENING

In order to conduct a timely and orderly screening of customers, Kabbage utilizes a third-party service provider, which screens against OFAC and other sanctions lists to ensure adequate coverage and risk mitigation for the OFAC screening process. Kabbage currently screens the following data elements:

- Name of business customer;
- Name of the business representative; and
- Name of the UBO(s).

For Offerings, names are screened:

- Prior to Account creation; and
- On a recurring monthly basis.

The Compliance Manager will immediately be advised of any OFAC screening matches and will work with the BSA/AML Officer to document and communicate the match to bank partners. Where appropriate, Kabbage will also report any confirmed true matches directly to OFAC and take the legally mandated actions to manage the Account in accordance with OFAC requirements. Any true OFAC match will also be reported to the Board and maintained as a record on a regular basis.

### b. USA PATRIOT ACT SECTION 314A- CUSTOMER LIST SCREENING

Section 314(a) grants FinCEN the authority to require that each financial institution expeditiously search its records to determine whether it maintains or has maintained any accounts for, or engaged in specified transactions with, each individual entity or organization named in FinCEN's request.

The BSA/AML Officer, or designee, is responsible for ensuring compliance with 314(a) information sharing requests from bank partners and ensuring that such requests and responses stay confidential. Upon receipt of a FinCEN 314(a) request from a bank partner, Kabbage, in compliance with the requirement, will conduct a one-time search of the records related to the relevant Offering to identify any current Account, or any Account maintained in the last twelve (12) months, for a named suspect. Positive matches will be provided to the relevant bank partner prior to the designated response date and Kabbage will retain all records in association with the review.

If, as a part of Kabbage's status as an approved non-bank lender for Paycheck Protection Program loans, Kabbage receives 314(a) requests directly from FinCEN, Kabbage will search Paycheck Protection Program Account records in response directly to such request.

### IV.   TRANSACTION MONITORING

The BSA/AML Program has in place policies, procedures, and processes to identify and monitor unusual activity, as well as a formal process for reviewing that activity, filing suspicious activity reports or referrals suspicious activity to bank partners, and managing its systems used to assist in this process. In addition, Kabbage requires all of its employees to report unusual or potentially suspicious activity to the BSA/AML Officer or designee.

A00360



Since all transactions are conducted online and no currency (i.e., cash) is deposited, withdrawn, exchanged, or transferred in connection with the Offerings, Kabbage does not have an obligation to file currency transaction reports ("CTRs").

## V.   REFERRALS FOR POTENTIALLY SUSPICIOUS ACTIVITY

Under federal law, a covered financial institution must file a Suspicious Activity Report ("SAR") when it identifies suspicious activities as part of the customer onboarding and monitoring processes. While Kabbage is not a financial institution, in connection with its status as a non-bank lender for Paycheck Protection Program loans, Kabbage will file SARs directly with FinCEN.  Additionally, and consistent with its contractual obligations, Kabbage will refer potentially suspicious activity to its bank partners.

Kabbage has implemented procedures for referring potentially suspicious activity to its bank partners[10] and maintains records for customer Account information (including the information obtained during the customer vetting process) for the time period required by federal obligations.

The Risk team works closely with the Compliance and Financial Operations teams to identify and report on any suspicious activities. Referrals and reports are submitted for any activity involving $5,000[11] or more of funds or assets (individually or in the aggregate) once Kabbage knows, suspects, or has reason to suspect the transaction:

- Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity as part of a plan to violate or evade federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

- Is designed, whether through structuring or otherwise, to evade any requirements of the BSA regulations;

- Has no apparent lawful purpose or is not the business activity in which the customer would normally be expected to engage, and Kabbage knows, after examining the background, possible purpose of the transaction and other facts, of no reasonable explanation for the transaction; and/or

- Involves the use of the Offerings to facilitate criminal activity.

Information collected by Kabbage regarding suspicious activity  may not be discussed with anyone outside the Kabbage organization (except for relevant bank partners). Discussion of such matters within Kabbage should be limited to those who have a need to know. If an inquiry is received from the customer or an outside third party, the inquiry must be promptly referred to the BSA/AML Officer who will consult with Kabbage's CCO to determine the appropriate course of action.

---

[10] Depending on the partner, such referrals may be labeled Questionable Activity Reports ("QARs") or Unusual Activity Reports ("UARs").

[11] Kabbage does not solely base its decision on whether to file or refer on whether the transaction is above a predefined threshold. Transactions below $5,000 may also result in a report or referral if determined to be warranted by the BSA/AML Officer.

A00361

 **Kabbage**

Enterprise BSA/AML and OFAC Policy

The BSA/AML Officer, or designee, evaluates whether to close accounts subject to reports or referrals. If an account is closed as a result, the BSA/AML Officer is responsible for documenting the basis for the decision. Unless specifically instructed by law enforcement not to close the account, Kabbage will consider the closure of any account on which it files three reports or referrals.

### VI.   MECHANISMS TO MONITOR ON-GOING COMPLIANCE

Kabbage has implemented additional mechanisms to monitor on-going compliance.

#### a.  NEW PRODUCTS APPROVAL

All new or modified Offerings require approval by the BSA/AML Officer. Any launch decisions for new products or services will appropriately consider AML risks and include plans for additional controls, as needed.

Kabbage currently only provides the Offerings to domestic (U.S.) businesses. Any expansion of the permitted customer base constitutes a new or modified business practice for these purposes.

#### b.  INTERNAL CONTROL MONITORING

The BSA/AML Officer is responsible for developing monitoring processes to identify BSA/AML Program systemic errors and control deficiencies promptly. These processes should facilitate remediation of identified BSA/AML control deficiencies as well as escalation procedures. The BSA/AML Officer or designee will then track the remediation of identified control deficiencies through corrective action plans (e.g., based on recommendations identified by the risk assessment or independent testing). The purpose of ongoing monitoring is to implement a quality control function to ensure day-to-day compliance between full, and comprehensive, testing of the BSA/AML Program.

#### c.  BOARD REPORTING

The BSA/AML Officer provides an annual report on the state of BSA/AML compliance and any significant emerging issues that assists the Board and CCO in evaluating any Policy changes that may be appropriate.

#### d.  CONFIDENTIAL REPORTING OF VIOLATIONS

The BSA/AML Officer ensures Kabbage employees can report violations of this Policy anonymously by telephone. The BSA/AML Officer further ensures that this mechanism is well publicized to all employees and takes all possible steps to ensure reports of potential violations remain anonymous and confidential. Kabbage never tolerates retaliation of any type against an employee who reports a potential violation of the Policy. Any employee who commits such retaliation will be subject to disciplinary action up to and including termination.

Internal referrals may not be discussed with anyone outside the organization. Discussion of such matters within Kabbage should be limited to those who have a need to know. If an inquiry is received from the customer or an outside third party, the inquiry must be promptly referred to the BSA/AML Officer, who will consult with Kabbage's CCO to determine the appropriate course of action.

### VII.   ADDITIONAL BSA/AML PROGRAM CONSIDERATIONS

The process by which Kabbage assesses the BSA/AML risk of a prospective customer is in part incorporated into the existing credit underwriting process for certain Offerings. Kabbage assesses the

**A00362**



credit risk of a customer using multiple sources, many of which may also serve as indicators of BSA/AML Risk.

Customers are required to link an account from a U.S. financial institution (e.g., a regulated bank or a money service business, such as PayPal), a process that assists underwriting, customer verification, and loan disbursement.

## C. TRAINING

Kabbage requires that all Kabbage personnel receive BSA/AML training appropriate to their roles and responsibilities at least annually.

New Kabbage employees are required, within 30 days of hire, to participate in an orientation that contains an overview of BSA/AML requirements.

The BSA/AML Officer is responsible for ensuring training is completed in a timely fashion. Kabbage provides training on relevant laws and regulations, including BSA/AML requirements, through an online course provided by a third-party. If deemed necessary by the BSA/AML Officer, additional in-depth training may be provided either directly by the BSA/AML Officer or a third party.

## D. INDEPENDENT TESTING

Kabbage's BSA/AML Officer oversees the completion, at least annually, of an independent test of Kabbage's BSA/AML Program to assess the implementation and effectiveness of the BSA/AML Program and the adequacy of its controls over BSA/AML compliance risk.[12]

The BSA/AML Officer, or designee, is responsible for updating the risk assessment for the Offerings in light of any issues raised during the independent testing and taking necessary corrective action to remediate findings.

## E. RISK-BASED CONTROLS

Kabbage has in place appropriate risk-based procedures for conducting ongoing customer due diligence which include, but are not limited to:

- understanding the nature and purpose of the customer relationship for the purposes of developing a customer risk profile; and

- conducting ongoing monitoring to identify and report suspicious activity and on a risk-basis, to maintain and update customer information.

Kabbage has implemented a CRR methodology for the Offerings, which assigns a risk-based rating to customers at the time of on-boarding using the following factors:

- entity type;

- industry type;

---

[12] Celtic Bank is required to conduct an independent review of its BSA/AML program to assess the overall effectiveness and institute practices for monitoring the strength of internal controls. As result, Celtic Bank expects that Kabbage, as service provider to Celtic Bank, will also conduct an independent testing of the BSA/AML Program on an annual basis.

**A00363**



- geographic location (e.g., in HIDTA or HIFCA); and
- marketing channel.[13]

Customers with a high CRR rating are subject to EDD. Suspicious activity monitoring and reporting are also critical internal controls and are addressed under Section 4(B)(IV). Kabbage periodically refreshes both business and individual verification information to ensure it continues to maintain updated customer information.

# 5. BSA/AML POLICY ADMINISTRATION

## A. RECORD RETENTION AND RECORD KEEPING

Kabbage maintains all information related to BSA/AML requirements for a period of at least five (5) years from the date of last activity on the Account. This includes but is not limited to: records of all customer information including, CIP information, purpose of loan information, credit bureau file information, documentary identification information, loan agreements, statements, transaction information, customer correspondence, and customer contact information.

## B. VERSION CONTROL MANAGEMENT

| Ver. | Last Revised Date | Edited By | Comments | Bank Partner Approval Date | Board Approval Date | Last Reviewed Date |
|---|---|---|---|---|---|---|
| 1 | 3/28/18 | A. Habib | Revised Policy per feedback from Promontory | Celtic (3/28/18) | 4/6/18 | 3/23/18 |
| 2 | 7/11/19 | A. Habib | • Expanded existing Policy to contemplate payment processing services<br>• Addressed findings from 2018 BSA/AML audit<br>• Made clarifications and clean-ups | Celtic (7/11/19) | 7/24/19 | 7/11/19 |
| 3 | 7/28/20 | A. Habib; S. Askins | Expanded existing Policy to incorporate the Kabbage Checking and Kabbage Paycheck Protection Program offerings | Green Dot (4/27/20) | 7/29/20 | 7/28/20 |

---

[13] Kabbage's customer risk segmentation process for Paycheck Protection Program loans differs from the standard CRR methodology as follows: rather than using these four factors to determine CRR for Paycheck Protection Program customers, Kabbage relies on LexisNexis risk scores to determine CRR, and, depending upon the score, performs EDD through either manual review or the use of additional risk scoring tools.

A00364

# EXHIBIT 36

**From:**      Rob Frohwein [rfrohwein@kabbage.com]
**Sent:**      8/4/2020 9:55:23 AM
**To:**      Hagler, Nathan E. [nhagler@goodwinlaw.com]
**CC:**      Chu, Lawrence [lawchu@goodwinlaw.com]; Oneal Bhambani [obhambani@kabbage.com]; Dzialo, Robert H [rdzialo@goodwinlaw.com]; Scott Askins [saskins@kabbage.com]; Amar Mehta [amar.mehta@ftpartners.com]; Bryan Bellmare [bryan.bellmare@ftpartners.com]; Dolman, Amber R.E. [adolman@goodwinlaw.com]; Kathryn Petralia [kpetralia@kabbage.com]
**Subject:**      Re: Project Green -- Issues List

Quick update:

1. Keep pencils down.

2. I had another call with Todd at Amex.  He explained that our PPP program is much larger than it used to be, they perceive more risk, yada yada.  I explained that if they want $62m in escrow, we want the purchase price increased by $100m because in the same time frame, we've brought on tens of thousands of more customers, proved just how much more kick ass we are, launched checking accounts (when they can't figure it out, have generated a huge amount of more revenue which means we really don't need this deal, and ONDK is no longer a thing in the market so we are freed of that ball and chain.  They can't simply look at one side of the benefit/risk continuum.

3. All follow up calls we had scheduled with Amex on HR etc have been cancelled.  They are trying to arrange a call with Anna and potential Steve (CEO).

I'm 100% committed to no more bullshit in this deal.

Rob


On Aug 3, 2020, at 6:18 PM, Hagler, Nathan E. <NHagler@goodwinlaw.com> wrote:

All:

for reference, attached is the issues list we just received from S&C.  Goodwin is going through it internally.

Nate

---

**From:** Chu, Lawrence <LawChu@goodwinlaw.com>
**Sent:** Monday, August 3, 2020 2:31 PM
**To:** Oneal Bhambani <obhambani@kabbage.com>
**Cc:** Hagler, Nathan E. <NHagler@goodwinlaw.com>; Dzialo, Robert H <RDzialo@goodwinlaw.com>; Robert Frohwein <rfrohwein@kabbage.com>; Scott Askins <saskins@kabbage.com>; Amar Mehta <Amar.Mehta@ftpartners.com>; Bryan Bellmare <Bryan.Bellmare@ftpartners.com>; Dolman, Amber R.E. <ADolman@goodwinlaw.com>
**Subject:** Re: Project Green -- Issues List Discussion

Sounds good.  Thx

---

Lawrence M. Chu
Office:  +1-650-752-3223
Mobile: +1-646-436-3817

**A00365**

On Aug 3, 2020, at 2:30 PM, Oneal Bhambani <obhambani@kabbage.com> wrote:

Can confirm we have placeholders / toggles in place to finalize the independent valuation with this information when it gets finalized.

The analysis in the independent valuation was largely on our loan book, HL more or less took our servicing liability estimates without much diligence.   On the solvency opinion, the diligence will be much more detailed around the servicing liability.    We will take the servicing liability from the solvency opinion and plug it into the independent valuation before we finalize.

On Mon, Aug 3, 2020 at 2:26 PM Chu, Lawrence <LawChu@goodwinlaw.com> wrote:

Thanks Oneal.

On the valuation opinion, I expect that the analysis is the same/similar as (or at least tied to) the work being done internally to scope how much we need to capitalize Legacy Company with... just checking that it includes what we expect to be contingent liabilities left at Legacy Company too.  I think you and Amber discussed this.  A lot still we don't know (e.g. how much IP indemnification exposure will be agreed to be; detail to be worked through on assets/liabilities divide), but can you confirm we are taking this into account?

Thx

_____

Lawrence M. Chu
Office:  +1-650-752-3223
Mobile: +1-646-436-3817

On Aug 3, 2020, at 2:19 PM, Oneal Bhambani <obhambani@kabbage.com> wrote:

Cannot make this time, set forth are updates:
- Tied up with Duff & Phelps this afternoon for solvency work which is scheduled for 8/7
- Independent valuation draft completed, before going to final -- needs to tie to the numbers in the solvency opinion.
- Ready to compare Included/Excluded and Working Cap Adjustment to our analysis when we see it
- Working with Jon Hoffman to see if we can get a quote (or two) from a loan servicer

On Sun, Aug 2, 2020 at 7:36 PM Hagler, Nathan E. <NHagler@goodwinlaw.com> wrote:

Nate Hagler is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://goodwinlaw.zoom.us/j/5360505119?pwd=RThXZDVOZXdNMFB1WENYV01TK3FDdz09

Meeting ID: 536 050 5119
Passcode: 1234
One tap mobile

A00366

+16699009128,,5360505119# US (San Jose)
+13462487799,,5360505119# US (Houston)

Dial by your location
    +1 669 900 9128 US (San Jose)
    +1 346 248 7799 US (Houston)
    +1 253 215 8782 US (Tacoma)
    +1 312 626 6799 US (Chicago)
    +1 646 558 8656 US (New York)
    +1 301 715 8592 US (Germantown)
    +33 1 7037 9729 France
    +33 1 7095 0103 France
    +33 1 7095 0350 France
    +33 1 8699 5831 France
    +33 1 7037 2246 France
    +49 69 3807 9883 Germany
    +49 695 050 2596 Germany
    +49 69 7104 9922 Germany
    +49 30 5679 5800 Germany
    +852 5803 3731 Hong Kong SAR
    +852 5808 6088 Hong Kong SAR
    +852 3008 3297 Hong Kong SAR
    +852 5803 3730 Hong Kong SAR
    +352 2786 4277 Luxembourg
    +352 342 080 9265 Luxembourg
    +352 2786 1188 Luxembourg
    +44 203 901 7895 United Kingdom
    +44 208 080 6591 United Kingdom
    +44 208 080 6592 United Kingdom
    +44 330 088 5830 United Kingdom
    +44 131 460 1196 United Kingdom
    +44 203 481 5237 United Kingdom
    +44 203 481 5240 United Kingdom
Meeting ID: 536 050 5119
Find your local number: https://goodwinlaw.zoom.us/u/aeYRdu3kz

Join by SIP
5360505119@zoomcrc.com

Join by H.323
162.255.37.11 (US West)
162.255.36.11 (US East)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)
213.19.144.110 (EMEA)
103.122.166.55 (Australia)
209.9.211.110 (Hong Kong SAR)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)
207.226.132.110 (Japan)
Meeting ID: 536 050 5119
Passcode: 1234

Join by Skype for Business
https://goodwinlaw.zoom.us/skype/5360505119

*******************************************************************
This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*******************************************************************

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or

A00367

taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

<SC1-#5272171-v3-Green_-_Key_Issues_for_Discussion.DOCX>

A00368

# EXHIBIT 37

| | |
|---|---|
| **From:** | Oneal Bhambani [obhambani@kabbage.com] |
| **on behalf of** | Oneal Bhambani <obhambani@kabbage.com> [obhambani@kabbage.com] |
| **Sent:** | 8/10/2020 8:23:00 PM |
| **To:** | Robert Frohwein [rfrohwein@kabbage.com]; Kathryn Petralia [kpetralia@kabbage.com]; Scott Askins [saskins@kabbage.com]; Chu, Lawrence [LawChu@goodwinlaw.com]; Dzialo, Robert H [RDzialo@goodwinlaw.com]; Dolman, Amber R.E. [ADolman@goodwinlaw.com]; Hagler, Nathan E. [NHagler@goodwinlaw.com]; Amar Mehta [Amar.Mehta@ftpartners.com]; Bryan Bellmare [Bryan.Bellmare@ftpartners.com] |
| **Subject:** | DP Cash Number |
| **Attachments:** | Kabbage, Inc. Solvency Analysis Board Presentation_8_10_20_DRAFT (1).pdf |

**<u>Attorney-Client Privilege</u>**

DP completed their technical committee review today and gave us the draft slides that accompany the opinion letter. The opinion letter will be available for comment tonight and will be sent directly to Goodwin. From the call we had with them this evening, it appeared to Amber and I from their language that the opinion letter will reflect the language in the merger agreement and the Included / Excluded we have talked about. Finally, D&P will lead tomorrow with the assumptions on what's Included / Excluded.

It was basically a deal within a deal with its own separate process. **DP will issue their opinion on a 'stress test' scenario which projects cash burn of $15 million. The firm is recommending cash to be deposited of $15.5 million**. There are a couple of placeholders if we want to provide more of a buffer -- namely if we want to reserve any amounts for potential litigation or charge card contract obligations (Visa, Mastercard, Marqueta). I will follow up with this group on these items.

Attached is the deck. Page 21 (last page) has the cash flow case that the opinion is on. This deck doesn't reflect some small comments I have -- it is fresh off the press. Will follow-up with the opinion letter where I know everyone wants to focus.

Oneal

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

A00369

# EXHIBIT 38

**From:** Scott Askins <saskins@kabbage.com>
**Sent:** Tuesday, August 11, 2020 8:15 AM
**To:** Oneal Bhambani <obhambani@kabbage.com>
**Subject:** Re: DP Cash Number

I have calls until likely 12:30 but maybe we can briefly discuss as would want to make sure I understand how $1M was derived.  Is there specific slide about that other than below - sorry as I haven't has a chance to review this deck yet.  Thanks

.

**L. Scott Askins**
*General Counsel*
404-345-2705
www.kabbage.com

Kabbage, Inc.
730 Peachtree Street NE
Suite 1100
Atlanta, GA 30308

On Mon, Aug 10, 2020 at 11:21 PM Oneal Bhambani <obhambani@kabbage.com> wrote:

$1mm is a lot because we have just general reserves as well that are unallocated.  It's also got a buffer from inflated costs which would go away with any form of a TSA.

Can walk you through at your convenience but at this point, let's keep this guy as the final copy.

| | | |
|---|---:|---:|
| Software tools for employees (Slack, Jira, Salesforce, Duo, Confluence, Gsuite) | 1,479,621 | 830,639 |
| **Software & Services** | **4,471,955** | **2,428,150** |
| Office, utilities and facilities | 1,076,037 | 440,959 |
| Bank fees | 245,000 | 56,000 |
| Audit fees | 360,000 | 60,000 |
| Legal | 1,000,000 | 166,667 |
| **Other G&A** | **1,605,000** | **282,667** |
| Liquidity reserve | 100,800 | 16,800 |
| Finance executive | 1,044,000 | 174,000 |
| Finance support staff (payables, accounting) | 720,000 | 144,000 |
| **Corporate Operations (incl labor)** | **1,864,800** | **334,800** |
| **Total Opex** | **9,017,792** | **3,486,576** |
| Cash from unpledged loans | 730,000 | 856,638 |
| PPP Put Back | ($948,795) | ($948,795) |

A00370

On Mon, Aug 10, 2020 at 8:14 PM Chu, Lawrence <[LawChu@goodwinlaw.com](mailto:LawChu@goodwinlaw.com)> wrote:

OK.  As long as there is something, and it takes into account legal spend and potential settlement cost.  Expect that Scott will weigh in here if she thinks otherwise.

**From:** Oneal Bhambani <[obhambani@kabbage.com](mailto:obhambani@kabbage.com)>
**Sent:** Monday, August 10, 2020 8:11 PM
**To:** Chu, Lawrence <[LawChu@goodwinlaw.com](mailto:LawChu@goodwinlaw.com)>
**Cc:** Amar Mehta <[Amar.Mehta@ftpartners.com](mailto:Amar.Mehta@ftpartners.com)>; Bryan Bellmare <[Bryan.Bellmare@ftpartners.com](mailto:Bryan.Bellmare@ftpartners.com)>; Dolman, Amber R.E. <[ADolman@goodwinlaw.com](mailto:ADolman@goodwinlaw.com)>; Dzialo, Robert H <[RDzialo@goodwinlaw.com](mailto:RDzialo@goodwinlaw.com)>; Hagler, Nathan E. <[NHagler@goodwinlaw.com](mailto:NHagler@goodwinlaw.com)>; Kathryn Petralia <[kpetralia@kabbage.com](mailto:kpetralia@kabbage.com)>; Robert Frohwein <[rfrohwein@kabbage.com](mailto:rfrohwein@kabbage.com)>; Scott Askins <[saskins@kabbage.com](mailto:saskins@kabbage.com)>
**Subject:** Re: DP Cash Number

Hi Larry, we have $1mm reserved in the model for litigation with no projected use of cash, literally a reserve.  It will be sufficient.   D&P called those items out on the slide because I walked them through our litigation section so they thought I was alluding to an additional reserve.   It was a misunderstanding and one of my comments.

$1mm will be good as a litigation reserve.  It comes across on the last page that they are writing their opinion.

The model has a lot of detail and has reserves for various things.   As part of this process, they did a bunch of line by line walkthroughs.

On Mon, Aug 10, 2020 at 8:04 PM Chu, Lawrence <[LawChu@goodwinlaw.com](mailto:LawChu@goodwinlaw.com)> wrote:

Litigation can't be $0 in terms of what we are reserving for this.  Scott will need to weigh in here but we have True Lender possible mass arbitration being left and at the very least, we have legal costs that would need to be budgeted for and I would expect settlement costs.

**From:** Oneal Bhambani <[obhambani@kabbage.com](mailto:obhambani@kabbage.com)>
**Sent:** Monday, August 10, 2020 5:23 PM
**To:** Robert Frohwein <[rfrohwein@kabbage.com](mailto:rfrohwein@kabbage.com)>; Kathryn Petralia <[kpetralia@kabbage.com](mailto:kpetralia@kabbage.com)>; Scott Askins <[saskins@kabbage.com](mailto:saskins@kabbage.com)>; Chu, Lawrence <[LawChu@goodwinlaw.com](mailto:LawChu@goodwinlaw.com)>; Dzialo, Robert H <[RDzialo@goodwinlaw.com](mailto:RDzialo@goodwinlaw.com)>; Dolman, Amber R.E. <[ADolman@goodwinlaw.com](mailto:ADolman@goodwinlaw.com)>; Hagler, Nathan E. <[NHagler@goodwinlaw.com](mailto:NHagler@goodwinlaw.com)>; Amar Mehta <[Amar.Mehta@ftpartners.com](mailto:Amar.Mehta@ftpartners.com)>; Bryan Bellmare <[Bryan.Bellmare@ftpartners.com](mailto:Bryan.Bellmare@ftpartners.com)>
**Subject:** DP Cash Number

**Attorney-Client Privilege**

A00371

DP completed their technical committee review today and gave us the draft slides that accompany the opinion letter. The opinion letter will be available for comment tonight and will be sent directly to Goodwin. From the call we had with them this evening, it appeared to Amber and I from their language that the opinion letter will reflect the language in the merger agreement and the Included / Excluded we have talked about. Finally, D&P will lead tomorrow with the assumptions on what's Included / Excluded.

It was basically a deal within a deal with its own separate process. **DP will issue their opinion on a 'stress test' scenario which projects cash burn of $15 million. The firm is recommending cash to be deposited of $15.5 million**. There are a couple of placeholders if we want to provide more of a buffer -- namely if we want to reserve any amounts for potential litigation or charge card contract obligations (Visa, Mastercard, Marqueta). I will follow up with this group on these items.

Attached is the deck. Page 21 (last page) has the cash flow case that the opinion is on. This deck doesn't reflect some small comments I have -- it is fresh off the press. Will follow-up with the opinion letter where I know everyone wants to focus.

Oneal

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Notice of Confidentiality: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender immediately by return electronic transmission and then immediately delete this transmission, including all attachments, without copying, distributing or disclosing same.

A00372

# EXHIBIT 39



# Confidential



## Kabbage

August 11, 2020

Solvency Analysis Related to a Proposed Distribution

**A00373**

The information contained herein is of a confidential nature and is intended for the exclusive use of the persons or firm to   whom it is furnished by us. Reproduction, publication, or dissemination of portions hereof may not be made without prior written approval of Duff & Phelp  s, LLC.

# Duff & Phelps Disclaimer

- The following pages contain material that is being provided by Duff & Phelps, LLC ("Duff & Phelps" or "we") to the Board of Directors (as defined herein) (solely in their capacity as such) of the Company (as defined herein) as supporting analysis for an opinion that Duff & Phelps has been engaged to provide to the Company and the Board of Directors in connection with a Proposed Transaction (as defined herein).

- The accompanying material was compiled and prepared on a confidential basis for the sole use of the Company and the Board of Directors in connection with their consideration of the Proposed Transaction and not with a view toward public disclosure and may not be disclosed, summarized, reproduced, disseminated or quoted from or otherwise referred to, in whole or in part, without the prior written consent of Duff & Phelps.

- Without limiting the prior bullet, because this material was prepared for use in the context of a presentation to the Company and the Board of Directors, which are familiar with the business, assets, liabilities, prospects and affairs of Kabbage, LLC (as defined herein), neither the Company nor Duff & Phelps, nor any of their respective legal or financial advisors or accountants, takes any responsibility for the accuracy or completeness of any of the material if used by persons other than the Company and the Board of Directors.

- These materials are not intended to represent an opinion but rather to serve as discussion materials for the Company and the Board of Directors to review and include information that may form a portion of a basis upon which Duff & Phelps may render an opinion. Any reference herein to an opinion or discussions related thereto are qualified in their entirety by reference to any opinion actually rendered by Duff & Phelps in connection with the Proposed Transaction.

- The information utilized in preparing this presentation was obtained from the Company and public sources. Duff & Phelps relied without independent verification upon the accuracy, completeness, and fair presentation in all material respects of data, including all information contained in the Company's pro forma financial statements, and relied without independent verification on the accuracy of representations that Duff & Phelps obtained from public sources, private sources and management of the Company.  Any estimates and projections contained herein have been prepared by or based on discussions with the senior management of the Company and involve numerous and significant subjective assumptions and determinations, which may or may not prove to be correct. Projections necessarily involve risks and uncertainties. No representation or warranty, expressed or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past or the future.  Duff & Phelps did not independently verify such information.

- Nothing contained herein should be construed as tax, legal, regulatory or accounting advice.

- As you are aware, the credit, financial and stock markets have been experiencing unusual volatility and economies and businesses have been impacted and disrupted due to the COVID-19 pandemic and may be potentially impacted and disrupted in the future due to a resurgence of the COVID-19 pandemic or "second wave" thereof.  As such, and notwithstanding anything to the contrary herein or otherwise, we express no opinion or view, and have performed no analysis, review or assessment, as to any potential effects of such volatility, impact or disruption on Kabbage, LLC or the Proposed Transaction.

**A00374**

Confidential

**DUFF&PHELPS**

# Table of Contents

**Section**

1. Introduction and Background

2. Balance Sheet Analysis

3. Capital Adequacy / Cash Flow Analysis

**A00375**

DUFF&PHELPS

1. # Introduction and Background

**A00376**

# Introduction and Background
## Engagement and Transaction Overview

**The Engagement**

- Kabbage, Inc., a Delaware corporation (together with its successors, including Kabbage, LLC (as defined below), "Kabbage"), has engaged Duff & Phelps, LLC ("Duff & Phelps") to serve as an independent financial advisor to the board of directors (the "Board of Directors") of Alpha Kabbage, Inc., a Delaware corporation ("Alpha Kabbage" and, together with Kabbage, the "Company") (solely in their capacity as members of the Board of Directors) and to provide certain determinations (collectively, the "Opinion") in connection with the Proposed Transaction, as defined below.

**The Proposed Transaction**

- It is Duff & Phelps' understanding that the transaction involves a series of steps intended to separate Kabbage's lending and servicing platform (the "Alpha Assets") from the Company's existing loan book to allow for the eventual sale to a third-party buyer (the "Buyer") of the Alpha Assets (the "Alpha Acquisition"). The first steps create Alpha Kabbage and effect a merger between Green Target Merger Sub, LLC, a Delaware limited liability company ("Reorg Merger Sub"), and Kabbage (the "Reorg Merger"), with the result of Alpha Kabbage becoming the sole stockholder of Kabbage.

- Following the conversion of Kabbage to a Delaware limited liability company ("Kabbage, LLC"), Kabbage, LLC will distribute the Alpha Assets to Alpha Kabbage (the "Distribution"). Kabbage, LLC will retain the existing loan book and will service obligations under the existing loan book and any other assets, liabilities and operations not acquired by the Buyer. After servicing those obligations, Kabbage, LLC will be eventually wound down.

A00377

DUFF&PHELPS

# Introduction and Background

## Determinations

**The Company has requested that Duff & Phelps determine whether, as of the date hereof and after giving effect to the consummation of the Distribution:**

1.  Kabbage, LLC should be able to pay its Debts (including Contingent Liabilities) as they become due;

2.  Kabbage, LLC will not have an unreasonably small amount of assets (or capital) for the businesses in which it is engaged or in which management has indicated it intends to engage;

3.  The Fair Value of the assets of Kabbage, LLC exceeds its Liabilities (including Contingent Liabilities) as such assets and liabilities are calculated pursuant to Section 18-607 of the Delaware Limited Liability Company Act (including the exclusion from such calculation of (a) Non-Recourse Liabilities and (b) assets subject to Non-Recourse Liabilities, except to the extent that the Fair Value of such assets exceeds such Non-Recourse Liabilities); and

4.  Kabbage, LLC will have sufficient cash on hand and working capital to service the Retained Loan Assets and to satisfy its obligations under any of its retained Contracts or Liabilities to third-parties that are known by the Company or are reasonably likely to exist as of the Closing Date (defined below), and the amount representing such sufficient cash on hand and working capital is equal to or greater than the Retained Cash (Retained Loan Assets, Contracts, Liabilities, and Retained Cash are each as defined in the Merger Agreement, which is hereinafter defined).

- It is Duff & Phelps' understanding that the closing of the Alpha Acquisition is expected to occur either before September 30, 2020 or shortly after October 1, 2020 (the "Closing Date"). Notwithstanding the foregoing, Duff & Phelps is making the determinations described in clauses 1 through 4 above and is delivering the Opinion as though the Proposed Transaction was completed as of the date hereof. Duff & Phelps will also make the determinations described in clauses 1 through 4 above as of the Closing Date (such determinations, collectively, the "Bringdown Opinion"). The Bringdown Opinion will be subject to assumptions, qualifications, other limitations, and other disclosures to be set forth therein and would be provided by Duff & Phelps in the form of a signed opinion letter separately provided to the Board of Directors.

**This presentation contains a summary of our analysis and related observations with respect to the determinations described above, but does not constitute an opinion with respect to these determinations. Any opinion as to these determinations would be subject to assumptions, qualifications, other limitations, and other disclosures which are described in the Opinion letter and would be provided by Duff & Phelps in the form of a signed opinion letter separately provided to the Board of Directors. Any capitalized terms used but not defined herein have the respective meanings ascribed to them in the Opinion.**

A00378

DUFF&PHELPS

# Introduction and Background

## Corporate Structure Chart



**US tax classification**

Disregarded Entity

Corporation

Entity analyzed as part of the Opinion

**A00379**



# Introduction and Background

## Scope of Analysis

In connection with the Opinion, Duff & Phelps has made such reviews, analyses and inquiries as it has deemed necessary and appropriate to render the Opinion. Duff & Phelps also took into account its assessment of general economic, market and financial conditions, as well as its experience in securities and business valuation, and with respect to similar transactions. Duff & Phelps' procedures, investigations, and financial analysis with respect to the preparation of the Opinion included, but were not limited to, the items summarized below:

- Reviewed the following documents:
  - The audited financial statements for Kabbage for the year ended December 31, 2019 provided to us by management of the Company;
  - Financial projections provided to us by management of the Company (the "Management Projections");
  - A letter dated August 11, 2020 from the management of the Company which made certain representations as to historical financial statements, the Management Projections and the underlying assumptions, and Contingent Liabilities for Kabbage, LLC on a post-transaction basis;
  - The form of Transfer, Assignment and Assumption Agreement to be entered into by Kabbage, LLC and Alpha Kabbage (the "Transfer Agreement");
  - The form of Agreement and Plan of Merger to be entered into by American Express Travel Related Services Company, Inc., Green Acquisition Merger Sub, Inc., [Green], Inc., Green Target Entity, Inc., and Fortis Advisors, LLC (the "Merger Agreement"); and
  - Other files provided by the management of the Company including, but not limited to:
    - » i.      KBRA Comments on Kabbage Asset Securitization LLC, Series 2019-1 Rapid Amortization Event (1).pdf
    - » ii.     Kabbage - Board Presentation (7.29.20) v1.pdf
    - » iii.    Kabbage Slide Deck (FTP).pptx
    - » iv.    Kabbage - Small Business Credit Co-brand Agreement - 2020 - signed.pdf
    - » v.     Marqeta Kabbage Program Addendum 10.6.15.pdf
    - » vi.    ns.Kabbage_Visa Direct Incentive Agreement_Final watermarked 8 9 18.pdf
    - » vii.   Project Green __ Servicing Transition Matters (3).DOCX
    - » viii.  Proposal to Kabbage - PPP & KBG Loan Servicing.pdf
    - » ix.    6 - Loan Loss Reserve June 2020.xlsx
    - » x.     B1 Credit Decision Process Overview.pdf
    - » xi.    B2 B3 Historical Roll Rates by Delinquency Bucket.xlsb
    - » xii.   B5 Houlihan Lokey Kabbage Draft (7.27.20).pdf
    - » xiii.  D5 Forward Flow Charge Off Repurchase.xlsx
    - » xiv.   Kabbage Servicing Model (8-9-2020) Base Case.xlsx
    - » xv.    Kabbage Servicing Model (Stress Test - 8-9-2020).xlsx
    - » xvi.   C1 Kabbage PPP Servicing Loan Tape 2020-06-30 (Update).xlsb
    - » xvii.  C1 Kabbage SMB Servicing Loan Tape 2020-06-30 (Update).xlsb
    - » xviii. C3 Servicing Overview Aug 4 2020.pptx;

**A00380**

DUFF&PHELPS

# Introduction and Background

## Scope of Analysis (continued)

- Discussed the information referred to above and the background and other elements of the Proposed Transaction with the management of the Company;
- Discussed with Company management its plans and intentions with respect to the management and operation of the business of Kabbage, LLC;
- Performed certain cash flow analyses on the Management Projections and a sensitivity analysis using financial assumptions that Duff & Phelps believes, based on management's representations and with its consent, represent a reasonable downside scenario versus the Management Projections; and
- Conducted such other analyses and considered such other factors as Duff & Phelps deemed appropriate.

**A00381**

DUFF&PHELPS

2.        Balance Sheet Analysis

A00382

# Balance Sheet Analysis
Conclusions

## Balance Sheet Test

*($ in thousands)*

| | |
|---|---:|
| Cash (1) | $15,850.0 |
| Contractual Servicing Obligation (2) | ($15,046.5) |
| Potential Reimbursement of Launch Support if Mastercard Terminates Co-Brand Agreement (3) | ($300.0) |
| Additional Contingent and Other Liabilities (3) | $0.0 |
| **Net Asset Value - Kabbage, LLC** | **$503.5** |

(1) As of August 11, 2020, pro forma for the Proposed Transaction; includes $0.35mn Georgia Quality Jobs Tax Credit
(2) Based on Sensitivity Case, refer to page 21. Sensitivity Case includes certain reserves for potential liabilities including legal ($1.0mn), PPP-related ($0.95mn) and general liquidity ($0.1mn).
(3) Per Management representation; amounts represent reserves in addition to those included in footnote 2

A00383

DUFF&PHELPS

# Balance Sheet Analysis
## Determinations and Methodology

**Determination**

- The Company has requested that Duff & Phelps determine whether, as of the date hereof and after giving effect to the consummation of the Distribution:

  1. The Fair Value of the assets of Kabbage, LLC exceeds its Liabilities (including Contingent Liabilities) as such assets and liabilities are calculated pursuant to Section 18-607 of the Delaware Limited Liability Company Act (including the exclusion from such calculation of (a) Non-Recourse Liabilities and (b) assets subject to Non-Recourse Liabilities, except to the extent that the Fair Value of such assets exceeds such Non-Recourse Liabilities); and

  2. Kabbage, LLC will have sufficient cash on hand and working capital to service the Retained Loan Assets and to satisfy its obligations under any of its retained Contracts or Liabilities to third-parties that are known by the Company or are reasonably likely to exist as of the Closing Date, and the amount representing such sufficient cash on hand and working capital is equal to or greater than the Retained Cash.

**Methodology**

- Duff & Phelps estimated the cumulative service obligations under the existing loan book utilizing the Sensitivity Case of the Management Projections (refer to page 21), and deducted liabilities and the undiscounted cumulative service obligations from pro forma balance sheet cash to estimate the net asset value for Kabbage, LLC.

A00384

DUFF&PHELPS

# 3. Capital Adequacy / Cash Flow Analysis

A00385

# Capital Adequacy / Cash Flow Analysis
## Determinations and Methodology

**Determination**

- The Company has requested that Duff & Phelps determine whether, as of the date hereof and after giving effect to the consummation of the Distribution:

  1. Kabbage, LLC should be able to pay its Debts (including Contingent Liabilities) as they become due; and

  2. Kabbage, LLC will not have an unreasonably small amount of assets (or capital) for the businesses in which it is engaged orri which management has indicated it intends to engage.

**Methodology**

- Performed a detailed analysis of cash flow projections based on the Management Projections to assess the ability to service obligations under the existing loan book.

- Performed a sensitivity analysis on the projected cash flows to assess the ability to service obligations under the existing loan book under a reasonable downside sensitivity case.

A00386

DUFF&PHELPS

# Cash Flow / Capital Adequacy Analysis

## Portfolio Stratifications

### Total Portfolio
($ in thousands)

| Program | Count* | Outstanding Principal* | % of Total | Maturity Date** | Term (Months)** | Interest Rate (APR)** | 30-59 Days Past Due** | 60-89 Days Past Due** | 90+ Days Past Due** |
|---|---|---|---|---|---|---|---|---|---|
| PPP | 219,074 | $5,557,726 | 88.22% | 1/9/2023 | 31.69 | 1.00% | N/A | N/A | N/A |
| Pledged Non-EPP | 136,090 | $654,542 | 10.39% | 12/1/2020 | 10.98 | 41.44% | 11.75% | 5.54% | 10.79% |
| Pledged EPP | 17,311 | $85,285 | 1.35% | 3/25/2020 | 9.74 | 44.42% | 5.87% | 4.68% | 10.34% |
| Not Pledged Non-EPP | 18,334 | $2,299 | 0.04% | 7/17/2019 | 11.36 | 39.99% | 7.81% | 6.70% | 31.98% |
| Not Pledged EPP | 1,908 | $183 | 0.00% | 3/19/2020 | 7.58 | 47.20% | 0.53% | 0.71% | 8.20% |
| **Total** | **340,874** | **$6,300,034** | **100.00%** | **9/22/2022** | **28.86** | **6.54%** | **11.06%** | **5.45%** | **10.80%** |

### PPP
($ in thousands)

| Loan Balance | Count* | Outstanding Principal* | % of Total | Maturity Date** | Term (Months)** | Interest Rate** |
|---|---|---|---|---|---|---|
| <=$150 K | 214,184 | $3,930,220 | 70.72% | 1/16/2023 | 31.89 | 1.00% |
| >$150 K | 4,890 | $1,627,506 | 29.28% | 12/26/2022 | 31.29 | 1.00% |
| **Total** | **219,074** | **$5,557,726** | **100.00%** | **1/9/2023** | **31.69** | **1.00%** |

| Direct vs. Non-Direct | Count* | Outstanding Principal* | % of Total | Maturity Date** | Term (Months)** | Interest Rate** |
|---|---|---|---|---|---|---|
| Direct | 62,957 | $1,174,541 | 21.13% | 8/3/2023 | 38.02 | 1.00% |
| Non-Direct | 156,117 | $4,383,185 | 78.87% | 8/30/2022 | 27.64 | 1.00% |
| **Total** | **219,074** | **$5,557,726** | **100.00%** | **1/9/2023** | **31.69** | **1.00%** |

### SMB
($ in thousands)

| EPP Status | Count | Outstanding Principal* | % of Total | Maturity Date** | Term (Months)** | Interest Rate (APR)** | 30-59 Days Past Due** | 60-89 Days Past Due** | 90+ Days Past Due** |
|---|---|---|---|---|---|---|---|---|---|
| Non-EPP | 154,424 | $656,840 | 88.49% | 11/29/2020 | 10.98 | 41.43% | 11.73% | 5.55% | 10.86% |
| EPP | 19,219 | $85,467 | 11.51% | 3/25/2020 | 9.73 | 44.43% | 5.85% | 4.67% | 10.33% |
| **Total** | **173,643** | **$742,308** | **100.00%** | **10/31/2020** | **10.84** | **41.78%** | **11.06%** | **5.45%** | **10.80%** |

*Balances displayed in thousands based on the provided filename "C1 Kabbage SMB Servicing Loan Tape 2020-06-30.xlsb". PPP balances and counts based upon filename "Kabbage Servicing Model (8-6-2020) v4.xlsx".

**Indicates a metric displayed as a weighted average.

A00387

DUFF&PHELPS

# Cash Flow / Capital Adequacy Analysis

## Base Case - Key Assumptions Reviewed

Duff & Phelps reviewed the Management Projections as the basis for the base case cash flow analysis (the "Base Case"). Key assumptions include:

**General**

– A run-off of the current business under which Kabbage, LLC stops issuing new loans, generating origination fees, and generating servicing fees.

– Management assumed the same amortization speeds for both outstanding balances and accounts.

– Management assumed no collection of late fees.

– Management assumptions for operating costs, including, among other things, Customer Service, Risk, Technology Support, Collections, and Compliance Costs implied the average servicing cost per loan as follows:[1]





[1] Management is in the process of negotiating a shared services agreement with Alpha Kabbage. Based on the current form of the agreement, Management has represented that the costs are expected to be lower than in the Base Case assumptions.

A00388

**DUFF&PHELPS**

# Cash Flow / Capital Adequacy Analysis
## Base Case - Key Assumptions Reviewed (continued)

**PPP Key Assumptions**

– A wind-down of operating costs based primarily upon the expected run-off of loans outstanding (due primarily from SBA forgiveness & guarantees):

  • "Blanket Forgiveness" available for loans under $150,000, which Management based upon review of current versions of the proposed HEALS Act.

  • 97% - 98% (depending on cohort) of the loans below $150,000 are gradually forgiven over an 11-month period after the 6-month deferral period;

  • 75% of the loans above $150,000 are forgiven by the 7th month after the 6-month deferral period.

– Management has assumed that lenders will be able to shield themselves from any liability relying on the SBA's 'good faith' clauses with respect to actions it took reviewing borrower documents when originating and servicing loans.

– Management assumed net interest will be accrued monthly on the outstanding balance at an annualized rate of 0.65% (1% interest income less 0.35% PPPLF interest expense) until the balance is forgiven. Unforgiven amounts are assumed to continue to accrue interest until the loans mature.

– Responses to SBA Loan Reviews requesting documents on loans can be executed on an automated basis with very low cost.

– Management assumed financing of unpaid PPP interest ahead of repayment from the SBA at a financing rate of 5-year Treasuries plus 75 basis points.

**SMB Key Assumptions**

– Management utilized roll rates and contractual paydown percentages to forecast balance, delinquency migration, and account number run-offs.

– Management applied contractual assumptions for servicing fees (3% for the warehouse and 1% for the forward flow).

– Management applied a contractual repurchase charge-off obligation fee of 3% of par for forward flow.

– Management assumed a resale of repurchased charge-offs of 4.5%.[1]

[1] Management has estimated that recent collections on charge-offs are approximately 5% to 6%.

A00389

DUFF&PHELPS

# Cash Flow / Capital Adequacy Analysis

## Base Case Summary

**Cash Burn Projections - Base Case**

*($ in thousands)*

| | Current | Year 1 Projected | Year 2 Projected | Year 3 Projected | Year 4 Projected | Year 5 Projected | Year 6 Projected |
|---|---|---|---|---|---|---|---|
| **Portfolio Outstanding (balances as of period end):** | | | | | | | |
| *Number of KBG Active Accounts* | 28,112 | 4,180 | 1,483 | 559 | 177 | 15 | - |
| *Number of KBG Delinquent and Charged Off Accounts* | 11,294 | 1,831 | 495 | 209 | 70 | 8 | 0 |
| *Principal balance outstanding* | $471,657 | $58,721 | $23,259 | $6,452 | $1,268 | $43 | $0 |
| **PPP Accounts and Principle Balance Outstanding** | | | | | | | |
| *Number of Accounts* | 219,074 | 14,449 | 11,147 | 11,147 | 11,147 | 11,147 | 11,147 |
| *Principal balance outstanding* | $5,557,726 | $944,904 | $529,471 | $529,471 | $529,471 | $529,471 | $529,471 |
| **Headcount (as of period end):** | | | | | | | |
| *KBG* | 89 | 15 | 6 | 3 | 2 | 2 | 1 |
| *PPP* | 113 | 25 | 15 | 11 | 11 | 11 | 11 |
| *Corporate staff* | 3 | 3 | 3 | 3 | 3 | 2 | 2 |
| *Total* | 205 | 44 | 24 | 17 | 16 | 15 | 14 |

| | Cumulative Total Year 1 - Year 6 | | | | | | |
|---|---|---|---|---|---|---|---|
| **KBG** | | | | | | | |
| *Servicing Income (Warehouse / Forward Flow)* | $288 | $237 | $35 | $13 | $3 | $0 | $0 |
| *Resale of repurchased charge-offs (at $0.045)* | 717 | 657 | 40 | 15 | 4 | 1 | 0 |
| *Repurchase obligation - Forward Flow (Purchase of Charge-offs at $0.03)* | 478 | 438 | 26 | 10 | 3 | 1 | 0 |
| *Credit Operations Costs* | 3,316 | 2,234 | 468 | 241 | 155 | 141 | 78 |
| *KBG Net Contribution* | ($2,789) | ($1,778) | ($420) | ($223) | ($150) | ($140) | ($78) |
| **PPP** | | | | | | | |
| *Interest Income, net of financing charges* | $7,952 | $5,294 | $585 | $539 | $525 | $511 | $497 |
| *Customer Service Costs* | 9,489 | 4,816 | 1,290 | 1,117 | 756 | 756 | 756 |
| *PPP Net Contribution* | ($1,538) | $478 | ($705) | ($577) | ($230) | ($244) | ($258) |
| **OPEX** | | | | | | | |
| *Software & Services* | $4,076 | $2,289 | $520 | $400 | $327 | $286 | $254 |
| *Office, utilities and facilities* | 1,094 | 461 | 241 | 133 | 86 | 86 | 86 |
| *Other G&A* | 1,019 | 200 | 189 | 180 | 150 | 150 | 150 |
| *Corporate Operations (incl labor)* | 1,944 | 348 | 348 | 348 | 348 | 276 | 276 |
| *Total* | $8,133 | $3,298 | $1,298 | $1,061 | $912 | $798 | $766 |
| Cash from unpledged loans | $778 | $681 | $44 | $37 | $12 | $3 | $0 |
| PPP Put Back | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Cash Burn** | **($11,682)** | **($3,918)** | **($2,378)** | **($1,824)** | **($1,280)** | **($1,180)** | **($1,102)** |
| **Beginning Cash Balance** | **$15,850** | **$15,850** | **$11,932** | **$9,554** | **$7,730** | **$6,450** | **$5,270** |
| **Ending Cash Balance** | **$4,168** | **$11,932** | **$9,554** | **$7,730** | **$6,450** | **$5,270** | **$4,168** |

**A00390**

Confidential

DUFF&PHELPS

# Cash Flow / Capital Adequacy Analysis

## Sensitivity Case - Key Assumptions Reviewed

The sensitivity analysis supplements our analysis of the base case projections in determining whether Kabbage, LLC passes the capital adequacy and cash flow solvency tests.   The sensitivity analysis (the "Sensitivity Case") is designed to illustrate Management's reasonable downside scenario projections. Key assumptions include:

**PPP Sensitivity Case – Key Assumptions**

- A faster amortization speed was applied to the outstanding balance than the amortization speed applied to the number of accounts, whereas the Base Case assumed the same amortization speed for both the outstanding balance and the number of accounts.

- A certain percentage of loans are projected to be "put-back" as a result of improper document review, or as a result of a change to the SBA's view on "Safe Harbor", compared to 0% in the Base Case.

- Higher Compliance/Legal costs were applied in preparation for future responses to document requests from the SBA pertaining to loan reviews.

- A more conservative forgiveness assumption of approximately 95.9% was applied for loans below $150,000, compared to a forgiveness assumption of 97.5% in the Base Case, as the threshold might change in the future.

- A stress was performed on the total costs for unforgiven loans in the tail after all forgiveness benefits are applied.

- Management assumed financing of unpaid PPP interest ahead of repayment from the SBA at a financing rate of 5-year Treasuries plus 75 basis points.

**SMB Sensitivity Case – Key Assumptions**

- In consideration of the potential for a COVID-19 second wave and/or a prolonged period where businesses are unable to operate at full capacity, Management stressed roll rates to reflect the increased default experience observed in Q2 2020.

A00391

DUFF&PHELPS

# Cash Flow / Capital Adequacy Analysis

## Sensitivity Analysis

**Sensitivity Analysis**

*($ in thousands)*

| | Year 1 Projected | Year 2 Projected | Year 3 Projected | Year 4 Projected | Year 5 Projected | Year 6 Projected | Year 1 - Year 6 Cumulative Variance |
|---|---|---|---|---|---|---|---|
| **Number of KBG Active Accounts** | | | | | | | |
| Base Case | 4,180 | 1,483 | 559 | 177 | 15 | 0 | |
| Sensitivity Case | 4,684 | 1,470 | 588 | 204 | 23 | 0 | **8.6%** |
| **Number of KBG Delinquent and Charged Off Accounts** | | | | | | | |
| Base Case | 1,831 | 495 | 209 | 70 | 8 | 0 | |
| Sensitivity Case | 3,427 | 866 | 387 | 141 | 20 | 1 | **85.2%** |
| **Number of PPP Accounts** | | | | | | | |
| Base Case | 14,449 | 11,147 | 11,147 | 11,147 | 11,147 | 11,147 | |
| Sensitivity Case | 16,488 | 12,761 | 12,761 | 12,761 | 12,761 | 12,761 | **14.4%** |
| **KBG Net Contribution** | | | | | | | |
| Base Case | ($1,778) | ($420) | ($223) | ($150) | ($140) | ($78) | |
| Sensitivity Case | ($2,456) | ($614) | ($305) | ($175) | ($146) | ($79) | **($985)** |
| **PPP Net Contribution** | | | | | | | |
| Base Case | $478 | ($705) | ($577) | ($230) | ($244) | ($258) | |
| Sensitivity Case | $304 | ($797) | ($677) | ($265) | ($289) | ($312) | **($498)** |
| **Total OpEx** | | | | | | | |
| Base Case | $3,298 | $1,298 | $1,061 | $912 | $798 | $766 | |
| Sensitivity Case | $3,487 | $1,437 | $1,189 | $1,057 | $941 | $907 | **$885** |
| **Cash Burn** | | | | | | | |
| Base Case | ($3,918) | ($2,378) | ($1,824) | ($1,280) | ($1,180) | ($1,102) | |
| Sensitivity Case | ($5,731) | ($2,859) | ($2,200) | ($1,526) | ($1,404) | ($1,327) | **($3,364)** |

A00392

**DUFF&PHELPS**

# Cash Flow / Capital Adequacy Analysis

## Sensitivity Case Summary

**Cash Burn Projections - Sensitivity Case**

($ in thousands)

| | Current | Year 1 Projected | Year 2 Projected | Year 3 Projected | Year 4 Projected | Year 5 Projected | Year 6 Projected |
|---|---|---|---|---|---|---|---|
| **Portfolio Outstanding (balances as of period end):** | | | | | | | |
| *Number of KBG Active Accounts* | 28,112 | 4,684 | 1,470 | 588 | 204 | 23 | - |
| *Number of KBG Delinquent and Charged Off Accounts* | 11,294 | 3,427 | 866 | 387 | 141 | 20 | 1 |
| *Principal balance outstanding* | $471,657 | $71,791 | $29,328 | $8,692 | $1,850 | $79 | $0 |
| **PPP Accounts and Principle Balance Outstanding** | | | | | | | |
| *Number of Accounts* | 219,074 | 16,488 | 12,761 | 12,761 | 12,761 | 12,761 | 12,761 |
| *Principal balance outstanding* | $5,557,726 | $1,231,675 | $913,487 | $913,487 | $913,487 | $913,487 | $913,487 |
| **Headcount (as of period end):** | | | | | | | |
| *KBG* | 89 | 23 | 7 | 4 | 3 | 2 | 1 |
| *PPP* | 113 | 28 | 22 | 16 | 16 | 16 | 16 |
| *Corporate staff* | 3 | 3 | 3 | 3 | 3 | 2 | 2 |
| *Total* | 205 | 54 | 32 | 23 | 22 | 20 | 19 |

| | Cumulative Total Year 1 - Year 6 | | | | | | |
|---|---|---|---|---|---|---|---|
| **KBG** | | | | | | | |
| *Servicing Income (Warehouse / Forward Flow)* | $274 | $272 | $3 | $0 | $0 | $0 | $0 |
| *Resale of repurchased charge-offs (at $0.045)* | 782 | 768 | 14 | - | - | - | - |
| *Repurchase obligation - Forward Flow (Purchase of Charge-offs at $0.03)* | 521 | 512 | 9 | - | - | - | - |
| *Credit Operations Costs* | 4,309 | 2,983 | 621 | 305 | 175 | 146 | 79 |
| *KBG Net Contribution* | ($3,774) | ($2,456) | ($614) | ($305) | ($175) | ($146) | ($79) |
| **PPP** | | | | | | | |
| *Interest Income, net of financing charges* | $9,807 | $5,350 | $960 | $910 | $886 | $863 | $839 |
| *Customer Service Costs* | 11,843 | 5,046 | 1,757 | 1,586 | 1,151 | 1,151 | 1,151 |
| *PPP Net Contribution* | ($2,036) | $304 | ($797) | ($677) | ($265) | ($289) | ($312) |
| **OPEX** | | | | | | | |
| *Software & Services* | $4,472 | $2,428 | $589 | $458 | $373 | $329 | $295 |
| *Office, utilities and facilities* | 1,076 | 441 | 242 | 133 | 87 | 87 | 87 |
| *Other G&A* | 1,605 | 283 | 272 | 263 | 263 | 263 | 263 |
| *Corporate Operations (incl labor)* | 1,865 | 335 | 335 | 335 | 335 | 263 | 263 |
| *Total* | $9,018 | $3,487 | $1,437 | $1,189 | $1,057 | $941 | $907 |
| Cash from unpledged loans | $730 | $857 | ($11) | ($29) | ($29) | ($29) | ($29) |
| PPP Put Back | ($949) | ($949) | $0 | $0 | $0 | $0 | $0 |
| **Cash Burn** | **($15,046)** | **($5,731)** | **($2,859)** | **($2,200)** | **($1,526)** | **($1,404)** | **($1,327)** |
| **Beginning Cash Balance** | **$15,850** | **$15,850** | **$10,119** | **$7,260** | **$5,061** | **$3,535** | **$2,130** |
| **Ending Cash Balance** | **$804** | **$10,119** | **$7,260** | **$5,061** | **$3,535** | **$2,130** | **$804** |

A00393

Confidential

DUFF&PHELPS

# EXHIBIT 40

As of August 11, 2020

**PAYCHECK PROTECTION PROGRAM LOANS**
Frequently Asked Questions (FAQs)

The Small Business Administration (SBA), in consultation with the Department of the Treasury, intends to provide timely additional guidance to address borrower and lender questions concerning the implementation of the Paycheck Protection Program (PPP), established by section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act).  This document will be updated on a regular basis.

Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the Paycheck Protection Program Interim Final Rules ("PPP Interim Final Rules") (link).  The U.S. government will not challenge lender PPP actions that conform to this guidance,[1] and to the PPP Interim Final Rules and any subsequent rulemaking in effect at the time.

1.  **Question:**  Paragraph 3.b.iii of the PPP Interim Final Rule states that lenders must "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application."  Does that require the lender to replicate every borrower's calculations?

    **Answer:**  No. Providing an accurate calculation of payroll costs is the responsibility of the borrower, and the borrower attests to the accuracy of those calculations on the Borrower Application Form.  Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost.  For example, minimal review of calculations based on a payroll report by a recognized third-party payroll processor would be reasonable.  In addition, as the PPP Interim Final Rule indicates, lenders may rely on borrower representations, including with respect to amounts required to be excluded from payroll costs.

    If the lender identifies errors in the borrower's calculation or material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the issue.[2]

2.  **Question:**  Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers in the PPP?

    **Answer:**  No.  Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632.  A business can qualify if it meets the SBA employee-based or revenue-

---

[1] This document does not carry the force and effect of law independent of the statute and regulations on which it is based.
[2] Question 1 published April 3, 2020.

A00394

As of August 11, 2020

based size standard corresponding to its primary industry.  Go to www.sba.gov/size for the industry size standards.

Additionally, a business can qualify for the Paycheck Protection Program as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

A business that qualifies as a small business concern under section 3 of the Small Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for PPP loans on the Borrower Application Form, unless otherwise ineligible.

3. **Question:**  Does my business have to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to participate in the PPP?

   **Answer:**  No.  In addition to small business concerns, a business is eligible for a PPP loan if the business has 500 or fewer employees whose principal place of residence is in the United States, or the business meets the SBA employee-based size standards for the industry in which it operates (if applicable).  Similarly, PPP loans are also available for qualifying tax-exempt nonprofit organizations described in section 501(c)(3) of the Internal Revenue Code (IRC), tax-exempt veterans organization described in section 501(c)(19) of the IRC, and Tribal business concerns described in section 31(b)(2)(C) of the Small Business Act that have 500 or fewer employees whose principal place of residence is in the United States, or meet the SBA employee-based size standards for the industry in which they operate.

4. **Question:**  Are lenders required to make an independent determination regarding applicability of affiliation rules under 13 C.F.R. 121.301(f) to borrowers?

   **Answer:**  No.  It is the responsibility of the borrower to determine which entities (if any) are its affiliates and determine the employee headcount of the borrower and its affiliates.  Lenders are permitted to rely on borrowers' certifications.

5. **Question:**  Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?

   **Answer:**  Yes.  Borrowers must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation.  A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable.  SBA's existing affiliation exclusions apply to the PPP, including, for example the exclusions under 13 CFR 121.103(b)(2).

A00395

As of August 11, 2020

6. **Question:** The affiliation rule based on ownership (13 C.F.R. 121.301(f)(1)) states that SBA will deem a minority shareholder in a business to control the business if the shareholder has the right to prevent a quorum or otherwise block action by the board of directors or shareholders. If a minority shareholder irrevocably gives up those rights, is it still considered to be an affiliate of the business?

   **Answer:** No. If a minority shareholder in a business irrevocably waives or relinquishes any existing rights specified in 13 C.F.R. 121.301(f)(1), the minority shareholder would no longer be an affiliate of the business (assuming no other relationship that triggers the affiliation rules).

7. **Question:** The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value?

   **Answer:** No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including:
   - employer contributions to defined-benefit or defined-contribution retirement plans;
   - payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and
   - payment of state and local taxes assessed on compensation of employees.

8. **Question:** Do PPP loans cover paid sick leave?

   **Answer:** Yes. PPP loans covers payroll costs, including costs for employee vacation, parental, family, medical, and sick leave. However, the CARES Act excludes qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Public Law 116–127). Learn more about the Paid Sick Leave Refundable Credit here.

9. **Question:** My small business is a seasonal business whose activity increases from April to June. Considering activity from that period would be a more accurate reflection of my business's operations. However, my small business was not fully ramped up on February 15, 2020. Am I still eligible?

   **Answer:** In evaluating a borrower's eligibility, a lender may consider whether a seasonal borrower was in operation on February 15, 2020 or for an 8-week period between February 15, 2019 and June 30, 2019.

10. **Question:** What if an eligible borrower contracts with a third-party payer such as a payroll provider or a Professional Employer Organization (PEO) to process payroll and report payroll taxes?

    **Answer:** SBA recognizes that eligible borrowers that use PEOs or similar payroll providers are required under some state registration laws to report wage and other data on

3

A00396

As of August 11, 2020

the Employer Identification Number (EIN) of the PEO or other payroll provider. In these cases, payroll documentation provided by the payroll provider that indicates the amount of wages and payroll taxes reported to the IRS by the payroll provider for the borrower's employees will be considered acceptable PPP loan payroll documentation. Relevant information from a Schedule R (Form 941), Allocation Schedule for Aggregate Form 941 Filers, attached to the PEO's or other payroll provider's Form 941, Employer's Quarterly Federal Tax Return, should be used if it is available; otherwise, the eligible borrower should obtain a statement from the payroll provider documenting the amount of wages and payroll taxes. In addition, employees of the eligible borrower will not be considered employees of the eligible borrower's payroll provider or PEO.

11. **Question:** May lenders accept signatures from a single individual who is authorized to sign on behalf of the borrower?

**Answer:** Yes. However, the borrower should bear in mind that, as the Borrower Application Form indicates, only an authorized representative of the business seeking a loan may sign on behalf of the business. An individual's signature as an "Authorized Representative of Applicant" is a representation to the lender and to the U.S. government that the signer is authorized to make the certifications, including with respect to the applicant and each owner of 20% or more of the applicant's equity, contained in the Borrower Application Form. Lenders may rely on that representation and accept a single individual's signature on that basis.

12. **Question:** I need to request a loan to support my small business operations in light of current economic uncertainty. However, I pleaded guilty to a felony crime a very long time ago. Am I still eligible for the PPP?

**Answer:** Eligibility for the PPP has been expanded. A business is ineligible due to an owner's criminal history only if an owner of 20 percent or more of the equity of the applicant:
- is presently incarcerated or, for any felony, is presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or
- has been convicted of, pleaded guilty or nolo contendere to, or commenced any form of parole or probation (including probation before judgment) for, a felony involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance within the last five years or any other felony within the last year.

13. **Question:** Are lenders permitted to use their own online portals and an electronic form that they create to collect the same information and certifications as in the Borrower Application Form, in order to complete implementation of their online portals?

**Answer:** Yes. Lenders may use their own online systems and a form they establish that asks for the same information (using the same language) as the Borrower Application Form. Lenders are still required to send the data to SBA using SBA's interface.

A00397

As of August 11, 2020

14. **Question:** What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

   **Answer:** In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019. An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.

   Borrowers may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard. Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months).

15. **Question:** Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs?

   **Answer:** No. Any amounts that an eligible borrower has paid to an independent contractor or sole proprietor should be excluded from the eligible business's payroll costs. However, an independent contractor or sole proprietor will itself be eligible for a loan under the PPP, if it satisfies the applicable requirements.

16. **Question:** How should a borrower account for federal taxes when determining its payroll costs for purposes of the maximum loan amount, allowable uses of a PPP loan, and the amount of a loan that may be forgiven?

   **Answer:** Under the Act, payroll costs are calculated on a gross basis without regard to (i.e., not including subtractions or additions based on) federal taxes imposed or withheld, such as the employee's and employer's share of Federal Insurance Contributions Act (FICA) and income taxes required to be withheld from employees. As a result, payroll costs are not reduced by taxes imposed on an employee and required to be withheld by the employer, but payroll costs do not include the employer's share of payroll tax. For example, an employee who earned $4,000 per month in gross wages, from which $500 in federal taxes was withheld, would count as $4,000 in payroll costs. The employee would receive $3,500, and $500 would be paid to the federal government. However, the employer-side federal payroll taxes imposed on the $4,000 in wages are excluded from payroll costs under the statute.[3]

---

[3] The definition of "payroll costs" in the CARES Act, 15 U.S.C. 636(a)(36)(A)(viii), excludes "taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period," defined as February 15, 2020, to June 30, 2020. As described above, the SBA interprets this statutory exclusion to mean that payroll costs are calculated on a gross basis, without subtracting federal taxes that are imposed on the employee or

5

A00398

As of August 11, 2020

17. **Question:**  I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020.  Do I need to take any action based on the updated guidance in these FAQs?

    **Answer:**  No.  Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application.  However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

18. **Question:**  Are PPP loans for existing customers considered new accounts for FinCEN Rule CDD purposes?  Are lenders required to collect, certify, or verify beneficial ownership information in accordance with the rule requirements for existing customers?

    **Answer:**  If the PPP loan is being made to an existing customer and the necessary information was previously verified, you do not need to re-verify the information.

    Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to BSA compliance.[4]

19. **Question:**  Do lenders have to use a promissory note provided by SBA or may they use their own?

    **Answer:**  Lenders may use their own promissory note or an SBA form of promissory note.

---

withheld from employee wages.  Unlike employer-side payroll taxes, such employee-side taxes are ordinarily expressed as a reduction in employee take-home pay; their exclusion from the definition of payroll costs means payroll costs should not be reduced based on taxes imposed on the employee or withheld from employee wages. This interpretation is consistent with the text of the statute and advances the legislative purpose of ensuring workers remain paid and employed.  Further, because the reference period for determining a borrower's maximum loan amount will largely or entirely precede the period from February 15, 2020, to June 30, 2020, and the period during which borrowers will be subject to the restrictions on allowable uses of the loans may extend beyond that period, for purposes of the determination of allowable uses of loans and the amount of loan forgiveness, this statutory exclusion will apply with respect to such taxes imposed or withheld at any time, not only during such period.

[4] Questions 2 – 18 published April 6, 2020.  Question 12 revised June 25, 2020.  The original FAQ 12 was as follows:

> Question:  I need to request a loan to support my small business operations in light of current economic uncertainty.  However, I pleaded guilty to a felony crime a very long time ago.  Am I still eligible for the PPP?
>
> Answer:  Yes.  Businesses are only ineligible if an owner of 20 percent or more of the equity of the applicant is presently incarcerated, on probation, on parole; subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or, within the last five years, for any felony, has been convicted; pleaded guilty; pleaded nolo contendere; been placed on pretrial diversion; or been placed on any form of parole or probation (including probation before judgment).

6

A00399

As of August 11, 2020

20. **Question:**  The amount of forgiveness of a PPP loan depends on the borrower's payroll costs over an eight-week or 24-week period; when does that eight-week or 24-week period begin?

   **Answer:**  The eight-week or 24-week period starts on the date your lender makes a disbursement of the PPP loan to the borrower.  The lender must disburse the loan no later than 10 calendar days from the date of loan approval.

   The Paycheck Protection Program Flexibility Act of 2020, which became law on June 5, 2020, extended the covered period for loan forgiveness from eight weeks after the date of loan disbursement to 24 weeks after the date of loan disbursement, providing substantially greater flexibility for borrowers to qualify for loan forgiveness.  The 24-week period applies to all borrowers, but borrowers that received an SBA loan number before June 5, 2020, have the option to use an eight-week period.[5]

21. **Question:**  Do lenders need a separate SBA Authorization document to issue PPP loans?

   **Answer:**  No.  A lender does not need a separate SBA Authorization for SBA to guarantee a PPP loan.  However, lenders must have executed SBA Form 2484 (the Lender Application Form for the Paycheck Protection Program)[6] to issue PPP loans and receive a loan number for each originated PPP loan. Lenders may include in their promissory notes for PPP loans any terms and conditions, including relating to amortization and disclosure, that are not inconsistent with Sections 1102 and 1106 of the CARES Act, the PPP Interim Final Rules and guidance, and SBA Form 2484.

22. **Question:**  I am a non-bank lender that meets all applicable criteria of the PPP Interim Final Rule.  Will I be automatically enrolled as a PPP lender?  What criteria will SBA and the Treasury Department use to assess whether to approve my application to participate as a PPP lender?

   **Answer:**  We encourage lenders that are not currently 7(a) lenders to apply in order to increase the scope of PPP lending options and the speed with which PPP loans can be disbursed to help small businesses across America.  We recognize that financial technology solutions can promote efficiency and financial inclusion in implementing the PPP.  Applicants should submit SBA Form 3507 and the relevant attachments to NFRLApplicationForPPP@sba.gov.  Submission of the SBA Form 3507 does not result in automatic enrollment in the PPP.  SBA and the Treasury Department will evaluate each application from a non-bank or non-insured depository institution lender and

---

[5] Questions 19 – 20 published April 8, 2020.  Question 20 revised June 25, 2020.  The original FAQ 20 was as follows:

   Question:  The amount of forgiveness of a PPP loan depends on the borrower's payroll costs over an eight-week period; when does that eight-week period begin?
   Answer:  The eight-week period begins on the date the lender makes the first disbursement of the PPP loan to the borrower.  The lender must make the first disbursement of the loan no later than ten calendar days from the date of loan approval.

[6] This requirement is satisfied by a lender when the lender completes the process of submitting a loan through the E-Tran system; no transmission or retention of a physical copy of Form 2484 is required.

A00400

As of August 11, 2020

determine whether the applicant has the necessary qualifications to process, close, disburse, and service PPP loans made with SBA's guarantee. SBA may request additional information from the applicant before making a determination.

23. **Question:** How do the $10 million cap and affiliation rules work for franchises?

    **Answer:** If a franchise brand is listed on the SBA Franchise Directory, each of its franchisees that meets the applicable size standard can apply for a PPP loan. (The franchisor does not apply on behalf of its franchisees.) The $10 million cap on PPP loans is a limit per franchisee entity, and each franchisee is limited to one PPP loan.

    Franchise brands that have been denied listing on the Directory because of affiliation between franchisor and franchisee may request listing to receive PPP loans. SBA will not apply affiliation rules to a franchise brand requesting listing on the Directory to participate in the PPP, but SBA will confirm that the brand is otherwise eligible for listing on the Directory.

24. **Question:** How do the $10 million cap and affiliation rules work for hotels and restaurants (and any business assigned a North American Industry Classification System (NAICS) code beginning with 72)?

    **Answer:** Under the CARES Act, any single business entity that is assigned a NAICS code beginning with 72 (including hotels and restaurants) and that employs not more than 500 employees per physical location is eligible to receive a PPP loan.

    In addition, SBA's affiliation rules (13 CFR 121.103 and 13 CFR 121.301) do not apply to any business entity that is assigned a NAICS code beginning with 72 and that employs not more than a total of 500 employees. As a result, if each hotel or restaurant location owned by a parent business is a separate legal business entity, each hotel or restaurant location that employs not more than 500 employees is permitted to apply for a separate PPP loan provided it uses its unique EIN.

    The $10 million maximum loan amount limitation applies to each eligible business entity, because individual business entities cannot apply for more than one loan. The following examples illustrate how these principles apply.

    Example 1. Company X directly owns multiple restaurants and has no affiliates.
    - Company X may apply for a PPP loan if it employs 500 or fewer employees per location (including at its headquarters), even if the total number of employees employed across all locations is over 500.

    Example 2. Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another). Company Y and Company Z each own a single restaurant with 500 or fewer employees.
    - Company Y and Company Z can each apply for a separate PPP loan, because each has 500 or fewer employees. The affiliation rules do not apply, because

8

A00401

As of August 11, 2020

> Company Y and Company Z each has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).

Example 3.  Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another).  Company Y owns a restaurant with 400 employees.  Company Z is a construction company with 400 employees.

- Company Y is eligible for a PPP loan because it has 500 or fewer employees. The affiliation rules do not apply to Company Y, because it has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).
- The waiver of the affiliation rules does not apply to Company Z, because Company Z is in the construction industry.  Under SBA's affiliation rules, 13 CFR 121.301(f)(1) and (3), Company Y and Company Z are affiliates of one another because they are under the common control of Company X, which wholly owns both companies.  This means that the size of Company Z is determined by adding its employees to those of Companies X and Y.  Therefore, Company Z is deemed to have more than 500 employees, together with its affiliates.  However, Company Z may be eligible to receive a PPP loan as a small business concern if it, together with Companies X and Y, meets SBA's other applicable size standards," as explained in FAQ #2.

25. **□uestion:**  Does the information lenders are required to collect from PPP applicants regarding every owner who has a 20% or greater ownership stake in the applicant business (i.e., owner name, title, ownership %, TIN, and address) satisfy a lender's obligation to collect beneficial ownership information (which has a 25% ownership threshold) under the Bank Secrecy Act?

**Answer:**
For lenders with existing customers:  With respect to collecting beneficial ownership information for owners holding a 20% or greater ownership interest, if the PPP loan is being made to an existing customer and the lender previously verified the necessary information, the lender does not need to re-verify the information.  Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected such beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to Bank Secrecy Act (BSA) compliance.

For lenders with new customers:  For new customers, the lender's collection of the following information from all natural persons with a 20% or greater ownership stake in the applicant business will be deemed to satisfy applicable BSA requirements and FinCEN regulations governing the collection of beneficial ownership information:  owner name, title, ownership %, TIN, address, and date of birth.  If any ownership interest of 20% or greater in the applicant business belongs to a business or other legal entity, lenders will need to collect appropriate beneficial ownership information for that entity.

9

A00402

As of August 11, 2020

If you have questions about requirements related to beneficial ownership, go to https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule. Decisions regarding further verification of beneficial ownership information collected from new customers should be made pursuant to the lender's risk-based approach to BSA compliance.[7]

26. **□uestion:** SBA regulations require approval by SBA's Standards of Conduct Committee (SCC) for SBA Assistance, other than disaster assistance, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest is: a current SBA employee; a Member of Congress; an appointed official or employee of the legislative or judicial branch; a member or employee of an SBA Advisory Council or SCORE volunteer; or a household member of any of the preceding individuals. Do these entities need the approval of the SCC in order to be eligible for a PPP loan?

**Answer:** The SCC has authorized a blanket approval for PPP loans to such entities so that further action by the SCC is not necessary in the PPP program.

27. **□uestion:** SBA regulations require a written statement of no objection by the pertinent Department or military service before it provides any SBA Assistance, other than disaster loans, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest, or if a household member of any of the preceding individuals, is an employee of another Government Department or Agency having a grade of at least GS-13 or its equivalent. Does this requirement apply to PPP loans?

**Answer:** No. The SCC has determined that a written statement of no objection is not required from another Government Department or Agency for PPP loans.

28. **□uestion:** Is a lender permitted to submit a PPP loan application to SBA through E-Tran before the lender has fulfilled its responsibility to review the required borrower documentation and calculation of payroll costs?

**Answer:** No. Before a lender submits a PPP loan through E-Tran, the lender must have collected the information and certifications contained in the Borrower Application Form and the lender must have fulfilled its obligations set forth in paragraphs 3.b.(i)-(iii) of the PPP Interim Final Rule. Please refer to the Interim Final Rule and FAQ #1 for more information on the lender's responsibility regarding confirmation of payroll costs.

Lenders who did not understand that these steps are required before submission to E-Tran need not withdraw applications submitted to E-Tran before April 14, 2020, but must fulfill lender responsibilities with respect to those applications as soon as practicable and no later than loan closing.[8]

---

[7] Questions 21 – 25 published April 13, 2020.
[8] Questions 26 – 28 published April 14, 2020.

10

A00403

As of August 11, 2020

29. **Question:**  Can lenders use scanned copies of documents or E-signatures or E-consents permitted by the E-sign Act?

**Answer:**  Yes.  All PPP lenders may accept scanned copies of signed loan applications and documents containing the information and certifications required by SBA Form 2483 and the promissory note used for the PPP loan.  Additionally, lenders may also accept any form of E-consent or E-signature that complies with the requirements of the Electronic Signatures in Global and National Commerce Act (P.L. 106-229).

If electronic signatures are not feasible, when obtaining a wet ink signature without in-person contact, lenders should take appropriate steps to ensure the proper party has executed the document.

This guidance does not supersede signature requirements imposed by other applicable law, including by the lender's primary federal regulator.[9]

30. **Question:**  Can a lender sell a PPP loan into the secondary market?

**Answer:**  Yes.  A PPP loan may be sold into the secondary market at any time after the loan is fully disbursed.  A secondary market sale of a PPP loan does not require SBA approval.  A PPP loan sold into the secondary market is 100% SBA guaranteed.  A PPP loan may be sold on the secondary market at a premium or a discount to par value.[10]

31. **Question:**  Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

**Answer:**  In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application.  Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary.  Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."  Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business.  For example, it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith, and such a company should be prepared to demonstrate to SBA, upon request, the basis for its certification.

---

[9] Question 29 published April 15, 2020.
[10] Question 30 published April 17, 2020.

A00404

As of August 11, 2020

Lenders may rely on a borrower's certification regarding the necessity of the loan request.  Any borrower that applied for a PPP loan prior to the issuance of this guidance and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith.[11]

32. **Question:**  Does the cost of a housing stipend or allowance provided to an employee as part of compensation count toward payroll costs?

   **Answer:**  Yes. Payroll costs includes all cash compensation paid to employees, subject to the $100,000 annual compensation per employee limitation.

33. **Question:**  Is there existing guidance to help PPP applicants and lenders determine whether an individual employee's principal place of residence is in the United States?

   **Answer:**  PPP applicants and lenders may consider IRS regulations (26 CFR § 1.121-1(b)(2)) when determining whether an individual employee's principal place of residence is in the United States.

34. **Question:**  Are agricultural producers, farmers, and ranchers eligible for PPP loans?

   **Answer:**  Yes.  Agricultural producers, farmers, and ranchers are eligible for PPP loans if: (i) the business has 500 or fewer employees, or (ii) the business fits within the revenue-based sized standard, which is average annual receipts of $1 million.

   Additionally, agricultural producers, farmers, and ranchers can qualify for PPP loans as a small business concern if their business meets SBA's "alternative size standard."  The "alternative size standard" is currently: (1) maximum net worth of the business is not more than $15 million, and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

   For all of these criteria, the applicant must include its affiliates in its calculations.  Link to Applicable Affiliation Rules for the PPP.

35. **Question:**  Are agricultural and other forms of cooperatives eligible to receive PPP loans?

   **Answer:**  As long as other PPP eligibility requirements are met, small agricultural cooperatives and other cooperatives may receive PPP loans.[12]

36. **Question:**  To determine borrower eligibility under the 500-employee or other applicable threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?

---

[11] Question 31 published April 23, 2020.
[12] Questions 32 – 35 published April 24, 2020.

A00405

As of August 11, 2020

**Answer:** For purposes of loan eligibility, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis." A borrower must therefore calculate the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold. For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees.

By contrast, for purposes of loan forgiveness, the CARES Act uses the standard of "full-time equivalent employees" to determine the extent to which the loan forgiveness amount will be reduced in the event of workforce reductions.[13]

37. **Question:** Do businesses owned by private companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

**Answer:** See response to FAQ #31.[14]

38. **Question:** Section 1102 of the CARES Act provides that PPP loans are available only to applicants that were "in operation on February 15, 2020." Is a business that was in operation on February 15, 2020 but had a change in ownership after February 15, 2020 eligible for a PPP loan?

**Answer:** Yes. As long as the business was in operation on February 15, 2020, if it meets the other eligibility criteria, the business is eligible to apply for a PPP loan regardless of the change in ownership. In addition, where there is a change in ownership effectuated through a purchase of substantially all assets of a business that was in operation on February 15, the business acquiring the assets will be eligible to apply for a PPP loan even if the change in ownership results in the assignment of a new tax ID number and even if the acquiring business was not in operation until after February 15, 2020. If the acquiring business has maintained the operations of the pre-sale business, the acquiring business may rely on the historic payroll costs and headcount of the pre-sale business for the purposes of its PPP application, except where the pre-sale business had applied for and received a PPP loan. The Administrator, in consultation with the Secretary, has determined that the requirement that a business "was in operation on February 15, 2020" should be applied based on the economic realities of the business's operations.

39. **Question:** Will SBA review individual PPP loan files?

**Answer:** Yes. In FAQ #31, SBA reminded all borrowers of an important certification required to obtain a PPP loan. To further ensure PPP loans are limited to eligible borrowers in need, the SBA has decided, in consultation with the Department of the Treasury, that it will review all loans in excess of $2 million, in addition to other loans as appropriate, following the lender's submission of the borrower's loan forgiveness application. Additional guidance implementing this procedure will be forthcoming.

---

[13] Questions 36 published April 26, 2020.
[14] Question 37 published April 28, 2020.

A00406

As of August 11, 2020

The outcome of SBA's review of loan files will not affect SBA's guarantee of any loan for which the lender complied with the lender obligations set forth in paragraphs III.3.b(i)-(iii) of the Paycheck Protection Program Rule (April 2, 2020) and further explained in FAQ #1.[15]

40. **Question:**  Will a borrower's PPP loan forgiveness amount (pursuant to section 1106 of the CARES Act and SBA's implementing rules and guidance) be reduced if the borrower laid off an employee, offered to rehire the same employee, but the employee declined the offer?

    **Answer:**  No.  As an exercise of the Administrator's and the Secretary's authority under Section 1106(d)(6) of the CARES Act to prescribe regulations granting de minimis exemptions from the Act's limits on loan forgiveness, SBA and Treasury intend to issue an interim final rule excluding laid-off employees whom the borrower offered to rehire (for the same salary/wages and same number of hours) from the CARES Act's loan forgiveness reduction calculation.  The interim final rule will specify that, to qualify for this exception, the borrower must have made a good faith, written offer of rehire, and the employee's rejection of that offer must be documented by the borrower.  Employees and employers should be aware that employees who reject offers of re-employment may forfeit eligibility for continued unemployment compensation.

41. **Question:**  Can a seasonal employer that elects to use a 12-week period between May 1, 2019 and September 15, 2019 to calculate its maximum PPP loan amount under the interim final rule issued by Treasury on April 27, 2020, make all the required certifications on the Borrower Application Form?

    **Answer:**  Yes.  The Borrower Application Form requires applicants to certify that "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program."  On April 27, 2020, Treasury issued an interim final rule allowing seasonal borrowers to use an alternative base period for purposes of calculating the loan amount for which they are eligible under the PPP.  An applicant that is otherwise in compliance with applicable SBA requirements, and that complies with Treasury's interim final rule on seasonal workers, will be deemed eligible for a PPP loan under SBA rules.  Instead of following the instructions on page 3 of the Borrower Application Form for the time period for calculating average monthly payroll for seasonal businesses, an applicant may elect to use the time period in Treasury's interim final rule on seasonal workers.

42. **Question:**  Do nonprofit hospitals exempt from taxation under section 115 of the Internal Revenue Code qualify as "nonprofit organizations" under section 1102 of the CARES Act?

    **Answer:**  Section 1102 of the CARES Act defines the term "nonprofit organization" as "an organization that is described in section 501(c)(3) of the Internal Revenue Code of

---

[15] Questions 38 – 39 published April 29, 2020.

A00407

As of August 11, 2020

1986 and that is exempt from taxation under section 501(a) of such Code." The Administrator, in consultation with the Secretary of the Treasury, understands that nonprofit hospitals exempt from taxation under section 115 of the Internal Revenue Code are unique in that many such hospitals may meet the description set forth in section 501(c)(3) of the Internal Revenue Code to qualify for tax exemption under section 501(a), but have not sought to be recognized by the IRS as such because they are otherwise fully tax-exempt under a different provision of the Internal Revenue Code.

Accordingly, the Administrator will treat a nonprofit hospital exempt from taxation under section 115 of the Internal Revenue Code as meeting the definition of "nonprofit organization" under section 1102 of the CARES Act if the hospital reasonably determines, in a written record maintained by the hospital, that it is an organization described in section 501(c)(3) of the Internal Revenue Code and is therefore within a category of organization that is exempt from taxation under section 501(a).[16] The hospital's certification of eligibility on the Borrower Application Form cannot be made without this determination. This approach helps accomplish the statutory purpose of ensuring that a broad range of borrowers, including entities that are helping to lead the medical response to the ongoing pandemic, can benefit from the loans provided under the PPP.

This guidance is solely for purposes of qualification as a "nonprofit organization" under section 1102 of the CARES Act and related purposes of the CARES Act, and does not have any consequences for federal tax law purposes. Nonprofit hospitals should also review all other applicable eligibility criteria, including the *Interim Final Rules on Promissory Notes, Authorizations, Affiliation, and Eligibility* (April 28, 2020) regarding an important limitation on ownership by state or local governments. 85 FR 23450, 23451.[17]

43. **Question:** FAQ #31 reminded borrowers to review carefully the required certification on the Borrower Application Form that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." SBA guidance and regulations provide that any borrower who applied for a PPP loan prior to April 24, 2020 and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith. Is it possible for a borrower to obtain an extension of the May 7, 2020 repayment date?

**Answer:** SBA is extending the repayment date for this safe harbor to May 14, 2020. Borrowers do not need to apply for this extension. This extension will be promptly implemented through a revision to the SBA's interim final rule providing the safe harbor.

---

[16] This determination need not account for the ancillary conditions set forth in section 501(r) of the Internal Revenue Code and elsewhere associated with securing the tax exemption under that section. Section 501(r) states that a hospital organization shall not be treated as described in section 501(c)(3) unless it meets certain community health and other requirements. However, section 1102 of the CARES Act defines the term "nonprofit organization" solely by reference to section 501(c)(3), and section 501(r) does not amend section 501(c)(3). Therefore, for purposes of the PPP, the requirements of section 501(r) do not apply to the determination of whether an organization is "described in section 501(c)(3)."

[17] Questions 40 – 42 published May 3, 2020.

15

A00408

As of August 11, 2020

SBA intends to provide additional guidance on how it will review the certification prior to May 14, 2020.

44. **Question:** How do SBA's affiliation rules at 13 C.F.R. 121.301(f) apply with regard to counting the employees of foreign and U.S. affiliates?

**Answer:** For purposes of the PPP's 500 or fewer employee size standard, an applicant must count all of its employees and the employees of its U.S and foreign affiliates, absent a waiver of or an exception to the affiliation rules. 13 C.F.R. 121.301(f)(6). Business concerns seeking to qualify as a "small business concern" under section 3 of the Small Business Act (15 U.S.C. 632) on the basis of the employee-based size standard must do the same.[18]

45. **Question:** Is an employer that repays its PPP loan by the safe harbor deadline (May 18, 2020) eligible for the Employee Retention Credit?

**Answer:** Yes. An employer that applied for a PPP loan, received payment, and repays the loan by the safe harbor deadline (May 18, 2020) will be treated as though the employer had not received a covered loan under the PPP for purposes of the Employee Retention Credit. Therefore, the employer will be eligible for the credit if the employer is otherwise an eligible employer for purposes of the credit.[19]

46. **Question:** How will SBA review borrowers' required good-faith certification concerning the necessity of their loan request?

**Answer:** When submitting a PPP application, all borrowers must certify in good faith that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." SBA, in consultation with the Department of the Treasury, has determined that the following safe harbor will apply to SBA's review of PPP loans with respect to this issue: Any borrower that, together with its affiliates,[20] received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith.

SBA has determined that this safe harbor is appropriate because borrowers with loans below this threshold are generally less likely to have had access to adequate sources of liquidity in the current economic environment than borrowers that obtained larger loans. This safe harbor will also promote economic certainty as PPP borrowers with more limited resources endeavor to retain and rehire employees. In addition, given the large volume of PPP loans, this approach will enable SBA to conserve its finite audit

---

[18] Questions 43 – 44 published May 5, 2020.

[19] Question 45 published May 6, 2020; revised May 27, 2020 to change the date from "(May 14, 2020)" to "(May 18, 2020)."

[20] For purposes of this safe harbor, a borrower must include its affiliates to the extent required under the interim final rule on affiliates, 85 FR 20817 (April 15, 2020).

16

A00409

As of August 11, 2020

resources and focus its reviews on larger loans, where the compliance effort may yield higher returns.

Importantly, borrowers with loans greater than $2 million that do not satisfy this safe harbor may still have an adequate basis for making the required good-faith certification, based on their individual circumstances in light of the language of the certification and SBA guidance.  SBA has previously stated that all PPP loans in excess of $2 million, and other PPP loans as appropriate, will be subject to review by SBA for compliance with program requirements set forth in the PPP Interim Final Rules and in the Borrower Application Form.  If SBA determines in the course of its review that a borrower lacked an adequate basis for the required certification concerning the necessity of the loan request, SBA will seek repayment of the outstanding PPP loan balance and will inform the lender that the borrower is not eligible for loan forgiveness.  If the borrower repays the loan after receiving notification from SBA, SBA will not pursue administrative enforcement or referrals to other agencies based on its determination with respect to the certification concerning necessity of the loan request.  SBA's determination concerning the certification regarding the necessity of the loan request will not affect SBA's loan guarantee.

47. **uestion:**  An SBA interim final rule posted on May 8, 2020 provided that any borrower who applied for a PPP loan and repays the loan in full by May 14, 2020 will be deemed by SBA to have made the required certification concerning the necessity of the loan request in good faith.  Is it possible for a borrower to obtain an extension of the May 14, 2020 repayment date?

**Answer:**  Yes, SBA is extending the repayment date for this safe harbor to May 18, 2020, to give borrowers an opportunity to review and consider FAQ #46.  Borrowers do not need to apply for this extension.  This extension will be promptly implemented through a revision to the SBA's interim final rule providing the safe harbor.[21]

48. **uestion:**  What is the deadline for lenders to complete the initial SBA Form 1502 reporting process?

**Answer:**  SBA is extending the deadline for lenders to submit the initial SBA Form 1502.  Under SBA's interim final rule on disbursements, posted April 28, 2020, lenders must disburse PPP loans within 10 calendar days of loan approval; a loan is considered approved when the loan is assigned a loan number by SBA.  That interim final rule also provides that loans for which funds have not been disbursed because a borrower has not submitted required loan documentation within 20 calendar days of loan approval shall be cancelled by the lender.[22]  Previously, the deadline for lenders' submission of the initial SBA Form 1502 reporting information was May 22, 2020.[23]  SBA is extending the deadline for lenders to electronically upload the initial SBA Form 1502 reporting information to the later of: (1) May 29, 2020, or (2) 10 calendar days after disbursement

---

[21] Questions 46 – 47 published May 13, 2020.
[22] 85 FR 26321, 26322-23.
[23] 85 FR 29845, 29846.

17

A00410

As of August 11, 2020

or cancellation of the PPP loan.  This extension of the timeline for the initial SBA Form 1502 reporting information will be promptly implemented through revisions to SBA's interim final rules providing an extension to the certification safe harbor and the deadline for SBA Form 1502 reporting.[24]

49. □uestion:  What is the maturity date of a PPP loan?

    Answer:  If a PPP loan received an SBA loan number on or after June 5, 2020, the loan has a five-year maturity.  If a PPP loan received an SBA loan number before June 5, 2020, the loan has a two-year maturity, unless the borrower and lender mutually agree to extend the term of the loan to five years.  The promissory note for the PPP loan will state the term of the loan.[25]

50. □uestion:  What effect does the payment or nonpayment of fees of an agent or other third party have on SBA's guarantee of a PPP loan or SBA's payment of fees to lenders?

    Answer:  The payment or nonpayment of fees of an agent or other third party is not material to SBA's guarantee of a PPP loan or to SBA's payment of fees to lenders. Additional information about such fees can be found in paragraph III.4.c of the initial Paycheck Protection Program interim final rule (link).

51. □uestion:  Do payments required for the provision of group health care benefits, including insurance premiums, include vision and dental benefits?

    Answer:  Yes.[26]

---

[24] Question 48 published May 19, 2020.
[25] Question 49 published June 25, 2020.
[26] Questions 50 – 51 published August 11, 2020.

18

A00411